[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[MEMORANDUM OF DECISION]
This complex litigation[1] was instituted by a complaint, dated October 29, 1986 and returned to this court on November 14, 1986.
The plaintiffs' amended substituted complaint (hereinafter "complaint") is in four counts.
The first count alleges the following: The plaintiff Center Court Associates Limited Partnership (hereinafter "Center Court") is a Connecticut Limited Partnership and is engaged in the development of a mixed-use residential and commercial real estate project located at 126 Court Street, New Haven, Connecticut (hereinafter "Project"). The plaintiff Landmark Development Corporation of America (hereinafter "Landmark") is a Connecticut corporation and is a general partner of Center Court. The plaintiff John J. Burke, Jr. (hereinafter "Burke") of Menomonee Falls, Wisconsin, is a general partner of Center Court. The plaintiff Burke Properties, a Wisconsin corporation, is also a general partner of Center Court. The defendant, Maitland/Strauss/Behr, P.C. (hereinafter "MSB") was at all relevant times a Connecticut professional corporation with an office and principal place of business in Greenwich, Connecticut and was engaged in the practice of architecture in Connecticut. The individual defendants, Richard A. Maitland, Peter L. Strauss and Richard H. Behr (hereinafter referred to respectively as "Maitland", "Strauss" and "Behr"), all certified professional architects, were at all relevant times members and stockholders of MSB. CT Page 4793
Prior to October 10, 1985 and at all times since the incorporation of Landmark as a Connecticut corporation, Maitland, Strauss and Behr were the owners of 100 percent of the shares of all classes of authorized and outstanding stock in Landmark. While owned by Maitland, Strauss and Behr, Landmark acquired the exclusive option to purchase the premises at 126 Court Street in New Haven. On or about June 30, 1980, MSB, in pursuance of its intent to develop the Project, executed an agreement (hereinafter "1980 Contract") with Landmark to provide the complete architectural, structural, electrical, heating, ventilating, air conditioning, plumbing and landscaping design services (hereinafter "Complete Services") for the complete rehabilitation and construction of the Project and which Maitland, Strauss and Behr, acting on behalf of Landmark, as its sole stockholders, agreed to pay a total fee of $240,000.00 to MSB for the Complete Services. During the period prior to October 30, 1985, when Landmark was wholly owned by Maitland, Strauss and Behr, Landmark failed to exercise its option to complete the Project. The first count then goes on to allege that on October 30, 1985, Maitland, Strauss and Behr entered into a contract with Center Court (hereinafter "1985 Contract") pursuant to which they conveyed to Center Court all the authorized and outstanding shares of Landmark, Landmark's interest in the 1980 Contract and the architectural and engineering working drawings for construction of the Project.
In paragraph thirteen of the first count the plaintiffs allege that the services, plans and specifications which the defendants provided pursuant to the 1980 Contract and the 1985 Contract were inadequate and incomplete in a number of respects because of their failure to disclose "accurately" that 343 windows in the Project were filled with masonry which was "toothed" into the original masonry of the building's exterior walls prior to the installation of aluminum siding on the walls in 1955 as well as their failing to disclose or even warn of the possible presence of toxic asbestos insulation later found in a "friable" condition throughout the project including in easily accessible locations where it was clearly visible by casual observation. The plaintiffs, in this allegation also maintain that MSB failed to consult applicable state and local codes and standards prior to designing plans for the Project with the result that additional design and construction beyond that depicted in the plans and drawings provided by MSB were required to complete the Project, that MSB also failed to incorporate, draft or design various construction specifications required for the successful completion of the Project concerning requirements for certain specified aspects of the Project. CT Page 4794
The foregoing alleged errors and omissions, the plaintiffs allege in paragraphs fourteen and fifteen of the first count, constitute negligent acts by the defendants in their performance of the Complete Services as a result of which negligence, completion of the Project has been repeatedly delayed by the plaintiffs and as a further result they incurred and continue to incur substantial cost overruns and damages including consequential damages for delays in the construction of the Project.
The second count of the amended substituted complaint realleges all the allegations of the first count except paragraphs fourteen and fifteen of the first count but it does add a new allegation. That, in turn, alleges that as a result of Maitland's, Strauss' and Behr's failure to deliver complete architectural and engineering drawings for the construction of the Project pursuant to the 1985 Contract, Maitland, Strauss and Behr breached the 1985 Contract and the plaintiffs have suffered damages, including consequential damages for delays in the construction of the Project.
The third count, like the second count, realleges all the allegations of the first count except paragraphs fourteen and fifteen of the first count, but it also adds a new allegation. That new allegation is to the effect that as a result of MSB's failure to deliver the Compete [Complete] Services for construction of the Project pursuant to the 1980 Contract, MSB breached the 1980 Contract and the plaintiffs have suffered damages including consequential damages for delays in construction of the Project.
The fourth count, likewise, realleges the first thirteen paragraphs of the first count, but adds several new allegations. These are that Maitland, Strauss and Behr knew or should have known at the time they entered the 1985 Contract that the plans and specifications for construction of the Project provided pursuant to the 1980 Contract were inadequate and incomplete, but they "misrepresented" to the plaintiffs that the plans and specifications were complete; that such misrepresentation upon which they relied, was false and misleading and was made by the defendants, either knowingly, recklessly or negligently with an intent to induce the plaintiffs to rely on such misrepresentation and the defendants knew or should have known that the plaintiffs were relying thereon and that the plaintiffs relied upon such misrepresentation in agreeing to enter the 1985 Contract. It is further alleged that as a result of plaintiffs' reliance on the CT Page 4795 misrepresentations of Maitland, Strauss and Behr concerning the completeness of the plans and specifications delivered to the plaintiffs pursuant to the 1985 Contract the plaintiff suffered the following damages: (a) The difference between the actual cost to complete the Project and the anticipated cost to complete the Project based on the incomplete plans and specifications delivered to the plaintiff, (b) interest and expenses, and (c) lost rental.
The plaintiffs' prayers for relief claim compensatory damages, punitive damages, interest and such other and further relief as law and equity may provide.
The defendants, other than admitting that the corporate defendant MSB was a Connecticut professional corporation engaged in the practice of architecture in Connecticut having an office and principal place of business in Greenwich and that each of the individual defendants as certified professional architects were at all times relevant members and stockholders of the corporate defendant, in effect, deny all the other allegations of the four counts of the amended substituted complaint.
In addition, the defendants have pleaded eight special defenses with each specifically directed to each count of the complaint. The first and second special defenses which raised defenses of statute of limitations have been withdrawn while the ninth special defense which raised the issue of arbitration has, some time ago, been decided adversely to the defendants. Each of the remaining special defenses are directed to all counts of the amended substituted complaint.
The third special defense, in effect, alleges that any damages and losses sustained by the plaintiffs were the direct result of their own negligence and carelessness in failing to do certain matters alleged in this special defense such as failing to update the plans and specifications, to reasonably inspect the premises before undertaking the rehabilitation, to obtain a complete estimate of the costs of doing the work, to cause inspections to ascertain the presence of asbestos or other hazardous materials and in requiring its contractors to certify the nature of existing conditions prior to bidding or proceeding.
The fourth special defense maintains that the alleged damages were the result of the plaintiffs' own inaction in that they failed to inspect the premises even though they acquired the premises "as is" pursuant to § 8b of the 1985 Contract and even though the CT Page 4796 defendants specifically disclaimed any representation as to the acceptability of their design drawings pursuant to § 8b of the 1985 Contract.
In their fifth special defense, the defendants allege that all or part of the alleged damages resulted from, or were contributed to, by acts or omissions of third parties, including acts or omissions by the project manager, KM Development Corporation (hereinafter "KM"); the inspecting architects, Tudda, Scherer, Zborowski (hereinafter "TSZ"); and various subcontractors and consultants, including B T Contractors and SCS of Wisconsin, Inc. It is also alleged that these acts or omissions included such things as failure to fully investigate the condition of the building before working on it, failure to remove portion of the aluminum cladding before pricing construction to determine the condition of the bricked-up windows, failure to independently price the cost of rehabilitating the building in 1985-1986 dollars so as to make for a reasonable probability of completing the Project within budget, failure to maintain an adequate reserve on a project likely to exceed budget given the age of the building and the likelihood of unforeseen conditions such as those allegedly encountered by the plaintiffs, failure to perform work in an efficient and workmanlike manner and failure to heed information contained in the defendants' plans and specifications about the possibility of hidden conditions becoming exposed during construction and the need to fully inspect the building before working on it.
In their sixth special defense, it is alleged that all or part of the damages resulted from conditions which were unforeseeable and beyond their control including windows toothed into existing masonry; missing or broken windows, sills and lintels; general masonry repair work around window and door openings and the location of certain column enclosures, concrete mat slabs, a grade beam system below the existing floor slab, the size of various hidden window openings, hidden pipe chases and ceramic pipes buried in the walls.
The seventh special defense is to the effect that, under the terms of the 1985 Contract the plaintiffs waived any and all objections to the defendants' design drawings and/or design services.
The eighth special defense is one of estoppel. There it is alleged that in Section 4 of the 1985 Contract the plaintiffs CT Page 4797 acknowledged the defendants' satisfactory completion of the design work for the Project, upon which acknowledgement the defendants relied in entering upon the 1985 Contract.
In their tenth special defense the defendants allege that to the extent that additional work performed or additional equipment installed at the Project premises caused the value of the renovated premises to exceed the value of the premises had it been rehabilitated in accordance with the defendants' plans and specifications, then the plaintiffs have received a betterment and they must set-off the value of the betterment against any damages allegedly sustained by them.
The eleventh special defenses maintains that to permit the plaintiffs to recover from others the value of benefits received by them would constitute unjust enrichment of them in prohibition of the law.
The plaintiffs' reply denies each and everyone of the special defenses.
Before we turn to any of the facts found, it is appropriate here to point out that the court was presented with many serious questions of credibility in this case both from lay and expert witnesses. Certain general principles on that aspect of the case, which will be supplemented as occasion requires, may, therefore, be set out here. The trier of fact determines the credibility of all witnesses and the weight to be accorded their testimony and, where the evidence is conflicting, its probative force is for the trier to decide. [Robert Lawrence Associates, Inc. v. DelVecchio],178 Conn. 1, 145 (1979); [Steinman v. Maier,] 179 Conn. 574, 576 (1978). It may also draw reasonable inferences from the evidence. [Swift Co. v. Rexton Inc.], 187 Conn. 540, 542 (1982). The factfinder has "the unique opportunity to view the evidence in a totality of circumstances including its observations of the demeanor and conduct of the witnesses and the parties. . . ." [Sportsman's BoatingCorporation v. Hensky], 192 Conn. 747, 750 (1984), quoting from Kaplan v. Kaplan, 186 Conn. 387, 391 (1982); [Solomon v. Hall-BrookeFoundation, Inc.], 30 Conn. App. 136, 141 (1973). It may also consider the interest of any witness in determining credibility. [Buonano v. Cameron,] 131 Conn. 513, 515 (1945). Our Supreme Court has said that "It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct. Findings based upon these observations in the CT Page 4798 courtroom are in the same category as findings based upon a view of premises or property. Such evidence is as properly to be considered by the court in rendering its decision or making its finding as if presented by the lips of witnesses." [Dadio v. Dadio],123 Conn. 88, 93 (1937); [Auger v. Auger], 133 Conn. 211, 213-214
(1946). The trier may accept or reject the testimony of a witness, offered by one party or the other, expert or otherwise, in whole or in part. [Crest Plumbing Heating Co. v. DiLoreto], 12 Conn. App. 468,476 (1987); [Barrilla v. Blake], 190 Conn. 631, 639 (1983). Moreover, the trier is not bound by the uncontradicted testimony of any witness including experts. [Mather v. Griffin Hospital],207 Conn. 125, 145 (1988); [Bieluch v. Bieluch], 199 Conn. 550, 555
(1986); [Acheson v. White], 195 Conn. 211, 217 (1985). Uncontradicted testimony does not because it is uncontradicted become admitted or undisputed nor does the strength of a witness's belief raise it to that level. [Stanton v. Grigley], 177 Conn. 558,563 (1979).
Before developing our analysis of the issues to be resolved, it is appropriate to set out, by way of an overview, some of the background circumstances in this matter. Sometime in 1980 the potential for the redevelopment of the Southern New England Telephone Company (hereinafter "SNET") building at 126 Court Street in New Haven came to the attention of MSB through an advertisement brochure inviting developers to submit feasible rehabilitation proposals for the thirteen story SNET building at 126 Court Street. Because this building could no longer accommodate recent technological advances in telephonic equipment, the soliciting literature indicated that rather than demolish this building that development guidelines proposed a multiple re-use, incorporating residential and/or office space. This invitation to developers was made by the New Haven Downtown Council and the New Haven City Plan Department in cooperation with SNET. At that time MSB was not a developer and had not been developers before that time but had been for some time a firm of practicing architects. MSB indicated its interest in submitting a proposal for the re-use of this building, were encouraged to submit and ultimately did submit a proposal. On June 30, 1980 MSB as the architect and Landmark Development Corporation of America (hereinafter "Landmark"), a Connecticut Corporation of which Maitland, Strauss and Behr were the sole shareholders and officers, executed between themselves an agreement concerning the project at 126 Court Street in which, inter alia, MSB agreed to perform certain services for the project. This 1980 agreement included the following description of Project location and scope: CT Page 4799
 "Complete architectural, structural, electrical, HVAC, plumbing, and landscape design services for the complete rehabilitation and new construction of approximately 97,0000 sq. ft. of building known as 126 Court Street, New Haven, CT. Such services shall include field investigation of existing building, measured drawings, and other field research or building investigation as required."
Under this 1980 agreement Landmark as owner agreed to compensate MSB as the architect in the amount of $240,000.00 for such services by MSB. MSB won the competition and were selected as the developer. At that time MSB was not involved with any general contractor, including Peter Kapetan (hereinafter "Kapetan"), or his company, Kapetan Incorporated (hereinafter "Kapetan, Inc.").
Several circumstances concerning this thirteen story building at 126 Court Street at that time should be mentioned here to indicate the magnitude of the Center Court project. The existing building is bounded on the north by Court Street, and is made of brick for most of its exterior. It is the product of three separate stages of construction over the years. It was built in 1916 as a ten story L-shaped mid-block facility accessible through other low rise buildings. In 1926 the north side was extended two ways to Court Street. Two stories, an attic and elevator were added at that time. In about 1955 an aluminum skin or panels also known as "cladding' was added to much of the exterior to protect `the building from further moisture related deterioration as part of that 1955 modernization.
On July 6, 1983, there was a detailed transmission by Landmark to the Connecticut State Historical Commission (hereinafter "Historical Commission") for submission by the latter to the National Park Service of the United States Department of Interior looking to Historical Preservation Certification for this building and to ultimate financial tax benefits for the developer from the federal government. Landmark said among other things: "Landmark . . . proposes to remove the aluminum, and restore the exterior to its 1926 appearance." That transmission also said: "It should be especially noted that the present condition of the masonry is not known, and cannot be fully understood until the aluminum is removed. This represents a considerable risk to the developer and CT Page 4800 contractor. The nature of the Mortgage Insurance (HUD 220) requiring a no change order construction has forced us to include the masonry coating as a reasonable contingency, which will be deleted, if possible. . . ." That transmission also indicated that Center Court was to be composed of 74 (residential) apartments inserted into ten floors of existing construction, 2 stories of office space, 1 story of retail space on the ground level and that a three story addition would be incorporated for retail and commercial space.
As involvement in the project progressed it appeared that over the next several years the defendant Behr was the person who pretty much handled the financial aspects and the dealing with regulatory agencies on the local, state and national level. It also appeared that Maitland was the person who had the responsibility for the drawings and plans for the plans for the project. Strauss' active involvement in the project was much less than that of Behr and Maitland.
The evidence disclosed that the launching and shepherding of this project required numerous approvals to be obtained, financing to be secured, various time limits to be met and coordinated, costs and tax laws to be monitored, state and municipal codes and regulations to adhere to and the like. A House and Urban Department (hereinafter "HUD") mortgage had to be obtained and administered. An Urban Development Action Grant (hereinafter "UDAG") was to be sought for the project as part of the financing. UDAG was a program administered by the U.S. Department of Housing and Urban Development under which a private developer could, if approved, obtain low interest financing for a qualified project. Under it the federal government makes a grant to the city involved which in turn makes the money available to the developer who must later eventually repay the grant. On the New Haven city level such matters as parking, tax abatement, various code officials (including but not limited to the building inspector, electrical inspector, fire inspector) were part of the process. On the state level when a developer, as Landmark did in this case, applies for federal investment tax credits under the "Preservation Tax Incentives Program", application for the same must be made to Connecticut State Historical Commission which administers this program as a "pass through" for the National Park Service of the U.S. Department of the Interior. This Connecticut commission reviews applications, makes a recommendation to the National Park Service which has the authority to approve or disapprove such applications. CT Page 4801
Maitland had made on behalf of Landmark a full set of design drawings and plans for the project by May 6, 1983 which are in evidence as Exhibit H. There was also, finished by May 6, 1983, a very detailed set of specifications specifically written for this project which are in evidence as Exhibit G and are in excess of 300 pages. These are the plans and specifications ultimately sold under the October 30, 1985 Contract.
Sometime after Landmark was designated as the developer, Peter Kapetan having contacted the defendants started examining the project site to prepare an estimate for the cost of construction with the view of negotiating a contract with them to become the general contractor. He has been president, for some years, of his own general construction company Kapetan, Inc. At that time of trial, he had been in the general construction business for about forty years including primarily commercial, industrial and high-rise housing. He has done rehabilitation and historic restoration work prior to 1980 and still does that work. His company has built about 3000 units of elderly housing funded by HUD. Over the course of his involvement in the Center Court project his company submitted seven construction estimates to Landmark for this project. The first two predated May 6, 1983, the date of the first finished set of drawings and plans. However, he had had plans available to him from Landmark to assist in preparing his estimate during the compilation of which he and his people would, among other things, go through the entire building, obtain bids on major categories of work to be done, talk to subcontractors and search out whatever information they could to assist them. His two estimates, prior to May 6, 1983, were dated in February and April of that year and were respectively $4,188,214.00 and $4,737,973.00. The remaining five estimates, were dated in November 1983, January 1984, February 1984, November 1984 and February 1985 and were respectively $4,889,000.00, $4,788,700.00, $5,157,000.00, $5,338,000.00 and $5,785,000.00. In his company's last estimate, dated February 13, 1985, Kapetan noted that he recognized that the HUD contract for the project provided $5,338,000.00 for this project and that his estimate of $5,785,000.00 demonstrated a shortfall of $447,000.00. Indicating that his company was still receiving prices, he also enclosed with this estimate the ancillary agreement which would cover the difference between the actual Contract and the contract allowed by HUD. Kapetan testified at the trial. All these estimates of Kapetan were in detail and inquired into at length during the trial. His estimates included the masonry and concrete construction as well as the other major areas CT Page 4802 of construction involved in this project. The restoration work at the window locations on the building was a substantial portion of the demolition involved as was the masonry with regard to new window sills and the patching of window openings. On June 27, 1984, Kapetan wrote to Behr, pursuant to their telephone conversation of that date, that his firm had no further interest in participating as a general contractor on the project. Thereafter, however, Kapetan did submit two further estimates, those of November 1984 and February 1985. The November 1984 estimate, which was in detail, was the one given to Burke and Kiesl. In any event, Kapetan Inc. did not ever sign a contract with Landmark to build the Center Court project.
Early in 1985, and prior to April 1, 1985, one Robert Goldkamp of Boston, who was president of Boston Equity Investments Inc. (hereinafter "Boston Equity") contacted the defendants. Boston Equity is a company that finds and structures syndications for apartment projects for a fee. Boston Equity, through Goldkamp, was aware of the defendants' involvement in the Project including their interest in obtaining satisfactory financing for it. Actually Goldkamp himself had visited the site of the Project at 126 Court Street in New Haven before April 1, 1985. Boston Equity, among its services, offered syndication services for a fee to parties such as developers. In any event, Boston Equity over Goldkamp's signature as its president on April 1, 1985, wrote to defendants offering certain syndication proposals. Enclosed with that letter was a detailed agreement drafted by Boston Equity in which it indicated it would expire if not "executed by all parties and returned to Boston Equity by April 17, 1985"; that agreement provided for the signature of Boston Equity by Robert Goldkamp as President and each of the three individual defendants, i.e. Maitland, Strauss and Behr. This proposal sounded in terms of Boston Equity proposals to buy out the defendants by, in part, paying them $1,800,000.00 in development fees. When sent to the latter, this Goldkamp letter had not been signed by anyone on behalf of Boston Equity. This April 1, 1985 letter, enclosing the proposed agreement, in closing contained this statement: "Based upon our site visit, our review of preliminary architectural plans and our current financial analysis, we are very impressed with the marketability and future prospects for the Center Court project. We would be pleased to meet with you to discuss further each of the above alternatives at your earliest convenience." The defendants met with Goldkamp who impressed them as a very knowledgeable person, that his company had done a number of projects providing syndication for them and that Goldkamp was no "neophyte" in this type of project. The potential agreement CT Page 4803 enclosed in Goldkamp's April 1, 1985 was, however, never signed by any of the proposed signatories therein. This all took place before Burke entered this matter.
Thereafter, Goldkamp's role vis a vis the defendants, changed. The plaintiff John J. Burke, who was based in Milwaukee, Wisconsin, and who was an experienced developer, received a call from Goldkamp who inquired whether Burke (or his company) would be "interested in an opportunity that he [Goldkamp] had possibly uncovered in Connecticut." Burke (or his company) had earlier utilized Goldkamp and Boston Equity to syndicate "a few of our projects in Wisconsin." Burke expressed such an interest. Goldkamp thereafter contacted the defendants concerning Burke as a result of which on April 23, 1985, Burke and Robert Kiesl of KM Development Corporation (of Wisconsin) come to New Haven, met Richard Behr and Goldkamp at the project site at #126 Court and went through the building. Kiesl had a college degree in mechanical engineering and had been in the general construction business for many years. He was vice president of KM which did business in a number of states although it had never worked in Connecticut as of April 23, 1985. KM and Kiesl had worked in the past on various projects for Burke including the conversion of a former girls' high school in Milwaukee and that of a vacant hospital in Sheboygan, both in Wisconsin. Kiesl had also worked with Burke on other projects.
Before, however, going into more detail of the April 23, 1985 site visit, it is appropriate to go into some of Burke's background as of that time. After graduation from college Burke attended Marquette University Law School for two years although he did not become a member of the bar. He entered residential real estate in 1965 and started his own residential real estate firm in 1967. In 1969 he entered the development business and began developing apartment complexes around the state of Wisconsin and he did so through the Seventies. In 1981 he was elected to the board of the National Center for Housing Management, which is a private nonprofit company headquartered in Washington, D.C. That group was set up by Presidential Order in 1973 to deal with issues of training in subsidized housing. That organization, of which he is presently the chair, a member of the board of directors and for which he has an office in Washington, D.C. continues to certify about 5000 housing managers a year.
Burke continues to develop real estate. Prior to the Center Court development he had been quite involved in three projects for the conversion of older buildings for new uses. In 1976 after CT Page 4804 buying an old Catholic girl's high school in Milwaukee there was a conversion of that 1929 four story building on a couple of acres of land into 104 elderly subsidized housing units. That was about a two million dollar conversion with about a million and a half dollar syndication of equity into that project. Burke first met Goldkamp in 1976 when the latter worked for a company called Real Estate Resources which was the company that syndicated this Milwaukee high school conversion project for the Burke interests and Burke has worked with Goldkamp on three or four other syndications after that. Next, the Burke interests purchased a vacant hospital building in Sheboygan, Wisconsin which was a 200,000 square foot building five stories high on a full city block. This building, which also had four or five elevators, was converted into one hundred units of elderly housing. The original building in Sheboygan was dated about 1870 and had a series of additions with the last in 1954. This conversion also included the tearing down of about one-third of it with the other two-thirds comprising the elderly housing as well as office space. This Sheboygan conversion involved about a two and a half million dollar mortgage "on top of about a two and a half million dollar equity investment." In 1983 the Burke interests converted the old Blatz Brewing Company's administrative office building, built in 1895, into a restaurant dining establishment. The Blatz historical preservation tax application for which the Burke interests paid the consultant who prepared it the sum of $5,000.00, was read by Burke because, he said, he was paying for it. Parenthetically, the Burke interests also paid for the Historical Preservation application in the present case but he said that he did not read it.
In Burke's referring to the syndication of a project he said that that means the actual sale of limited partnership interests that have been created as a way of selling equity in a project and, in doing so, a limited partnership would be created. Then they themselves would sell those interests on an exempt basis or they would hire a company to market those shares to the public in a private placement manner. Prior to the Center Court project Burke had been involved in about seventeen projects that had been syndicated ranging from the smallest being a twenty-four unit elderly project in Chilton, Wisconsin for about $800,000.00 to the largest being the hospital conversion in Sheboygan, Wisconsin, above referred to, which was a $5,000,000.00 transaction. He has also developed projects in Florida and Georgia. In addition, he has done another nine or ten projects throughout Wisconsin that were not syndicated. CT Page 4805
Starting in 1970, Burke worked on projects that were either insured or financed by HUD when it was a guaranty by HUD to guarantee a mortgage as basically a mortgage insurance policy granted by the federal government. Prior to the Center Court project Burke has been involved in probably a dozen HUD and/or Wisconsin State Housing Finance Agency projects. This Wisconsin state agency is similar to HUD but operated by the state.
Returning to Goldkamp's role after April 15, 1985 when Boston Equity's deadline to sign their proposed agreement had come and gone without the execution of that proposal, Goldkamp's role, as noted, changed. Shortly thereafter Goldkamp came to New Haven on April 23, 1985, met with Burke, Kiesl and Behr at the project site. Where they went in the building, what was said or indicated and by and to whom and other circumstances of that visit presented serious conflicts in the evidence at the trial. Burke and Behr appeared and testified about this at the trial, Kiesl's (now deceased) deposition was entered into evidence and Goldkamp did not appear and testify at the trial. There was no evidence Goldkamp was available and no adverse inference is taken for his not testifying. See [Secondino v. New Haven Gas Co.], 147 Conn. 672 (1960).
On April 23, 1985, the four went into the building. It was not lit and the elevators were not operating. At that time Burke was not aware that a short time earlier Goldkamp had made an offer to purchase the defendants' interest in this project. Burke, Goldkamp and Behr walked all the way up to the top and viewed the city and harbor. Kiesl, who was not feeling well, only walked up five floors. After seeing the "representative" floor on the first five levels Kiesl had seen enough, according to him, to tell him the condition of the building. Kiesl and Burke were not at that point looking to make "quantity take-off" for estimating purposes. Kiesl was the one who raised the technical questions concerning the building although Burke also asked some questions. Burke opined that the building which was of "poured concrete reinforced" was "very substantial, very solid." The discussions that took place during this site visit, which visit itself lasted only between twenty-five minutes and forty-five minutes, centered around the condition of the slabs, what was going to happen to those, which would have loft apartments, the exterior of the building which was largely although not entirely covered with the siding, i.e. the aluminum cladding which had been applied in panels during the 1950's, the condition of the elevators, the responsibility for removing the equipment found on several of the lower floors and "things along those lines" The matter of the presence of asbestos CT Page 4806 in the building also came up according to Burke.
As to the elevators, which were to be revised, Behr said at that time that he did not know how much work that would entail, but did say that they had had the elevator manufacturer in and that that manufacturer had "come up with a package that is in the specification for you [Kiesl] to bid." Behr suggested to Kiesl that the latter contact Otis Elevator which was later done.
On the matter of the exterior of the building Behr told Kiesl that the window openings had been filled in with brick at the time the aluminum cladding had been put on where the windows had been filled with brick on the exterior, but the bricks were not visible from the interior of those openings as there they had been filled with plaster. Behr did not assure anyone at that time, despite claims by the plaintiffs to the contrary that "the building is in good condition, very little work will have to be done, and they took care when they look out the windows so you won't have a lot of patching to do." Nor did he assure anyone at that time when the windows were taken out and the window openings were closed up at the time of the cladding installation that "at that particular time that there was very little damage done to either the exterior brickwork or to the jambs or to the window openings." In addition, Behr did not tell anyone at that time including Burke that when window openings were closed at the time of cladding that "they had just taken brick and lined it up and filled in the window [so that] upon demolition, all that would have to be done at that time, would be to pull those bricks out of the window. Just push them out, or pull them back into the building as the case maybe. And you would then end up with the original building jamb that was built, . . . on the original building. In the twenties." Behr did, at that time, say that bricks had been used in the closing of window openings and that there might be some damage to some of the sills and that there "may be `some sills missing'". Nor did Behr say that there was no "significant" amount of damage to the sills at the time the bricks were "installed". Not all the windows on the building were bricked up on April 23, 1985, according to Burke, as on direct examination he said "of the three hundred and something windows in the building, probably two hundred and fifty of them were bricked up." When pressed on cross-examination as to how many windows were not filled in with brick when he purchased the project Burke said "he would guess maybe fifty." In any event, even on his own testimony certainly not all the existing windows were bricked up. The aluminum cladding, which Burke noted were in panels, he first said started "probably about the third floor" but later said it started CT Page 4807 at the "second floor."
Upon the end of the site visit of April 23, 1985, Behr left the other three and went to his class at the Yale School of Architecture where he had taught a variety of courses. Burke, Kiesl and Goldkamp, however, drove to the offices of MSB in Greenwich where they remained for a short time. Burke indicated that "they" liked the building and the area. They asked MSB for a copy of the schedule of values on the building, were told that one would be sent to them in Milwaukee and this was later done. A schedule of values is a HUD Form 2328, (hereinafter "Form 2328"), which gives HUD a detailed breakdown of the categories of work that are necessary on a project, new or rehab. It is one of the first documents one submits to HUD when an application is made for HUD mortgage insurance. HUD uses that form and the numbers put on it by an applicant as the basis for its analysis of the mortgage they may be willing to make on a given project. It is also the particular project's construction cost breakdown and it is the schedule of values from which draw requests are made to get payment for doing the work on the project. The Form 2328 forwarded to Kiesl and available to Burke, was one signed by Peter Kapetan as President of Kapetan Inc. and was dated November 5, 1984. It was eight pages long. Certain plans were also forwarded by MSB.
Thereafter, Burke and Kiesl in Milwaukee, based on information they had from the defendants, got together with Goldkamp. The latter was "kind of acting as the intermediary." They "crafted a preliminary type offer, basically outlining a structure under which we would be interested in proceeding." Shortly, thereafter, a letter dated May 7, 1985, on the letterhead of Boston Equity Investments signed by Goldkamp as its president with copies to Kiesl and Burke was sent to the defendants. The stated purpose of it was to advise the defendants "of the interest of our firm and Mr. John J. Burke, Jr. in purchasing the stock of the Landmark Development Corporation which presently holds right and title to the Center Court in New Haven, Connecticut." It further stated that assuming defendants' agreement to the terms set out or to the mutually satisfactory alternatives ". . . we are prepared immediately to enter into a binding Purchase and Sale Agreement with you and to conclude the transaction promptly." The proposed purchase price for the Landmark stock was $1,100,000.00. It also said that "based on KM Development Corporation's review of the job to date, they estimate a potential cost overage of approximately $330,000.00. I have included for your information a listing and brief description of the items which Bob Kiesl of KM Development believes may CT Page 4808 constitute this potential overage." Parenthetically, there is no credible evidence to indicate that Kiesl or anyone from KM had been to the project site between the April 23, 1985 site visit and the Goldkamp letter of May 7, 1985. This letter closed with the statement "We are prepared to proceed with the purchasing transaction immediately" and that the drafting of a Purchase and Sales Agreement was hopefully anticipated.
Thereafter, Burke requested certain information from Maitland. A meeting was then held in Greenwich which was attended by Burke, Maitland, Kiesl, Kapetan, Kapetan's chief estimator John Noble, as well as James Theusch, later KM's project manager at the Center Court project and a representative of Legnos Cramer who were mechanical and electrical engineering consultants to the defendants. At that meeting Kiesl went over estimates and drawings. Kiesl and Kapetan at that time withdrew from this central meeting to hold a meeting between themselves involving Kapetan's backup information for his estimating. Kapetan had already been told by the defendants that they had no problem with Kapetan's sharing such information with Kiesl.
After that meeting Burke wrote Maitland by letter dated June 4, 1985. That letter indicated that while Kapetan was very helpful at that meeting, he was unwilling to share his actual work papers with Kiesl. It also said that "we are willing to enter into an agreement for the purchase of the Landmark stock subject to these outstanding conditions [stated in this letter] and those articulated in Bob Goldkamp's letter to you and would appreciate you sending us your draft of this agreement." Burke, it is fair to say, had also been inquiring, on his own, concerning the HUD and UDAG status of the project. This is so because in the June 4, 1993 letter to Maitland he says: "We are sorry for any confusion that may have resulted from our efforts to determine the status of the UDAG Amendment and will not initiate any further communications with HUD without your prior approval." Burke had also met the witness Kathleen Etkin, an employee of the City of New Haven who had acted as project manager for the City on Center Court since the fall of 1982 and met with her on a number of occasions both before and after he purchased the Center Court project. Her areas of interest there included the UDAG grant, tax abatement agreements, parking agreements and the like and Burke met with her concerning the status of the financing and various agreements.
On June 26, 1985, Burke wrote Maitland again. It would appear that some discussions had occurred and Burke, in this letter, CT Page 4809 suggested an "approach" he felt would be helpful. He, however, expressed his concern that while he appreciated that the defendants were "trying to make the best deal possible for yourselves" he was "becoming increasingly concerned about the shortness of the time to put a deal together", that they "were fast approaching the point at which closing within the prescribed period is going to become an impossibility" and that "if our agreement is not complete by the week of July 10th it may be too late to save the deal." On the defendants' side, they were having ongoing discussions concerning the financing of the project which they did not want to disrupt or derail or stop pending any firm understanding being reached with Burke. Although they talked with Burke after Goldkamp's May 7, 1985 letter they "were not seeking other people in other deals."
Between the time Goldkamp's May 7, 1985 letter arrived and August 8, 1985 when the preliminary agreement was signed with Burke the defendants the latter did not jettison financing options and discussions that were under way because they believed prudent business procedure did not indicate doing so as they had no agreement even in principle, with the Burke interests, including Goldkamp.
Not only was Goldkamp in touch with the owners and architects, i.e. Maitland, Strauss and Behr but so was Burke. Kiesl said Burke was "having conversations" with these people "through the months of April, May, June, July and into August (1985)." In August Burke notified Kiesl that he thought that he was very close to signing a contract with them and that "we should start our bidding process to update the bids and to figure out exactly where we were going on the project." In addition Burke on his own had already been making inquiries of the City of New Haven to update the status of the financing and the agreements concerning this project.
In any event, on August 8, 1985, a "Preliminary Purchase and Sale Agreement" was signed between Burke, on the one hand as the buyer, and Maitland, Strauss and Behr on the other, as the sellers. Each of the four executed it in their individual capacities. It provided for, inter alia, the purchase of all the stock of Landmark together with all of the Landmark's interest in the "Transfer Documents" which were therein defined, title to the subject building, the purchase price, etc. This nine page agreement also provided for a closing date of September 22, 1985, HUD approval, syndication, grant of buyer's access to and inspection of the project itself and of Landmark's books, records, financial statements, tax returns, sellers' representations, warranties and CT Page 4810 agreements. The buyer's indemnity agreement running to the sellers was also included.
The October 30, 1985 agreement was longer and in some respects different from that of August 8, 1985. For the purpose of acquiring this project John J. Burke, Jr. had formed Center Court Associates Limited Partnership of which he was then general partner. The October 30, 1985 agreement, however, in its final section captioned "Prior Agreements" provided: "This Agreement replaces and supersedes in its entirety that certain Purchase and Sale Agreement among the parties dated as of August 8, 1985." We will return below to both the August 8, 1985 and October 31, 1985 agreements.
Although Burke had indicated to Kiesl early in August that he was close to signing a contract with the defendants and that Kiesl should start to update the bids and get new bids, it was not until August 20, 1985 that Kiesl and two other people from KM came to New Haven to work on this. On that date Kiesl came to Connecticut with James Theusch and Tom Chapizio.
Prior to going to the project site on this August 20, 1985 visit, Kiesl, Theusch and Chapizio stopped in Greenwich at the defendants' architecture offices and picked up a number of sets of the drawings (which consisted of 54 pages per set) and of the specifications. They had earlier contacted the defendants requesting they be made available to them as they intended to pass them out to potential subcontractors who might want to bid on certain aspects of the projects. They had not, however, prior to this visit, made any appointments with or contacted any potential subcontractors. For that matter, prior to this project, KM had never worked on any project in Connecticut. The three then went to the project site and did a walk through the interior of the building which took "one hour to one and a half hours." One of the things they wanted to do was to set up a staging area from which copies of the plans and specification could be distributed to potential subcontractors for bid purposes. Kiesl did not visit the site after the first day, i.e. August 20, 1985. They also visited the New Haven area offices of the Associated General Contractors, a national organization of which KM was a member "which can be of help when you're working in areas where you're not as familiar as maybe other ares [areas]." They also visited Peter Kapetan at his offices in Orange "for approximately one hour". Aware of Kapetan's involvement in the project they hoped to obtain from him certain information concerning, particularly, any bids he had from CT Page 4811 subcontractors as well as their identity, keeping in mind that Kiesl, as well as Burke himself, already had a copy of the project Kapetan's HUD contractor's Cost Breakdown, dated November 5, 1984 which was in the amount of $5,338,000.00 (without factoring in a separate agreement). This Kapetan breakdown was on the FHA (HUD) Form #2328 and contained Kapetan's individual cost estimates in dollars of some thirty odd items on this project including such items as concrete, masonry, demolition, restoration, windows, dry wall, elevators, plumbing and electrical. They did not ever get the information they wanted from Kapetan as it appeared Kapetan was interested in a fee and/or some compensation for such information. In addition to the one and a half hours Theusch spent through and examining the project building on August 20, he spent "maybe an hour" more going through the building during their August 1985 visit. During this visit they began contacting, from their hotel room and using the telephone book, potential subcontractors and, as a result, some came to the staging area. After this first visit, Theusch's impression was that "it was going to be a strong challenge" and "it appeared it was going to be not an easy project."
Kiesl was personally involved in the cost estimating of the Center Court project. In making his ultimate cost estimate he relied on the plans and specifications (Exhibits G and H) furnished to him by the defendants. Although he had Kapetan's 2328 cost estimate of November 5, 1984 he said that he "worked with it", but that he "did not rely on it". He maintained that he "used it as a guide to tell [him] whether [he] thought the project was or was not feasible, but [he] wouldn't rely on anybody else's estimate." In August 1985 he informed Burke orally that he had come to the "conclusion that [he] could not build the project for the $5,338,000.00 [which was the approved HUD figure.]" Rather, Kiesl's estimate in August 1985 was in the amount of $5,638,000.00. Burke, however, had known as far back as May 7, 1985 that the defendants had had a HUD commitment in the amount of $5,338,000.00 as well as knowing, as of that date, that Kapetan had informed the defendants that he felt that he could not complete the project within that amount. In any event, after Kiesl's estimate of $5,638,000.00 a contract was submitted on behalf of Burke's interests in the amount of the Kiesl estimate, i.e. $5,638,000.00 but the HUD office in Hartford, Connecticut "would not allow that contract to go through because HUD was only going to insure the Center Court project for $5,338,000." KM however, when it entered into its September 4, 1985 Contract with Center Court, also entered into a separate agreement with Burke for the $300,000.00. Burke CT Page 4812 indicated that he could get that $300,000.00 from the UDAG grant of $1,100,000.00.
On September 4, 1985, a "Construction Contract Cost Plan" contract was signed by KM Development Corp. (KM), called the "Contractor", and Center Court Associates, a Connecticut Limited Partnership, called the "Owner". This contract, in Article I, which was on a HUD form provided inter alia that "B. The Contractor shall furnish all of the materials and perform all of the work . . . shown on, and in accordance with, the Drawings and Specifications entitled Center Court HUD Project No. 017-32025, dated 5/6/83, with Revision 5/11/83 11/8/84. C. The drawings which are Numbered See Exhibit A [which in turn cite "Plans dated 5/7/83 and revised 11/8/84] and the Specifications, the pages of which are numbered. See Exhibit A [which in turn refers to Specifications Dated May 6, 1983], both of which are stated to have been prepared by "Maitland, Strauss Behr, Architects P.C. "`Design Architect'". This contract was signed for KM Development Corp. by Robert J. Kiesl as President and for Center Court Associates, a CT Ltd. Partnership, by John J. Burke. Two witnesses signatures appear on this contract one of which is James C. Theusch, who was project manager on the Center Court project.
This contract also provided in Article 3(A)(1)(b) that, "subject to the provisions hereinafter set out, the Owner shall pay to the Contractor for the performance of this contract, the following items in cash. . . . In no event, however, shall the total cash payable pursuant to this paragraph (1) [Article 3] exceed $5,338,000.00. (See Page Three). Further, this contract provides that the Architect `administering' this Construction Contract is to be Tudda, Scherer Zborowski, 210 East 52nd Street, New York, N Y" On the same day, i.e. September 4, 1985, the same parties with Kiesl acting for KM and Burke for Center Court Associates, Center Court signed another agreement whereby Center Court agreed to pay KM, related to this construction, a construction fee of $718,300.00. This side argument as to the $718,000.00 referred to that sum as "a builder's profit or fee . . . for the performance of the Construction Contract" and it provides how and when it was to be paid. It should be noted that prior to September 4, 1985, when KM signed this contract with Center Court, that Theusch, the project manager not only did not have the bid on the proposed demolition work on the project, but also could not recall which subcontracts or which trade areas upon which KM had firm bids on as of that date. He, however, knew there were areas other than demolition that "involved substantial portions of the work on the project for CT Page 4813 which KM did not have firm subcontractor bids prior to September 4, 1985." When questioned at the trial that given these circumstances how was it then that KM entered into a firm contract with Center Court Associates on September 4, 1985, to this inquiry he simply answered "I don't know."
In any event, on October 30, 1985, Center Court Associates, Limited Partnership, acting by John J. Burke, Jr., General Partner as the buyer and Richard A. Maitland, Peter L. Strauss and Richard H. Behr (each of these three acting as individuals) as the sellers signed a Purchase, Sales and Transfer Agreement. This Contract, the interpretation and meaning of various sections of which is vigorously debated, provides for the transfer of the seller's entire interest in the stock of Landmark which includes Landmark's interest in the "transfer documents" (as those were therein described) and title to the building at 126 Court Street. It also contains various other agreements, conditions and circumstances of this contract including architectural services, syndication, buyer's access to and inspection of the property, condition of the property and assumption of liabilities and responsibilities (including an "as is" proviso), representations, the application of representations, warranties and agreements, etc. While this October 30, 1985 agreement has certain similarities to the agreement of August 8, 1986 it is not the same. The October 1985 agreement, as noted, contains a section entitled "Prior Agreements" which clearly provides in part: "This Agreement replaces and supersedes in its entirety that certain Purchase and Sale Agreement among the parties dated as of August 8, 1985. . . ." The impact of the October 1985 agreement plays a significant part in this case.
Before examining the October 1985 Contract as well as the agreement of August 8, 1985 when that may be relevant, we set out certain general principles concerning the construction of contracts. A contract is to be construed as a whole and all relevant provisions will be considered together. [Lar-Rob BusCorporation v. Fairfield], 170 Conn. 397, 407 (1976). In doing so each part must be given effect if possible. [Sturtevant v.Sturtevant], 146 Conn. 644, 648 (1959). In giving meaning to the terms of a contract, it must be construed to give meaning to the intent of the contracting parties. [Barnard v. Barnard], 214 Conn. 99,109 (1990). However, in ascertaining intent the court considers not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish and the intent of the parties to the contract is to be determined from CT Page 4814 the language used interpreted in the light of the circumstances connected with the transaction and the question is not what intention existed in the minds of the parties but what intention is expressed in the language used. [Barnard v. Barnard], 214 Conn. 99,109-110 (1990). This is so when the parties have a written agreement. [Sturman v. Socha], supra, 10. In interpreting contract terms, it has been repeatedly said that "the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the contract must be accorded its common, natural and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." [Sturman v. Socha], supra, 10; [Sturtevant v. Sturtevant], supra, 647-648. If the terms of a contract are fairly susceptible of two or more interpretations, the one which is the more equitable, reasonable and rational is to be preferred. [Lanna v. Greene], 175 Conn. 453,458-459 (1978). It is an accepted principle that whenever two interpretations of a contract provision seems equally possible, it is to be construed against the one who drew it. [Rayvitch v.Stollman Poultry Farms, Inc.], 165 Conn. 135, 146 (1973); [Dorne v.Williams], 140 Conn. 193, 200 (1953). "Where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and give both effect. 3 Corbin on Contracts § 547 at 172-173 (1960). . . ." [Proyectin DeVenezuela v.Banco Industrial], 760 F.2d 390, 395-396 (2d Cir. 1984); see also [McKeown Distributors, Inc. v. Gyp-Crete Corp.], 618 F. Sup. 632, 640
(D.Ct. 1985).
Initially, with reference to the October 1985 Contract there appears to be some claim by the plaintiffs that the defendants drew this Contract. This is not in fact so. For some time prior to its signing on October 30, 1985 it is evident that both parties were represented by counsel concerning the drafting of what turned out to be that Contract. Moreover, the credible evidence demonstrated that counsel for both had reviewed and revised it but also that certain significant provisions and language was included as the result of negotiations. Neither the buyers or the sellers (or their counsel) can be found to have drawn this Contract as finally executed. It was negotiated and as Burke said there was a delay because it was negotiated. The final version of the October 1985 Contract was that transmitted by Burke's counsel to counsel for the defendants.
We now examine the October 1985 Contract with reference to the plaintiff's claim that it does not, as the defendants do claim, absolve the defendants from responsibility. The plaintiffs claim CT Page 4815 that the plans and specifications which they purchased were not complete as that Contract requires them for the construction of the project and, under the law and the evidence, demonstrates their breach of the October 1985 Contract. This failure to deliver such complete plans and specifications also involves claims by the plaintiff of the negligence of the defendants concerning these plans and specifications in addition to breach of contract claims.
In resisting the plaintiff's claim under this Contract the defendants refer to the fourth, seventh and eighth defenses which they say are based on key provisions of this Contract. In doing so, they point to several contract provisions. They refer to §§ 1(b), 8(a), 8(b) and 10. The plaintiffs argue as to the "first count, the negligence claims, there has been no waiver of that claim, as Section 4 of the 1985 agreement", they argue, "clearly retains the plaintiffs' right to pursue the defendants." Here the plaintiffs point to the language of § 4 which provides: "Without limiting any liability which MSB may have for any negligence in the preparation of plans and specifications, the Buyer acknowledges that all work required by MSB for design services has been satisfactorily completed." This language, which Burke testified that he said he insisted upon being included, the plaintiffs contend preserves their right to proceed, as they do in the first count against the defendants in negligence concerning the plans and specifications. The defendants maintain that there has been a waiver of "their [plaintiffs] rights to object to the adequacy of the working plans and specifications" and refer to the waiver language which appears in § 1(b). The defendants quote from that section the following: "Sellers make no representation as to the present enforceability or acceptability of any of the Transfer Documents and any changes which the Buyer may require to be made to transfer documents in an attempt to render such satisfactory . . . shall be undertaken by the Buyer. Furthermore, upon payment to the Seller on the Closing Date of all sums due and payable on such date, any and all objections which Buyer may have to the transfer documents shall be deemed waived." In addition, they also refer to § 8(a) from which they quote the following: "Buyer and Buyer's agents and representatives shall have the right to access to the Project at all reasonable times to inspect the Project generally, and in particular, without limiting the generality of the foregoing, to inspect the physical condition thereof, to take measurements and prepare plans, and to inspect the books, records, financial statements and tax returns of Landmark to verify the truth and accuracy of the representations set forth in Section 9 hereof." Parenthetically, we note two matters here: CT Page 4816 First, Section 9 fairly read which is captioned "Seller's Representations" contains no representations about the plans and specifications. Second, this 1985 agreement in Section D of its preamble as to "Project" refers to that term in this language: "Landmark presently owns the building, subject to a right of reversion in Southern New England Telephone Company ("SNET"), and holds the right to acquire the land, located at 126 Court Street, New Haven, Connecticut (collectively, the "Project") together with various documents and agreements related and necessary to the development of the Project. . . ." (Parentheticals in original.)
Continuing, the defendants cite to § 8(b), the so-called "as is" provision, which provides: "Sellers make no representations as to the physical condition of the Project and Buyer shall acquire the same on behalf of Landmark `as is', including subject to any `notices of violation' for similar claims."
Finally, the defendants refer to that portion of § 10 which provides: "Buyers agree that he shall indemnify, defending (using attorneys subject to Sellers' reasonable approval) and will hold Sellers harmless against any liability arising out of any act or action undertaken by Buyer or allowed to be undertaken by Buyer with respect to the Project or the Transfer Documents prior to the Closing Date and all causes of action arising with respect to this Project or the Transfer Documents subsequent to the Closing Date, except causes of action relating to architectural design services described in Section 4 of this Agreement."
Taking these cited provisions and keeping in mind defendants' claim that they go to this fourth, seventh and eighth special defenses (each of which are interposed to all counts), defendants maintain that taking these Contract provisions together that the plaintiffs "(1) acquired the project `as is' with no representations about its condition or the ease with which the work could be performed, (2) waived their right to object to the adequacy of the working plans and specifications and (3) acknowledged after careful review and full access to the building and all background information that all design work required of M/S/B Architects was satisfactorily completed."
The defendants argue that the plaintiffs have, in this Contract, waived their rights to object to the adequacy of the plans and specifications prepared. In support of that claim they point to the quoted language of § 1(b) while only noting in passing the quoted language of § 4 inserted by Burke. We consider this in CT Page 4817 the light of the whole Contract including the plaintiffs' argument that § 1(b) does not support any claim that that language "constitutes an express disclaimer of any representations as to the usefulness of the architectural and engineering working drawings providing the plaintiffs under the contract." The provisions of § 1(b) set out what constitutes the "Transfer Documents", one part of which, as stated in § 1(b)(vii) are "Complete architectural and engineering working drawings for construction on the Project." It is beyond dispute that this refers to the undertaking between Landmark and Maitland/Strauss/Behr P.C. in their June 30, 1980 Contract (the plans and specifications of which were in final form sometime but well before the October 30, 1985 Contract). The defendants' waiver or "disclaimer" claim cannot have the effect they claim for it, particularly and significantly because of the quoted language of § 4 which speaks deliberately, specifically and clearly in terms of reservation by the Buyer of any rights to proceed in negligence against MSB ". . . in the preparation plans and specifications. . . ." This conclusion comports with the authority already cited. In addition see [Miller Brothers Construction Co. v.Maryland Casualty Co.], 113 Conn. 504, 514 (1931); [Panwitz v. MillerFarm-Home Oil Service], 422 N.W.2d 63, 66 (Neb. 1988); 3A Corbin, Corbin on Contracts § 547 at 176 (2d Ed. 1960); 17A C.J.S. Contracts § 313.
At this point we turn to the waiver issue specifically. The plaintiffs contend that there has been no waiver by them under the Contract. They argue that, despite the Contract references on that by the defendants that the latter has not, considering the Contract as a whole, accorded the quoted language of § 4 the telling significance to which it is entitled as to plaintiffs' reservation on negligence in the preparation of plans and negligence. The court agrees here with the plaintiffs.
Finally, the defendants argue that taking the quoted portions of Section 4 and 10 together do not constitute a reservation by the buyer to themselves the right to later assert "a direct negligence claim" against the sellers. Rather, they claim that the buyers were not reserving a direct negligence claim against the sellers but the buyers were seeking protection against potential third-party claims relating to the architectural drawings. Thus the defendants say this "limited exception was carved out for third party claims" and this exception was expressed as a refusal in section 4 to limit any liability which MSB may have for any negligence in the preparation of plans and specifications and in section 10 as a limit on the buyers' obligation to indemnify the CT Page 4818 seller for contingent claims. This construction is quite strained and cannot stand after a consideration of the entire Contract. The "except" clause in § 10 clearly related to the reservation to sue in negligence in section 4 and supports, we submit, the conclusion that the buyer, under this entire Contract, reserved the right to see for negligence as set out in Section 4. No waiver or disclaimer of the plaintiffs to assert a professional negligence claim against the defendants is found.
Considering the Contract as a whole, the buyer effectively reserved any such rights on negligence as against the sellers, the individual defendants, i.e. Maitland, Strauss and Behr. Nor does the balance of the quoted portion of § 4 require a contrary conclusion. There, the buyer's acknowledgment ". . . that all work . . . to the [Project] has been satisfactorily completed" cannot be said to control or dilute the clear language "without liability . . . negligence . . . of plans and specifications" that precedes it in the same sentence. (underling added). Included also in this determination is that the defendants also have not proven, on the law and credible evidence that they relied on the plaintiffs' "acknowledgment" in § 4 of their "satisfactory completion" of the designs work as they allege in their eighth special defense in entering the 1985 Contract.
Continuing, some mention should be made at this point concerning the parties' views as to the "as is" provision of § 8(b). That section follows § 8(a) already referred to which gave the buyer and his agents "the right to access the Project . . . to inspect the Project generally . . . to inspect the physical condition thereof, to take measurements and prepare plans . . . `as well as'. . . to inspect their books, records, financial statements and tax returns of Landmark. . . ." This right of access is verbatim the right given in the preliminary agreement of August 8, 1985. The "as is" provision in § 8(b) which provides "Sellers make no representations as to the physical condition of the Project and the Buyer shall acquire the same on behalf of Landmark `as is' . . . ." The fourth special defense which contains the "as is" defense is interposed as to each and every count.
The plaintiffs seem to argue that the "as is" defense in really not significant in this case. They say that the "Project" as defined in this 1985 Contract "does not include the plans and specifications which were owned by Landmark and transferred as part of the "transfer documents." Urging the critical nature of this, they say "It is not the condition of the building or land on which CT Page 4819 it is located which is at issue in this action. Rather it is the failure of the plans and specifications prepared by MSB to adequately address the work necessary to convert the building and the land to the structures which was ultimately envisioned as a final product of the rehabilitation of the Project." They further argue that information concerning the Project which the defendants had acquired "through five years working on the Project were "never made part of the plans and specification provided to the plaintiffs." It is, continue the plaintiffs, their "absolute failure to disclose within the plans and specifications the information necessary to build the Project that is the central issue in this action." "That the building was acquired `as is' is not a matter of contention" state the plaintiffs categorically. Rather, as stated, the issue is the failure "of the plans and specifications to disclose information known to the defendants which was critical to the construction of the building."
The defendants, on the other hand, strenuously object to this position and argue that the "as is" issue is clearly an issue in this case. The court agrees. It is in their special defenses. It is on the October 1985 Contract, as well as is also the right of access and inspection in § 8(a). Burke admitted that the "as is" proviso was an "obviously negotiated" provision and he testified what "as is" meant to him. As stated above "Parties generally do no insert meaningless provisions in their agreements and therefore every possible provision must be given effect if reasonably possible." [Hatcho Corporation v. Della Pierre], 195 Conn. 18, 23
(1985). The "as is" clause in 8(b) includes the language that "Sellers make no representations as to the physical condition of the Project. . . ." The plaintiffs, on their case, put this squarely in the case including their evidence going to that, including but not limited to as to what the defendant Behr is said to have said on that both from Burke and Behr whom the plaintiffs called on their case. The defendants claim under their defenses that many of the items which are the subject of the plaintiffs' claims are either shown in the plans, called for in the specifications or were impossible to determine before demolition. The defendants point to the unlimited rights of access and inspection given to plaintiffs including Burke and his agents and representatives, for a long period of time prior to the October 1985 Contract and the evidence of just how much time and effort was spent by Burke and/or his agents Kiesl and Theusch in doing inspection and investigation of the building before not only the October 1985 Contract between the buyers and sellers but also before the construction contract of September 4, 1985 between KM Development Corporation (the general CT Page 4820 contractor) and Center Court Associates. The defendants also maintain that the plaintiffs could have discovered a number of the conditions in the building if the owner (the plaintiffs) and his agents had complied with the requirements of the Contract documents and inspected the premises as required by the October 1985 Contract. We note that the rights of access and inspection are in both the August 1985 and October 1985 agreements.
The contract documents are also referred to here by the defendants. For example, Section 1A of the Specifications entitled "Demolition and Protection" provides in Section 3 (entitled "Special Requirements") under § 3b that "the site and building shall be accepted in that condition found at time of starting work. Verify all existing site and building conditions." This demonstrates that the "as is" provision is built into the Specifications as well as is a duty of verification. Another example, is Sheet D1 of the Demolition Plans, part of the Contract documents which contains 14 general notes describing the contractor's duties with reference to the use of the plans and specifications in the process of construction. There is credible evidence that copies of the plans and specifications were given to Burke as well as his agents, Kiesl and Theusch, well before even the execution of the preliminary agreement of August 8, 1985.
A large body of evidence concerned the matters just above referenced going to the claims thereon by the parties. We do not propose to develop and resolve those claims here but will do so below. Our discussion here is to demonstrate that the issue is clearly in this case and that it is clearly implicated in the adequacy of the plans and specification issue as to all the counts.
 [Fraud and Negligent Misrepresentation (Fourth Count]
Initially we examine the fourth count which the plaintiffs argue sounds in fraud and negligent misrepresentation against the individual defendants, Maitland, Strauss and Behr. We deem it appropriate to deal first with this fourth count and to decide it resolving all the claims of fraud and negligent misrepresentation insofar as this case is concerned. The fourth count starts by incorporating the first thirteen paragraphs of the first count as they are above set out. To these allegations of the first count so incorporated there are additional ones added by this fourth count. They are to the effect that when Maitland, Strauss and Behr entered CT Page 4821 into the October 1985 Contract they knew or should have known that the plans and specifications provided pursuant to the 1980 Contract between MSB and Landmark were inadequate and incomplete but that they "misrepresented to the plaintiffs that the plans and specifications were complete"; that such misrepresentation upon which the plaintiffs relied was "false and misleading" and was made, either "knowingly, recklessly or negligently" with an intent to induce the reliance of the plaintiffs thereon and that the defendants knew or should have known that the plaintiffs were relying thereon and did so rely in agreeing to enter the October 1985 Contract. It is also alleged that as a result of their reliance on the misrepresentation concerning the completeness of the plans and specifications that they suffered certain damages, i.e. the difference between the actual cost to complete the Project and the anticipated cost to complete the Project based on the incomplete plans and specifications delivered to them, interest and expenses and lost rentals.
Before discussing the evidence on the subject of fraud and negligent misrepresentation, we note certain applicable principles. "The essential elements of an action in fraud . . . are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury. [Paiva v. Vanech HeightsConstruction Co.], 159 Conn. 512, 515, 271 A.2d 69 (1970); [Clark v.Haggard], 141 Conn. 668, 109 A.2d 358 (1954); [Helming v.Kashak], 122 Conn. 641, 642, 191 A. 525 (1937); [Bradley v.Oviatt], 86 Conn. 63, 67, 84 A. 321 (1912); [Barnes v.Starr], 64 Conn. 136, 150, 28 A. 980 (1894)." [Miller v.Appleby], 183 Conn. 51, 54-54 (1981); [J. Frederick ScholesAgency v. Mitchell], 191 Conn. 353, 358 (1983). With respect to the scienter element, our Supreme Court has said "`[w]e have had occasion to point out that where a defendant has special means of knowledge, and a plaintiff can under the circumstances attribute to the former accurate knowledge of what is represented, the plaintiff need not show the actual knowledge of the falsity of the representation. See [Richard v. A.Waldman Sons, Inc.], 155 Conn. 343, 346-47, 232 A.2d 307 (1967); [Warman v. Delaney], 148 Conn. 469, 172 A.2d 188 (1961); see also 37 Am.Jur.2d, Fraud and Deceit § 201.' [Miller v.Appleby] supra, 56; see [Johnson v. Healy],176 Conn. 97, 102, 405 A.2d 54 (1978)." [J. Frederick Scholes Agency v.Mitchell], supra, 358; see [Maturo v. Gerard],196 Conn. 584, 588 (1985). CT Page 4822
"Fraud is not to be presumed but must be proven by clear and satisfactory evidence. See [Bruneau v. W. W. Transportation Co.],138 Conn. 179, 182, 82 A.2d 923 (1951); [Kulukundis v. Dean StoresHolding Co.], 132 Conn. 685, 689, 47 A.2d 183 (1946); [Burley v.Davis], 132 Conn. 631, 634, 46 A.2d 417 (1946); [Basak v.Damutz], 105 Conn. 378, 382, 135 A. 453 (1926)." [Miller v.Appleby], supra, 55. It must be "strictly proven." [Puro v.Henry], 188 Conn. 301, 308 (1982).
 "`"Fraud and misrepresentation cannot be easily defined because they can be accomplished in so many different ways. They present, however, issues of fact"' [Alaimo v. Royer], 188 Conn. 36, 39, 448 A.2d 207 (1982). This middle tier standard has been formulated as `"clear and satisfactory evidence"' and as `"clear, precise and unequivocal evidence."' Id."
[J. Frederick Scholes Agency v. Mitchell], supra; [Miller v. Appleby]. supra, 51; [Alaimo v.Royer], 188 Conn. 36, 39 (1982).
In approaching the issue of fraud in this case the plaintiffs contend that the defendants purposefully acted or failed to act against a long backdrop of frustrations, reverses and obstacles that led to their perpetration through their incomplete plans and specifications of fraud upon the plaintiffs, particularly John Burke who is the principal plaintiff. Intermixed with this claim is a mass of evidence, expert and lay, portions of which are not credible.
It is fair to say that the defendants, in this their maiden effort as developers, encountered many problems. Landmark, over the period from May 1980 through May 1985, show in their expense analysis for officer time, employee time, legal expenses, etc., expenses of $565,421.00. It is quite another matter to maintain as the plaintiffs do that the entry of Burke into the picture provided "an unexpected solution to the defendants' dilemma" by the defendants' commission of fraud (or negligent misrepresentation) upon the plaintiffs. Moreover, although the plaintiffs maintain otherwise, the defendants had no cash flow problems at that time.
Crucial to the claims of fraud are certain representations allegedly made by Behr during the initial visit of Burke to the CT Page 4823 project site in April 1985 at which time he was there with Kiesl, Goldkamp and Behr. We have already dealt above with the quality of the evidence allegedly attributed to Behr at that time concerning the removal of the brick in the windows under the cladding and will not repeat it here. At that time the plaintiffs also claimed that Kiesl and Behr discussed the presence of asbestos in the building which they later claimed should have been "called out" or referred to in the plans and specifications. Burke said that Behr told "us" that "there was no asbestos in the building." Behr said that he said nothing concerning the "possible presence of asbestos" in the building. Kiesl, in his deposition, speaks of a number of matters discussed that day at the site such as the bricked-in windows, elevators, slabs and equipment on the lower floors left by the telephone company. Nowhere, however, in his deposition does he ever mention asbestos. The court concludes that the matter of asbestos was not discussed at all at that time as claimed by the plaintiff.
Thereafter, Burke, working with Goldkamp, initiated a proposed purchase proposition to the defendants in a May 7, 1985 letter in which the offering price was said to be based on the assumption that the project could be constructed for the amounts shown in the HUD firm Commitment of February 11, 1985 with certain other provisions. Burke said this was only a "preliminary type offer." As of May 7, 1985 Burke knew that the defendants had been working with Kapetan and that Kapetan felt that he could not complete the Center Court project within the amount of the firm HUD commitment. Kiesl eventually told Burke, before the execution in September 1985 of the construction Contract between KM and Center Court, that he (Kiesl), having inspected the project building, also could not construct the Center Court project within the amount of the firm HUD Commitment.
Early in June 1985, Burke wrote the defendant Maitland referring to a meeting Kiesl had had with at least one of the defendants which included discussion of "the construction numbers." Burke said that while Kiesl, who was one of Burke's representatives, found that meeting "very productive" Kiesl had some concerns about Peter Kapetan, who though "very helpful" at that meeting with Kiesl was "unwilling to share his actual work papers and subcontractor bids with Bob [Kiesl]." Burke, in this June 1985 letter, also wrote that it was important "for us," because some of the bids were at least six months old that they get hold of his bids to see if they are still competitive. Burke, then said that it is "our understanding that some arrangement will have CT Page 4824 to be negotiated between you and Capitan [sic] which will reimburse him for his work to date" and "We feel that this will have to happen in any event given the fact that we are honoring your request not to go to the market place for costs." Several things deserve comment here. The defendants had no contract with Peter Kapetan who had spent, as stated, considerable time on this project. The defendants did not ever hobble or deter any contacts with Kapetan by Burke or Kiesl or anyone representing the plaintiffs and actually had encouraged their contact with him and he with them. It is strange and not credible that Burke is the only one who articulated an "understanding" that the defendant Maitland or any defendant had to arrange to reimburse Kapetan for his work papers so believed to be needed by Burke. Kiesl never said this in his deposition. Moreover, the "request" of the defendants that the plaintiffs not go to the market place for costs is also not credited. As to that, we note parenthetically that Kiesl said nothing at all about that in his 1987 deposition and that neither Behr or Maitland or Strauss were inquired of it by the plaintiffs at trial.
Burke again wrote Maitland on June 29, 1985, noting inter alia, that he was presenting an approach that could have "possibilities of saving the UDAG and generating funds that might otherwise be deemed profits" as well as stating that "While HUD normally requires a firm underwriting, I think that something may be able to be negotiated given the present uncertainties of tax proposals." There was evidence suggesting possible changes in federal legislation concerning the extent and nature of the tax dollars advantages to a developer of the historical rehabilitation aspect of a project such as Center Court. Burke also expressed his increasing concern "about the shortness of time available to put a deal together" opining that "if our agreement is not concluded by the week of July 10th it may be too late to save the deal." Certain observations may also be made here. Burke, an experienced developer, was pursuing the defendants and not vice versa as the plaintiffs strive to imply and/or demonstrate. We have already rejected the plaintiffs' claim that since May 1985 the defendants were in a dilatory mode because they were pursuing other deals. There was certainly in July 1985 when this letter was written, no agreement neither in principle or in writing. Actually, their later agreement of August 8, 1985 was specifically captioned "Preliminary." Also as of the date of June 29, 1985, Burke and Kiesl had had the plans and specifications for approximately two months and there is no credible evidence that either of them or anyone on their behalf had even visited or examined the project CT Page 4825 site since their April visit. There is little doubt, however, that Burke himself was checking on various aspects of the arrangement he was hoping to bring about. Actually, he later apologized for doing so without alerting the defendants.
Although Burke continued to pursue the defendants to make an arrangement for his interests to acquire this project, we do note that this was the first such development project that, in his experience he had admittedly ever attempted to acquire when it was "about mid-way through the development process."
Burke, however, over the course of his interest in a proposed deal had, as noted, checked into the status of the HUD Commitment, the UDAG grant, the SNET option to permit the defendants to purchase the building, as well as other financing aspects including the City of New Haven tax abatement arrangement and the status of federal legislation concerning tax benefits to developers on a historical rehabilitation project such as Center Court. His inquiry into the HUD Commitment was not confined to Connecticut but extended to Washington.
It is true that Burke and the defendants did not even enter into their preliminary agreement until August 9, 1985. It is, however, unusual that because of the magnitude of this new undertaking for Burke, i.e. first time taking over a building development "about midway" during the development process that there was not a more hands-on inspection and evaluation of the project before August 8, 1985.
It cannot be overlooked that the building, as ultimately taken over by the plaintiffs, over the course of about sixty years since the original building had been constructed in 1916, had been, inter alia, increased in height to thirteen stories and in modernity. In the mid-1950's the evidence indicates a "modernization" during which a large number of window openings were bricked-up and toothing occurred which made the ultimate removal of the bricks from these windows more costly. The evidence demonstrates that during this 1950's "modernization" that by far the greater part of the exterior of the building was covered over by aluminum cladding covering almost all of the bricked-up windows as well as the toothing aspect of them. This aluminum "cladding, or "skin," as it was sometimes referred to, consisted of separate grey corrugated aluminum panels screwed to aluminum "Z" furring bolted to the brick exterior of the building. The existence of this toothing condition, though not the extent, was known to Maitland and Behr CT Page 4826 before the plans and specifications involved were sold by Landmark to Center Court and actually was so known before that — at least sometime around the middle of 1983. This is so because, during Landmark's efforts to develop this project and in order to qualify for certain tax credits from the federal government, Landmark had to apply for historic preservation certification of the building. Landmark did so apply for such tax credits and did obtain that certification. That process of application involved submission of detailed information including photographs to the Connecticut State Historical Commission which operated as a "pass through" for the United States Department of the Interior which makes the ultimate approval or disapproval. Landmark's application was eventually approved. The materials submitted, which are copious in nature, included 1916 and 1926 architectural drawings of the building, the 1955 "modernization" plans and specifications for the cladding project showing the toothing-in of the brick infill together with some progress photos of the 1955 cladding installation. Landmark's historical preservation application containing the toothing-in the brick infill information, and certain correspondence concerning that application, have all remained available as public records at the Connecticut Office of the Connecticut State Historic Commission at all times relevant to this case. Gilbert Boro, the plaintiffs' expert, agreed that any existing plans that were available, especially on a historical rehabilitation project, should have been inquired into by a potential developer. Boro is here again inconsistent with his declared adversarial position in this case that "we live or die by what's on those drawings and not a lot of meetings and discussions prior. . . ." This is also anomalous to his own statement that in such a project "I'm a very curious person, I would have liked to see anything available." Further, not only up to the end of July 1985, but all times relevant to this case, the defendants had at their Greenwich architectural offices in their project files an existing set of the historic plans and the information Landmark had submitted to the Connecticut Historic Commission as well as earlier plans concerning the project building. These were available on request. Neither Burke or anyone acting in his behalf went to the Connecticut Historic Commission or to the defendants' offices to review these historical materials or any earlier plans. Interestingly, Burke knew of a letter from the Connecticut State Historic Commission to Maitland, Strauss and Behr approving their application for historical status providing the building was built in accordance with the plans and specifications submitted. He, however, could not recall whether that letter was given to him by these architects or the City of New Haven. In any event, he was aware of it. We do note that while CT Page 4827 Burke had little historical rehabilitation experience he had applied for similar federal historical certification for tax credits in connection with his own renovation in Wisconsin of the Blatz Brewery project referred to above.
It should be pointed out that when Ronald Feltenstein, the inspecting architect for TSZ who succeeded Frank Sequino of TSZ as inspecting architect on this project, was asked whether he believed that it was up to the defendants "to pull off the aluminum siding to determine what's underneath", he answered "Absolutely not." Also, when Feltenstein was the inspecting architect he never talked to anyone from the defendants because "as far as we were concerned they were no longer on the project."
In any event, on August 8, 1985, Burke and Maitland, Strauss and Behr entered the preliminary purchase and sales agreement already referred to including giving Burke and his agents and representatives, inter alia, the right to access the project (which included the premises at 126 Court Street). There is no credible evidence that Burke ever sought access prior to that date and after his April 1985 visit there.
As already set out in some detail Kiesl, Theusch and Chapizio, each of whom were concededly Burke's agents and/or representatives, did not come to New Haven until August 20, 1985 and for that inspection of the project site at that time they had, as certainly did Burke and Kiesl already, the plans and specifications. The quality of that inspection by them as well as their preparation for it and the brevity of their stay in Connecticut in August 1985 has been set out earlier as has the actual time spent at the building by Kiesl and Theusch. There is practically no evidence about Chapizio's activities on this visit. Kiesl, while here, did meet with Kapetan again and Theusch was also there. That meeting was on August 20, 1985. Kiesl at that time asked Kapetan to let him see the documents concerning Kapetan's cost estimates and that "I [Kiesl] even offered to pay for it . . ." but Kapetan would not let him see them" ". . . or even offering to sell it to us." It appears to be claimed that somehow the defendant should have caused Kapetan to make them available to Kiesl and are to be faulted for not doing so. This contention has already been rejected; certainly they did not control or employ Kapetan or obstruct Kiesl's effort to strike a bargain with Kapetan. There is no evidence to cause this court to believe that any of the defendants had any control over Kapetan to make Kapetan deal with Burke or any agent of his. Nor did Kapetan have any obligation to any of the defendants to do so. In CT Page 4828 addition, there is no evidence that they at all misled the plaintiffs and/or any representative that they would get Kapetan to accede to any such request. Kapetan's position, however, did not deter Burke, or anyone acting on his behalf, from continuing to pursue to attempt to culminate what Burke believed to be a potentially very desirable arrangement in his own interest. There is no credible evidence that Burke, in any capacity, thereafter took the position that the defendants had to, or even attempt to, get Kapetan to change his mind. Rather, Burke pressed on.
In this context it is significant to remember that Burke had been given, sometime in early May 1985, a copy of the HUD Form 2328 made out by Kapetan with Kapetan's seven estimate sheets attached showing Kapetan's November 5, 1984 cost estimate for this project of $5,338,000.00. Up to this time Kiesl had worked with Burke on six projects. After his August 1985 visit to Connecticut, Kiesl orally told Burke that he could not build the project for the $5,339,000.00 figure. Kiesl maintained that he did not "rely" on Kapetan's November 5, 1984 2328 estimate; rather he "worked" with it as a feasibility guide.
Theusch, who became project manager of the Center Court project, first came to that site late in August 1985. He was a civil engineer employed by KM Development Corp. He had no background in architecture. Center Court was the largest job he had ever been project manager for. He had never been involved in a HUD financed project before Center Court. He had never been involved in a high rise project of thirteen stories or more. He had never been involved in a construction project in Connecticut prior to Center Court. He had never worked on a project involving or had he any familiarity with historical preservation certification applications or such documentation as involved in Center Court. Prior to coming to Connecticut he had looked at the Center Court plans for two or three days. Prior to September 4, 1985, when Center Court Associates, acting by Burke, and KM Development, acting by Kiesl as President, signed the Contract to build the Center Court project, Theusch himself knew that there were a number of areas on this project, including demolition, that "[involved substantial portions of the work on the project for whichKM did not have firm subcontractor bids.]" (Underlining added). When Theusch, who was a witness on this written KM September 4, 1985 Contract, was asked why if this were so did KM enter into the firm Contract of September 4, 1985, he replied "I don't know." On September 4, 1985 Burke did not really know with any specificity what construction cost numbers Kiesl and/or Theusch had come up CT Page 4829 with as the result of their August visit to Connecticut. He maintained, however, that KM was "comfortable" with that Contract. Center Court Associates still owes KM moneys today for this September 4, 1985 Contract.
The speed with which the September 4, 1985 Contract was executed after the cursory inspection by Burke's agents, Kiesl and Theusch, whom he chose (and particularly Kiesl) as well as the paucity of firm subcontractor bids (if any) in hand, cannot under the circumstances at all support the plaintiffs' claim that the time crunch so-called prevented the contractor not having a sufficient time to inspect to make a bid after a proper inspection because basically the project was facing certain deadlines. As he testified, Burke maintained that the time crunch here was such as to effectively prevent his doing the "due diligence that's required on this type of project." This "due diligence" involved the bidding and investigation necessary. Even on Burke's own testimony he spoke of time needed in the area of a couple of months. Considering the circumstance that he and/or his agents had full access from August 8, 1985 (the date of the preliminary agreement) a date almost three months before the October 30, 1985 Contract, it fairly appears that there was sufficient time to do the "due diligence" he spoke of. Again, Burke was not pushed into his agreement of August 8, 1985 or, for that matter, the one of October 30, 1985. He did not have to undertake this project at all.
Again, there is little question that Burke's entry into the picture was the catalyst that later made for an agreement. It is correct to say things moved quickly. Burke was successful in getting deadlines extended and, as he aptly noted, the deadline for the project really became a "moving deadline". Suffice it to point out that in any event, "deadline[s]" were extended through October 30, 1985. When the October 30, 1985 agreement was executed all the commitments, grants, agreements, etc. necessary were in place.
Burke said that after the August 8, 1985 agreement there was "a lot of time pressure working against the project, and it required somebody to act quickly if it was going to be salvaged" and that the project was "on a short fuse" with" a lot to be done." Therefore, according to him, he did what he "thought was important which had to be accomplished prior to the expiration of the underlying commitments or the extensions thereto." It is true, for example, that the SNET option given Landmark was due to expire at the end of August 1985, the HUD commitment was due to expire in September 1985 and an extension of the UDAG grant had to be CT Page 4830 considered. Burke undertook accomplishing these and related matters in New Haven, Hartford and Washington. It is important again, however, to underline the fact that even though the defendants benefitted [benefited] from the ultimate sale of their interest in this project that cannot be cast in the posture of having fraudulently induced Burke and his interests into this October 1985 agreement. Burke remained the pursuer throughout. Early on, Burke, an experienced developer with many years in the business, recognized this project as an attractive business opportunity for a person of his knowledge, expertise and experience to seize upon. Despite the fact that, as he said, he "had not done a high-rise building, and a high-rise rehab of this sort", he thought that over twenty-five years "we've become rather expert." He had, over his years in real estate and developing, become quite successful and was a sophisticated businessman capable of making intelligent business judgments and apparently quite capable of protecting his own interests. This is so even in light of the circumstance that the defendants appeared pleased to be able to terminate their interest in the project by transferring their interest to the Burke interests; yet the thrust and impetus to do so came mainly and aggressively from Burke. It is, however, curious how Burke, although he brought Kiesl in as his prime representative right from his initial contact can credibly maintain that he knew so little about the results of the investigation which Kiesl, now dead, did on the building before and after Kiesl had the plans and specifications, before and after both the August 8, 1985 agreement, as well as the September 5, 1985 Contract between KM and Center Court, and up to at least the October 30, 1985 Contract. He knew from the start that the greater number of windows under the cladding were bricked-up from the exterior and with plaster from the inside. He knew from the start that Behr had told him that there would be at least "some" missing stone sills under the cladding. He knew himself from his reviewing of the specifications that there was "some problems with the sills." In that regard the specifications in Section 4A ("Unit Masonry") in subsection 11 dealing with "Cast Stone Window Sills" clearly provides that, during construction, "New cast stone sills shall be provided to replace sills found with the following defects; (1) Missing sills. (2) Sills not to full profile and size of sound full profile sills. (3) Cracked, chipped or spalled sills." He knew, having reviewed the demolition plans of the drawing which included the general notes thereon that the intent of the defendants' drawings was to make it the contractor's responsibility to do any and all work necessary to accomplish the finished work called for in the Contract documents as well as to place upon the contractor the CT Page 4831 obligation to carefully survey the existing conditions and determine that the extend of the demolition work to be done. These things Burke knew although he said he only "perused" the plans and specifications. We note again that at the absolute least, from August 8, 1985 forward, the Burke interests had complete access to the building site at all reasonable times. He also knew or should have known from the specifications that the contractor, not the architect, was the one "who shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract."
In any event, Burke had representation, particularly Kiesl who not only had access to the site but who had considerable day-to-day hands-on experience scrutinizing plans and specifications. Burke also knew that the historical rehabilitation certification with its important tax benefits was part of the package being purchased. Some years earlier, Burke, in developing the old Blatz Beer Company offices in Milwaukee had filed an application for such historical tax benefits which cost the Burke interests some $5,000.00 and Burke said he examined that application as he was paying for it. Here, however, he said that he or no one on his behalf that he knew of examined or read the application or materials filed by the defendants for the historical tax benefits although they clearly revealed the toothing component of the largest change order in this case. Burke did not examine any of these materials in this case although the defendants charged the Burke interests $26,000.00 for that historical tax application in their sale arrangement, nor did any of his representatives do so. This was not done, said Burke, because their basic concern there was that this historic rehabilitation tax credit had been approved and was in place and so he did not examine it. That was his concern here he said; this position is not persuasive.
There was much evidence about the toothing-in of the window jambs in the bricked-in-filled windows. Burke, Kiesl and Theusch all knew that many windows were in-filled with brick. The toothing-in, however, which allegedly made the masonry work more expensive, it is claimed none of them knew of. We have already concluded that the defendants, singly or collectively, have not been proven to have made in their interaction with Burke (Center Court Associates), or any representative a false representation as a statement of fact as to the toothing, see e.g. [Miller v. Appleby], supra, 54-55, upon which Burke could be found to have relied to his injury. CT Page 4832
Furthermore, the credible evidence demonstrates that the plans and specifications were of that quality that Burke and/or Kiesl or Theusch should have been alerted to the circumstance that the toothing condition existed as to a number of windows. There is credible evidence that the applicable standard of care for the preparation of architectural working drawings which is that we discuss at length in the first count did not require that the defendants specifically detail the toothed-in condition in its plans for this project. Here, however, that condition was depicted in the drawings albeit not as clearly as it could have been. There was, however, enough there, to the experienced eye, to alert one to such a condition. That is not, however, to say the number of windows toothed-in were capable of being ascertained as that was not certainly within the duty of the architect to so indicate. More, the defendants, singly or collectively, did not know even approximately how many windows had been toothed-in.
Properly utilized and read, the plans and specifications pointed to this condition and it is somewhat disingenuous to suggest otherwise. There was no duty on the defendants under the circumstances to personally and affirmatively communicate that toothing circumstance as the plans and specifications did. Certain credible expert evidence demonstrates that, in terms of what the plans and specifications are not claimed to have disclosed, that an architect is not required to disclose quantity, for example how many sills may be damaged or how many windows may have toothing.
On the matter of fraud, we conclude that on the credible evidence that the plaintiffs have not sustained their high burden of proof on that claim with reference to any of the material allegations of fraud in the fourth count of their amended substituted complaint. This conclusion applies specifically to that threshold element of proving that a false representation was made as a matter of fact. See [J. Frederick Scholes Agency v.Mitchell], supra, 358; [Miller v. Appleby], supra, 54-55. Such proof is a necessary predicate to the other elements of fraud as set out in such cases as [Scholes] and [Miller]. The failure of the plaintiffs to sustain their high burden of proof as stated on fraud obviates the need to reach any of the special defenses pleaded and claimed to be directed to the fraud claim in the fourth count. Moreover, our analysis and conclusion on this fraud claim does not contravene the venerable case of [Sherwood v. Salmon], 5 Day 439 (1810) and its progeny as the plaintiffs appear to claim.
Going on, we examine the plaintiffs' claim of negligent CT Page 4833 misrepresentation which they maintain they have also proven under the fourth count. We do not agree. In [D'Ulisse-Cupo v. Board ofDirectors of Notre Dame High School], 202 Conn. 206 (1987), our Supreme Court said:
 "The court has long recognized liability for negligent misrepresentation. We have held that even an innocent misrepresentation of fact `may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth.' [Richard v. A. Waldman Sons, Inc.], 155 Conn. 343, 346, 232 A.2d 307 (1967); see also [J. Frederick Scholes Agency v. Mitchell], 191 Conn. 353, 359, 464 A.2d 795 (1983); [Johnson v. Healey], 176 Conn. 97, 102, 405, A.2d 54 (1978); [Warman v. Delaney], 148 Conn. 469, 473, 172 A.2d 188
(1961); [Boucher v. Valus], 6 Conn. Cir. Ct. 661, 665, -66, 289 A.2d 238 (1972). The governing principles are set forth in similar terms in § 552 of the Restatement Second of Torts (1979): `One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.' See also [Ultramares Corporation v. Touche], 255 N.Y. 170, 174 N.E. 441 (1931); [Glanzer v. Shepard], 233 N.Y. 236, 135 N.E. 275 (1922); W. Prosser . W. P. Keeton, Torts (5th Ed. 1984) § 107, p. 745.
[D'Ulisse-Cupo v. Board of Directors of Notre Dame High School], supra, 217-218.
We will not repeat all the evidence set out earlier, including that already recited concerning the fourth count, as well as the standard of care of architects in preparing plans and specifications. The bulk of it is applicable here. No false representation or false statement has been proven, as to any material fact found, to have been made to the plaintiffs as CT Page 4834 alleged. We deem it appropriate to note that, as the cases indicate the actionable representation(s) or statement(s) must be made or conveyed in the setting of a proven lack of reasonable care by the maker. See e.g. [D'Ulisse-Cupo v. Board of Directors ofNotre Dame High School], supra. The test of negligent misrepresentation involves the breach of a duty to exercise reasonable care in communicating information upon which another may reasonably be expected to rely in conducting their affairs. Under this principle one making a representation or communication to such another person, may even believe that representation or communication to be true, but because of his lack of reasonable care in making that representation or communication it is in fact false. In speaking of a breach of duty here we keep in mind that "The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . The test is, would the ordinary man in the defendant's position knowing what he knew or should have known, anticipated that harm of the general nature of that suffered was likely to result? [citations omitted]." [Coburn v. Lenox Homes,Inc.], 173 Conn. 567, 575-576 (1977). Applying the principles of negligent misrepresentation to the credible evidence already set out in this opinion, we conclude that the plaintiffs have not proven liability on the part of the defendants for negligent misrepresentation under the fourth count.
The issues on the fourth count are found for the defendants and judgment is entered on that count for the defendants.
[First Count]
Continuing, we turn now to the first count which sounds in professional negligence, here architectural malpractice.
In order to decide whether the plaintiffs have sustained their burden of proof on this count, we must first determine the standard of care to which the defendants were subject. The general rule, to which we have alluded in discussing the fourth count above, is essentially the same as that which is upon an attorney to his client or upon a physician to his patient or one who undertakes to render professional services and that is that that person is under a duty to whom the services are to be performed to exercise such care, skill and diligence as persons in that profession ordinarily exercise under like circumstances. [City of Mounds View v.Walijorvi], 263 N.W.2d 420, 422 (1978); [City of Evelethv. Ruble], 225 N.W.2d 521, 524 (1974); [Klein v.CT Page 4835Catalano], 386 Mass. 701, 719 (1982); see 6 C.J.S. Architects § 27, 5 Am. Jur. Architects, § 8.
The Massachusetts Supreme Court states it thusly in [Klein v.Catalano], supra, 718-719:
 "Architects, doctors, engineers, attorneys, and others deal in somewhat inexact sciences and are continually called upon to exercise their skilled judgment in order to anticipate and provide for random factors which are incapable of precise measurement. The indeterminable nature of these factors makes it impossible for professional service people to gauge them with complete accuracy in every instance. . . . Because of the inescapable possibility of error which inheres in these services, the law has traditionally required, not perfect results, but rather the exercise of that skill and judgment which can be reasonably expected from similarly situated professionals. `[Mounds View v. Walijarvi], 263 N.W.2d 420, 424 (Minn. 1978). See [Trustees of Union College v. Kennerly, Slomanson Smith], 167 N.J. Super. 311, 318, 400 A.2d 850 (1979). See also [Broyles v. Brown Eng'r Co.], 275 Ala. 35, 39, 151 So.2d 767 (1963). Moreover, unlike a mass producer of consumer goods, `an architect has but a single chance to create a design for a client which will produce a defect-free structure. Accordingly, we do not think it just that architects should be forced to bear the same burden of liability . . . as that which has been imposed on manufacturers generally.' [Mounds View v. Walijarvi], 263 N.W.2d 420, 425 (Minn. 1978). We believe that unlike a manufacturer, an architect does not impliedly guarantee that his work is fit for. its intended purpose. Rather he impliedly promises to exercise that standard of reasonable care required of members of his profession."
As already noted, the general rule also is that they are not guarantors of their work. In the absence of special agreement the CT Page 4836 architect does not imply or guarantee a perfect plan or a satisfactory result, but rather is only liable if he fails to exercise reasonable care and skill. [Klein v. Catalano], supra, cases there cited.
In this case, however, it is claimed that the architects assumed a higher standard of care as to their architectural plans and specifications because of certain language in the 1980 Contract between Landmark and Maitland, Strauss and Behr, P.C. and that this standard persisted and is the benchmark to be used here in assessing the claims of professional negligence of the defendants who sold their plans and specifications to Burke and Center Court in the 1985 Contract. The relevant language as it appeared in the 1980 Contract by which it is claimed a higher standard case was expressly assumed as to the plans and specifications for the Center Court project is:
 "Complete architectural, structural, electrical, HVAC, plumbing, and landscape design services for the complete rehabilitation and new construction of approximately 97,000 sq. ft. of building known as 126 Court Street, New Haven, Ct. Such services shall include field investigation of existing building, measured drawings, and other field research or building investigation as required."
It is claimed that in the circumstances of this case that this constituted the assumption by the defendants' architects of a higher standard of care than that ordinarily applicable under the general rule. This was the opinion of Gilbert Boro, the plaintiffs' architectural expert. There was also other expert evidence that the general rule applied. It is true that the duty of an architect, as to the preparation of plans and specifications, depends upon the particular agreement he has entered into with the person who employs him. [Klein v. Catalano], supra, 718. In the circumstances of this case this court concludes that the general rule as to the standard of care applies.
Boro opined that the standard of care "nationwide" as to architects was what a "normal" architect would do under similar circumstances. Here, however, he said that because of the language quoted above in the 1980 Contract it was his opinion that the architect said "he was going to do measured drawings and other CT Page 4837 field research and building investigation which is above and beyond the normal architectural services . . ." and that the architect here was going "to add a lot more services and that "they said they were going to do more than an architect normally would do." He also indicated that the word "complete" supported his opinion here.
In order to aid in determining the issue of the applicable standard we refer to other evidence which serves to put our determination of applicable standard of care in context. Prior to the decision as to who won the design competition sponsored by SNET the defendants had perhaps only two or three drawings available to them. Once, however, Landmark won the competition they then received extensive plans of the building forwarded to them by SNET. Recognizing that the project building was a thirteen story building, added to over the years, and that each floor was just a little bit different, the defendants went into and through the building. They ran strings of dimensions, made and took measurements to confirm for themselves that the drawings received from SNET were in fact accurate. This was done because many times the nature of an existing drawing can be changed in the construction process, keeping in mind that the then building had undergone at least three substantial construction processes since the building at 126 Court Street had originally been erected in 1916 at which time it was not a building of thirteen stories. In any event, the term "measured drawings", in the parlance of the profession is more a term of methodology and it indicates a scope of services as opposed to a distinct set of drawings. In addition, and again all before the plans and specifications, the nature of which is in issue, were in fact completed, the defendants, in investigating the building, attempted to determine its condition, what work would necessarily have to be done, which of the systems such as mechanical, electrical and plumbing, etc. could be salvaged and which would have to be replaced. The defendants did all these things.
The purpose of the design plans and the specifications, ultimately prepared and which the defendant architects undertook to furnish by the 1980 Contract and which later were sold by the 1985 Contract, was to communicate to the contractor the design intent of these documents. Although an architect, in the preparation of such plans, will investigate many sources and go to many locations to get the necessary information to produce such design drawings, he does not put all that information on his drawings nor is he required to under the applicable standard of care. It depends upon the circumstances of a particular case. However, in the CT Page 4838 profession, design drawings (or plans) are to be such as to call out or alert the contractor to matters `he is to look for in performing his responsibility in constructing the project as required under general conditions §§ 4.3 and 4.4 of the Contract documents. These sections of the general conditions in this case are from the standard form of General Conditions 201 of the Standard American Institute of Architects and American Contractors contract. Of course, design drawings are not the only drawings a contractor would use to build the project. Shop drawings are also involved and, parenthetically, Theusch, Kiesl and Feltenstein, each of whom were agents and/or representatives of Center Court or Burke acknowledged this. Contractors are aware that shop drawings are involved and will be forthcoming in the construction of a project. Suffice it to point out at this juncture that shop drawings, which are prepared during the course of construction for almost all the systems of a building originate from the subcontractors of particular areas or systems in the building and they show in greater detail the construction of those particular items in the building. When shop drawings are made, it then becomes the duty of the inspecting architect, in this case the New York firm of Tudda, Scherer Zborowski, to review these shop drawings submissions and to confirm that they carry out the intent of the design documents which encompass the defendants' plans and specifications on the project. At that time many adjustments may be made to fit particular conditions that may have evolved during the course of construction to that date.
In any event, the defendants finished the plans (Exhibit H) as well as the specifications (Exhibit G) by May 6, 1983. The plans consist of fifty-two separate drawings while the specifications, written specifically for the Center Court project, are in a book of approximately three hundred pages. These are the plans and specifications made pursuant to the 1980 Contract and which were sold to Center Court by the October 1985 Contract.
Boro's testimony in which he indicated that by the language in the 1980 Contract the defendants had assumed a higher standard of care also involved his evidence about his "complete" nature of the services agreed to be rendered. His evidence disclosed some remarkably startling opinions which contribute to this court's conclusion in having grave questions of his credibility. For example, he had reported to the plaintiffs in writing, after examining the defendants' plans and specifications pre-trial that:
"The plans and specifications were found to CT Page 4839 be basically preliminary on a scale of approximately 60 to 70% complete. A budget estimate could be prepared from this set of plans and specifications with a contingency carried but this set is not as complete as is required to get competitive bids or complete enough to obtain a building permit in most Building Departments."
In his "conclusions" in that report he also said:
 "The plans and specifications are not complete. They are what could be interpreted as in approximately 60% plus or minus stage of the finish set to be used for competitive [sic] bidding and to obtain final building and associated permits.
 The specifications at this stage are basic boiler plate with need to be refined as to scope and detailed specification refinements. . . ."
The credible evidence is that these specifications were definitely not "boiler plate" but were written for this specific project and that the finished product was the result of much contact and consultation between one Williams, who composed these specifications and the defendant architects. As to the plans and specifications being "as in approximately 60% plus or minus stage of the finish set to be used for competitive bidding and associated permits" a few comments maybe made. There is no credible evidence that any other plans or specifications had to be commissioned or made by any other architect to get the permits necessary for this project. Kapetan, once these plans and specifications were finished in 1983 had no evident difficulty in putting together comprehensive bids to do this project. Despite claims about the term "complete", Landmark was able to obtain a HUD Firm Commitment on September 19, 1983, several months after these plans and specifications were completed by the defendants. This was the HUD commitment Burke was interested in obtaining from the defendants as well as, parenthetically, the UDAG grant they had received under date of October 1, 1983. These plans and specifications were the same ones used by Kiesl, in preparing his bid estimate as well as the only ones he had when he signed the construction contract, on September 4, 1985, on behalf of KM with Center Court with which CT Page 4840 contract Burke said he believed KM was "comfortable" with. There was no complaint from Kiesl about the plans and specifications, who as already pointed out, had them in his possession, well before September 5, 1985 as well as a copy of Kapetan's 2328 bid estimate with breakdowns. Actually, Kiesl who was Burke's and Center Court's point man on this job never complained about the completeness of these plans and specifications and he was very much in the picture through his attendance at the final HUD closing of two days at the end of December 1985 and up to January 20, 1986. Theusch, of course, who had these plans and specifications, at the very least from August 1985 (if not earlier), when he came to New Haven and Kiesl and Chapizio did not raise [any] questions about them until, at the earliest, the end of January 1986.
This court, after observing and listening to Mr. Boro cannot accept his opinion that these defendants assumed a higher standard of care by virtue of the language of 1980 Contract. The court, on the professional malpractice count, has determined that the applicable standard of care, for which there is credible evidence, is that already referred to. That is that one who undertakes to render professional services is under a duty to the person for whom the service is to be performed to exercise such care, skill and diligence as a person in that profession ordinarily exercises under like circumstances. Moreover, this standard is also to apply in assessing the under taking as to "complete" plans and specifications by the defendants in the 1985 Contract in which Center Court bought, inter alia, from the individual defendants all their Landmark stock and its avails. Center Court also purchased in that 1985 Contract "complete architectural and engineering working drawings for construction of the Project." (Section 1(b)(vii)).
When we speak to the term "complete" in this case we keep in mind, inter alia, the experience and sophistication of the actors and their interaction with the plans and specifications and the consequences thereof.
Significantly certain of those actors who are not architects by profession are hardly working with an altogether new slate when it comes to plans and specifications. Burke, Kiesl and Theusch, for example, had often over the years, looked at and examined plans and specifications before those of the Center Court project. The same applied to such persons as Noble and Kapetan. So, when we hear the claims from both sides as to the meaning of "complete", and keeping in mind the intent of those vying for its meaning it does call to mind that there are times when "the logic of words CT Page 4841 should yield to the logic of realities." [DiSanto v. Pennsylvania],273 U.S. 34, 43 (1926 Brandeis, J., dissenting) and that "Words are chameleons, which reflect the color of their environment." [Commission of Internal Revenue v. National Carbide Corporation],167 F.2d 304, 306 (1948 L. Hand, J.). It is wise counsel to consider "that the words used, even in their literal sense, are the primary, and ordinarily the most reliable source of interpreting the meaning of any writing . . . but it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary. . . ." [Cabell v. Markham], 148 F.2d 737, 739 (2d Cir. 1945, L. Hand, J.). Nor in construing "complete" here should we overlook the standard of care applicable or that architects are not guarantors. This is not to say that plans and specifications that are complete may not, however, fail to meet the applicable standard of care in one or more respects. We should not also overlook in our discussion of "complete" that it is the "design services" which are the subject of the term "complete" as it first appears in the 1980 Contract. Actually, the 1980 Contract was in reality between professionals, individual architects on the one hand and a corporation peopled by the same architects on the other. Again we should not overlook, nor do we in this discussion that in the October 1985 Contract the transfer documents, in Section 1(b)(vii) specify "Complete architectural and engineering [working] drawings [for] construction [on] the Project." (underlining added).
We want to make it clear, as noted above, that the discussion leading to the standard of care we deem applicable here does not at all tend to resolve the issue of whether or not the defendants are negligent as claimed. When we say "negligent" we meant guilty of any "actionable negligence", which may be said to consist in the breach of the duty of one person to whom the duty is owed to protect that other from injury, the proximate result of which breach is injury to that other person to whom the duty is owed. In a word, our analysis of "complete" does not render improbable a finding of negligence under the first count in professional malpractice.
Next, the plaintiffs claim that the doctrine of comparative negligence is applicable to this case citing General Statutes 572h(b). This doctrine was referred to during the trial. The plaintiffs' brief claims that it is applicable; the defendants' brief takes no position on these — and in fact does not refer to it. "The central purpose of the comparative negligence statute was to replace the harsh rule that contributory negligence was a complete defense in negligence cases with the rule that contributory CT Page 4842 negligence merely operates to diminish the amount recovered as damages in proportion to the percentage of negligence attributable to the person recovering." [Gomeau v. Forrest], 176 Conn. 523, 525
(1979). Under our statute on comparative negligence, negligence attributable to the plaintiff is not a complete bar to his recovery if such negligence is not greater than that of the defendant(s). [Acompora v. Asselin], 179 Conn. 425, 426 (1980). Our comparative negligence statute does not alter Connecticut law as to proximate cause. See [Melesko v. Riley], 32 Conn. Sup. 89, 91
(1975); [Coburn v. Lenox Homes Inc.], 186 Conn. 370, 383
(1982). The circumstances of this case bring it within the language of ". . . injury to persons or damage to property . . ." of our comparative negligence statute. This court determines that the comparative negligence statute, as it stood at the times of the conduct complained of and determined to have occurred by this court, is applicable to the first count sounding in professional negligence.
Looking at another special defense interposed to all the counts, including the first count, we now examine the "as is" defense made under § 8(b) of the 1985 Contract which remains in this case and consider its application to the first count. The plaintiffs appear to argue that the "as is" clause is not to be considered in the nature of a defense because they maintain that the "Project" as a "defined term" does not include the plans and specifications which were owned by Landmark and transferred as part of the "transfer documents." Going on, they contend that it is not the condition of the building or the land on which it is located which is at issue, but rather it is the failure of the plans and specifications to "adequately address" the work necessary "to convert the building and the land to the structure which was ultimately envisioned as a final product of the rehabilitation of the Project." There is, they say, no contention that the building was acquired "as is", but rather that the issue is the "absolute failure" of the plans and specifications to disclose information known to the defendants which was critical to the construction of the Project. In urging that the "as is" principle has "no relevance to the instant action", the plaintiffs postulate that their whole case refers only to defects in the plans and specifications and not to the physical condition of the building. They, thus, argue that this distinction they make forces the "as is" defense right out of the case.
The defendants, on the other hand, first claim that the plaintiffs have the burden of proving that the "as is" clause is not what the parties intended when they entered the 1985 Contract CT Page 4843 and that, in any event, the language of the "as is" provision conveys the clear and unambiguous intention of the parties. In invoking the "as is" clause, the defendants point to § 8a of the 1985 Contract granting the plaintiffs full access to the Project, to notes on defendants' demolition plans that instruct the contractor to survey existing conditions before beginning work and to the General Contract Conditions obligating the contractor to investigate the job site to verify conditions. They also point out that the access provision not only gives the plaintiffs the right of access generally but also the specific right ". . . to take measurements and prepare plans. . . ." The defendants strongly maintain that the "as is" clause in the 1985 Contract precludes the plaintiffs' recovery on their claims relating to the physical condition of the building and in doing so they refer to change orders concerning the toothed-in windows, misalignment of existing windows, replacement of stone sills and for the underground slabs and foundations discovered during the course of construction and the matter of the pipe chases encountered during construction (for which latter item there is no change order). They do not agree that the "as is" clause is irrelevant but, rather, that it is applicable and is clearly commingled with the plaintiffs' claims on the adequacy of the disputed plans and specifications.
The term "as is", when applied to a sale, has been said to mean "that the property will be sold in its then-existing physical condition." [In Re Hawaii Daicho-Kanko Inc. v. Makaha Valley Inc.],16 B.R. 163, 166 (B.C. Hawaii 1982); [Johnson v. Waisman Brothers],93 N.H. 133, 136 (1943). Our Supreme Court, in a recent "as is" case said that "It is established well beyond the need for citation that parties are free to contract for whatever terms on which they may agree. This freedom includes the right to contract for the assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract." [Holly HillHoldings v. Lowman], 226 Conn. 748, 755-756 (1993). of course, "a court must enforce the contact as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties, unless the contract is voidable on such grounds as mistake, fraud or unconscionability." [Holly Hill Holdings v.Lowman], supra. As a general matter, a clause for the sale of property "as is" is enforceable. [Holly Hill Holdings v. Lowman], supra. In speaking to an "as is" provision, courts have noted that the buyer's remedy is to inspect the "as is" property before he becomes the owner. See, e.g. 1845 [Ocean Associates v. Stein], 449 N.Y.S.2d 54, 56 1982). CT Page 4844
We recognize that: "`The intention of the parties to a contract is to be determined by a fair and reasonable construction of the language used interpreted in light of the situation of the parties, the circumstances connected with the transaction, the motives of the parties and the purposes which they sought to accomplish. [E. F Construction Co. v. Rissil ConstructionAssociates, Inc.], 181 Conn. 317, 320, 435 A.2d 343 (1980); [Marcusv. Marcus], 175 Conn. 138, 141, 394 A.2d 727 (1978)." [John F. EpinaRealty, Inc. v. Space Realty, Inc.], 194 Conn. 71, 77-78,480 A.2d 499 1984.'" [Balboa Ins. Co. v. Zleski], 12 Conn. App. 529, 535
1987. Moreover, we also recognize that "Parties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible." [Hatcho Corporation v. Della Pietra], 195 Conn. 18, 23 (1985); [Connecticut Co. v. Division 425], 147 Conn. 608, 617 (1960).
We begin our analysis here by pointing out that there can be little question that Burke, who was Center Court, actually knew what "as is" meant. He said "It meant that we were taking the [project] as is. In other words, the condition that it was, subject to this contract which includes all the other provisions." (underlining added). The October 1985 agreement was also a negotiated contract with both sides being represented by counsel. Burke said that the "as is" provision was agreed to by him in exchange for the inclusion of the provision giving Center Court the right to bring a negligence action if the defendants' plans and specifications "were not as they were represented."
The plaintiffs cannot just read this "as is" provision out of the agreement. In it they were buying all the stock of Landmark whose assets included such "transfer documents" as the sales agreement with SNET to buy the land on which the "Project will be built" and the firm HUD commitment issued by HUD for not less than $5,391,900.00, which latter sum included not only the building and the land but also a large part of the fiscal where with all along with the UDAG grant of not less than $1,100,000.00. The buyers also bargained forgetting, by the transfer documents, the means of obtaining title to the building and the land. This they maintain is the "Project" by definition and the "as is" clause, they go on, is irrelevant although it is clearly something that they clearly bargained to buy. The Court does not agree with the plaintiffs.
The term "project" appears at least fifteen times in the agreement. It first appears in "C" after the identification of the parties and the sentence "Reference is hereby made to the CT Page 4845 following:" which states:
 "Landmark presently owns the building, subject to a right of reversion in Southern New England Telephone Company ("SNET"), and holds the right to acquire the land, located at 126 Court Street, New Haven, Connecticut (collectively, the `Project') together with various documents and agreements related and necessary to the development of the Project into not less than 73 residential apartments plus approximately 25,750 gross square feet of commercial space (the "Transfer Documents"), all as more fully described in Section `1b' below."
An examination of this recital reveals that what is called their "Project" and what are called the "Transfer Documents" are related and both are necessary to accomplish the contractual objectives and expectations for the development of the Project. Something is "necessary" when it is essential and indispensable and when it is logically required and cannot be done without. Webster's Third New International Dictionary. In § 2(f)(vii), in addition to the HUD and UDAG grants (as well as other "Transfer Documents"), there appears the language "Complete architectural and engineering working drawings for construction on the Project." Although "working drawings" is not defined in this agreement, it is, nonetheless, apparent that the parties as they have in contract language just recited demonstrated that there is a vital nexus between the "Project" and the "Transfer Documents" Moreover, the plaintiffs wanted access to the building and were given it in their October 1985 Contract as well as in the August 9, 1985 agreement. Significantly, when Burke and the individual defendants executed the preliminary purchase and sales agreement of August 8, 1985, Burke sought and was given the "right of access to the Project at all reasonable times . . . to inspect the physical conditions thereof . . ." and at that time Burke and his agent Kiesl already had the plans and specifications. It is interesting to note that the provision giving the buyer access and inspection rights contains the same language in the August 1985 Contract as it does in the October 1985 agreement. The times and nature of the inspections of the Project by Burke and Center Court and their agents and representatives prior to August 1985 and up to the time of the October 1985 Contract has been referred to earlier. The "as is" provision was not in the August 1985 agreement but was included in CT Page 4846 the October 1985 agreement and it was a negotiated provision.
The demolition plans prepared by the defendants contained language, and not in any obscure footnote, that indicated, inter alia, that it was to be the contractor's responsibility to do any and all demolition work necessary to accomplish the finished work called for and shown on the rest of the Contract Documents.[,] as well as providing that "Before beginning any cutting or demolition work the Contractor shall carefully survey the existing conditions and determine the extent of the work to be done . . ." In the specifications which is another of the Contract documents it is provided in Section 1.2.3 of the General Conditions that by executing the Contract, the contractor, in the General Conditions, represents that "he has visited the site, familiarized himself with local conditions under which the work is to be performed, and correlated his observations with the requirements of the Contract Documents." This latter is a common provision in a contract between an architect and an owner as well as also being a common provision in the Standard American Institute of Architects Contracts. One other item noted here is that Kiesl (and Burke) had in their possession for a substantial period of time before October 30, 1985 and actually as far back as May 1985 Kapetan's comprehensive 2328 estimate form which on its face demonstrated, inter alia, that Kapetan contemplated having to do a substantial amount of work on the masonry of the building. The General Conditions also provide that "the Contractor shall supervise and direct the work, using his best skill and attention. He shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract." While this recital is not intended to be exhaustive it serves to support our determination below that "as is" is applicable despite the plaintiff's claims to the contrary.
Moreover, Center Court's brief iterates that "It has been Mr. Burke's testimony that has been uncontroverted that the foregoing provision [of Section 4 of the October 1985 Contract which states "without limiting any liability which MSB may have for any negligence in the preparation of plans and specifications the Buyer Center Court acknowledges that all work required by MB for design services [to the Project] has been satisfactorily completed]" was specifically inserted because Mr. Burke felt that he did not have adequate time to determine the suitability of the plans and specifications for construction of the Project." underlining added). In a larger context, however, we simply cannot accept the position about Mr. Burke's "uncontroverted" testimony as just above set out. CT Page 4847 First, we cannot overlook the fact that Burke and his agent Kiesl had the plans and specifications long before October 30, 1985, that Burke, Kiesl and another admitted agent, James Theusch, had them before September 4, 1985 and that Theusch had them before September 4, 1985, and that thereafter KM and Center Court had them. Actually KM, for all practical purposes, had them long before September 4, 1985 because Kiesl so had them. Even assuming there was no written right of access given to the land and building involved before August 8, 1985, Burke's testimony on rebuttal is quite interesting in this matter when he again addressed the time it would take to do "the due diligence" he felt was required on this type of project and he said "a couple of months." A fair view of the credible testimony indicates that he did have adequate time. It is hardly reasonable for Burke, a sophisticated developer, to insist as he does that there was no need here to go beyond the plans and specifications where he had agreed by contract to submit his interests to the "as is" provision as to an older building just because he argues that of his total reliance of his reservation of the right to sue in negligence as to the adequacy of the defendants' plans and specifications. He knew that this was not new construction and that in 1985 he believed that this building, then thirteen stories, had been built back in the twenties.
We believe that the "as is" provision and the reservation of the buyer's right to sue for negligence provisions can be harmonized and operate in the October 1985 Contract as to the first count. We will not repeat here our analysis of certain other provisions of this Contract above set out but do realize that a contract is to be construed as a whole and in accord with the intent of the parties. See, e.g. [Barnard v. Barnard], 214 Conn. 99,109-110 (1990); [Fletcher-Terry Co. v. Grzeika], 1 Conn. App. 422,431 (1984). On determining the intent from the language used and the circumstances connected with the transaction "the question is not what intention existed in the minds of the parties but what intention is expressed in the language used." [Barnard v. Barnard], supra, 110. This is so when their agreement is in writing. Id. Where seemingly conflicting contract provisions can reasonably be reconciled a court should undertake to do so and give effect to both. [Proyecfinde Venezuela S.A. v. Banco Industrial de Venezuela],760 F.2d 390, 395-396 (2nd Circ. 1985); [City Service Co. Inc. v.Derby Co.], 654 F. Sup. 492, 502 (S.D. 1987); see 3 Corbin Contracts § 547, p. 173 n. 17. There is no question, of course, but that the court cannot write a new contract for the parties. Moreover, this court does not consider these two provisions under all the circumstances of this case as being fatally inconsistent. CT Page 4848
Having discussed the claims of the parties as to those provisions of the 1985 Contract containing the "as is" provision buyer's reservation of the right to sue in negligence, we now resolve that issue insofar as the first count is concerned. In doing so we consider these provisions in the light of the whole contract and what the intent of the parties appears to be. We will not, in the first count, regard the "as is" special defense to be an absolute bar to those change orders to which the defendants say it is interposed. Rather, keeping in mind that there is also a special defense of contributory negligence, and what we believe harmonizes, in accord with the parties' intent, we consider both the "as is" and contributory negligence defenses as essentially one in the nature of contributory negligence to be used in our comparative negligence analysis as to the first count only. The buyer in the 1985 Contract, in effect, said the "as is" clause may go in if we are given the right to sue in negligence and this was acceptable to the sellers. Or, it may be that the sellers said we will agree to the buyer's reservation to sue in negligence if you will include the "as is" provision. In any event, they are both in the 1985 Contract and, apparently, both sides were trying to protect themselves. Thus, essentially, under the whole contract, it does not distort the intent or expectations of the parties, in our view, to consider the "as is" and contributory negligence defenses as essentially contributory negligence in employing comparative negligence.
Prior to discussing the liability, if any, of the defendants under the first count on the numerous claims of damages made by the plaintiffs against the defendants, certain additional observations are appropriate. The plaintiffs in this action are Center Court and Burke. The defendants are Maitland/Strauss, Behr P.C. (Professional Corporation), Richard A. Maitland, Peter L. Strauss and Richard H. Behr. Realistically Burke [is] Center Court and vice-versa.
In this action we have a number of items for which counsel have agreed that the total of the plaintiffs' claim damages in the "Detail of plaintiffs' claims" filed February 27, 1993 is $779,668.00. The largest number of those items involve change orders, of which there are about twenty-five. The largest of these change orders is, to use the nomenclature agreed upon by the parties, for "toothed windows and windowsills" in the claimed amount of $435,353.00. The total claims in the change orders is $689,726.00. There are also three additional items of damages for CT Page 4849 which there are no change orders which total $89,942.00. These latter two figures total $779,668.00.
Although the defendants' answer interposes its "as is" defense to all counts, in its brief they take the position that "once the claims relating to the physical condition of the building are eliminated by the `as is' clause of the 1985 Contract, the change order amount in issue would be reduced from $782,000 to $200,524." The items of claimed damages which the defendants claim in their brief are required to be dismissed because of the alleged bar of the "as is" clause because they relate to the physical condition of the building are: the change order relating to the toothed-in windows and sills (Exhibit XX), the change orders concerning the misalignment of the existing windows (Exhibits AAA, CCC, EEE, GGGG), the change order for the removal of asbestos (Exhibit qq), the change order for the underground slabs and foundations discovered during the course of construction (Exhibit QQQQ) and the pipe chases encountered during the course of demolition for which there is no change order.
In going through the first count prior to determining whether the plaintiffs have proved any liability we have not overlooked the circumstance that the defendants maintain, in their fifth special defense that all or part of the damages resulted from or were contributed to by acts or omissions of third parties "including" certain persons and entities named and unnamed. The plaintiffs' briefing, in speaking to their argument that the defendants have raised a "due diligence" defense "characterized as a prong of their Third, Fifth and Sixth special defenses" claim that here the defendants are making "essentially a claim of contributory negligence." This, the plaintiffs maintain must fall both as a "factual and legal matter" and to this we do not agree.
As to the due diligence defenses in their Third, Fifth and Sixth special defenses the defendants first claim that many of the plaintiffs' claims are either shown in the plans or were impossible to determine before demolition and that the applicable standard of care did not require them to discover all "hidden" conditions found during demolition. The plaintiffs' basic misconception, they say, is that the design architect should have performed the contractor's investigatory work so that the contractor would meet no conditions on the job to complicate his work. The defendants also stress the full access right to the building given the plaintiffs well before buying the project which afforded them the opportunity to discover most of the conditions now complained of. The plaintiffs, the CT Page 4850 defendants continue, passed over every opportunity to investigate the building, simply adopted Kapetan's year old estimate of $5,338,000.00 without setting aside an adequate contingency and did not even do minimum due diligence despite adequate time to do so.
After we have discussed the matter of contributory negligence and "as is" as to those items of claimed damages where "as is" is involved, we will discuss the other items of damages claimed where only contributory negligence (and not "as is") is involved.
Looking at the allegations of the first count it is alleged in paragraph thirteen, inter alia, that the services, plans and specifications which the defendants provided to the plaintiffs pursuant to the 1980 Contract and the 1985 Contract "were inadequate and incomplete in the following respects: a. The plans and specifications prepared by MSB failed to disclose accurately that 343 windows on the Project were filled with masonry which was `toothed' into the original masonry of the building's exterior walls prior to the installation of aluminum siding on the walls in 1955." Subparagraph (c) of the same paragraph also alleges negligence in that "MSB failed to inspect properly or adequately the site with the result that MSB failed to identify or disclose the following: . . . v. masonry filling window frames which was toothed into the original masonry of the building's structure, . . ."
This court will not attempt a detailed discussion of the meaning of "toothed" or "toothed in" windows on the Project as the parties will know the meaning attributed to those items. The largest change order in this case which is in the amount of $435,353.00 and is Exhibit XX includes moneys claimed for masonry work at window openings because of the window enclosure at 343 window locations being toothed into the adjacent masonry. Exhibit maintains that KM had to rebuild all window jambs at both the interior and exterior of the wall at all of these locations. In the course of the 1955 construction on the Project sheets or panels of aluminum cladding was applied to most of the exterior of the building at 126 Court Street. Prior to doing so at that time most of the windows on that building were bricked up on the exterior and the inside of the window openings were bricked up on the interior were filled in with sheetrock and plaster. When window openings were bricked up from the exterior in 1955 it was not done so that there were straight jambs from which such brick could be knocked out or removed during demolition and restoration of such window openings. Rather, demolition or restoration was made more difficult because it was learned by KM early in the construction CT Page 4851 process in 1986 that rather than the brick infill making for a straight jamb in the window opening there had been a toothing in or toothing of brick in the jamb. This condition involved the toothing of brick into the adjoining brick already on the building in, according to Theusch, "3 to 4 locations on each jamb." This, it is claimed by the plaintiffs, was not disclosed by the plans and specifications and resulted in a more difficult and more expensive brick removal process than anticipated. The change order on Exhibit XX which totals $435,353.00 will be discussed in two main categories, i.e. damages claimed concerning window openings (without the sill replacement damage claim aspect) and those concerning the sill replacement aspect of damages (which, per Exhibit XX, basically cost $88,317.00).
First, we turn to the claim of the window openings (without the sills aspect) where inter alia the plaintiffs argue that the toothing condition caused them to have to rebuild "all windows jambs at both the interior and the exterior of the wall" and jambs at 343 window openings. It is maintained that this condition was not only not shown on the plans and specifications but also that it was "hidden" and/or "totally unforeseen." Insofar as "hidden" is concerned any consideration of that word that suggests fraud or negligent misrepresentation is ruled out by our disposition of the fourth count.
At the trial there was evidence on both sides of the matter of what and how much the standard of care required should or what should not be shown on or communicated by the plans and specifications on this issue. On all the credible evidence it is concluded that the applicable standard of care required the plans and specifications contain more sufficient data than was disclosed so as to communicate more clearly that the toothing-in condition existed at window openings in the Project building keeping in mind that by far the greater number of window openings were under the aluminum cladding installation in 1955. This is not to say that the plans and/or specifications had to disclose the precise number of such window openings as that was not known by the defendants. It is also relevant to remember that the defendants, particularly Maitland knew from drawings and specifications of Douglas Orr, the architect whose drawings and specifications were used for the 1955 work on the project building during which the aluminum cladding was installed, as well as certain available progress photographs of the 1955 work, that window openings on the building were being filled and that some toothing was being done. It is also true, however, that Maitland and the defendants did not know if toothing was done CT Page 4852 on all of the window openings. It was known to the defendants that there was toothing when Landmark submitted certain materials in 1983 to the Connecticut Historical Commission in connection with their application to obtain from the federal government certain tax benefits available to eligible developers. In this 1983 submission by Landmark, which was approved, the materials included certain categories captioned "Architectural feature" and "Approximate date of feature." Under the category for "Windows" with the approximate dates including 1916, 25, 55" the "Describe existing feature" states in part: "Most of the window units above the second story were removed during the 1955 modernization. The masonry openings were reduced or bricked up. Photographs indicate that the infill was substantially, but not uniformly toothed into the existing masonry. Many sills were damaged, or removed to accommodate air intakes for unitary air conditioners. . . ." Also included in this Landmark submission was a copy of certain of the architect's specifications for the 1955 modernization by the office of Douglas Orr, the architect at that time. Those specifications, dated February 15, 1955, concerning "masonry" in Section 3.04 entitled "Preparation Work" provides in part ". . . [Tooth out existingbrickworking every 6th course for bonding into old.]" (underlining as in Exhibit T). Section 3.06 of those specifications, entitled "Laying" provides in part: "Build to align and carried up plumb, straight and old. [Bond new work into old with toothed joint every6th course]. . . ." (underlining as in Exhibit T). The covering letter of the Landmark submission of July 1983 to the Connecticut Historical Commission over the signature of Joseph Chadwick, an employee of the defendants who worked on the submission states in part: "It should be especially noted that the present condition of the masonry is not known, and cannot be fully understood until the aluminum is removed. This represents a considerable risk to the developer and contractor. The nature of the mortgage insurance (HUD 220) requiring a no change order construction contract has forced us to include the masonry coating as a reasonable contingency, which will be deleted, if possible." This statement, of course, was made in July 1983, well before the appearance of John Burke.
On the whole of the credible evidence, as set out below, we find the defendants guilty of greater negligence than the plaintiffs on the toothing issue at window openings. We have already decided that the applicable standard of care does not require that an architect must set out or communicate in his plans and specifications all the information that he has concerning that which is the subject of those plans and specifications. It is well CT Page 4853 settled that a party may be liable for the breach of a duty which arises out of a contractual relationship. See e.g. [Scribner v.O'Brien, Inc.], 169 Conn. 389, 400 (1975); [Sasso v. Ayotte],155 Conn. 525, 529 (1967). Prosser opines that, in negligence cases, a duty may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. Prosser, Law of Torts, (4th ed) § 53. The ultimate test of the duty involved is to be found in the reasonable foreseeability of harm resulting from a failure to exercise the requisite care and this does not mean the foreseeability of any harm whatsoever or that the particular harm which resulted would occur. [Noebel v. Housing authority [Authority]], 146 Conn. 197,200-201 (1959); [Coburn v. Lenox Homes, Inc.], 173 Conn. 567,575 (1977); [Frankovitch v. Burton], 185 Conn. 14, 21 (1981). Rather the test is whether the ordinary reasonable architect, in the position of the defendants, knowing what they knew or should have known, anticipate that harm of the general nature suffered would result, keeping in mind the architectural services they had agreed would be provided in representing their expertise as professionals. See [Noebel v.Housing Authority], supra, 201, and cases there cited. The foreseeability requirement operates as a limitation upon a defendant for the consequences of his negligent act and, so, while foreseeability has no relevance to the issue of causation, it does have relevance to the issue of duty. Again, as Justice Traynor said, those who retain expertise ". . . are not justified in expecting infallibility, but can expect only reasonable care and competence. They purchase service, not insurance." [Gagne v. Bertram], 275 P.2d 15,21 (1984.
In this case, the defendants did not, on the window openings issue, meet the standard of care which the duty thereunder imposed on them to the plaintiffs and they are therefore found to be negligent in that regard. From the information the defendants had available to them on this issue, they should have included on or in the contract documents, i.e. the plans and specifications, such additional information as would likely alert or communicate to the person or persons that they actually knew would be using and/or relying on them that there was a "considerable" risk posed by the toothing condition.
The defendants themselves told the Connecticut Historical Commission of the considerable risk to the developer and contractor on this toothing condition into existing masonry from photographs they had which that the "[brick] infill was substantially, but not uniformly toothed into the existing masonry" and they also opined CT Page 4854 that "the extent of it would not be known until the cladding was removed." They had the 1955 Orr drawings and specifications; the latter were explicit on the presence of certain toothing. Any claim that the defendants' drawings so alerted or communicated the quality of the risk in the toothing has not been proven and this applies, on the whole evidence, including Exhibits UU, VV and WW. Moreover, the defendants' specifications (Exhibit G) on the masonry phase are not helpful here either. The judgment call not to expand upon this information in the plans and specifications under all the circumstances, while not fraudulent or negligent misrepresentation, does lead to a conclusion of negligence. Here the plaintiffs have sustained their burden of proving negligence and that negligence was a proximate cause of harm and damages to the plaintiffs. It goes without saying, however, that negligence does not require that a defendant be the sole proximate cause of harm suffered as more than one proximate cause may result in any harm suffered. See, e.g. [Coburn v. Lenox Homes, Inc.], supra, 383.
Next, on this window opening issue, we consider the question of the plaintiffs' negligence in resolving the comparative negligence issue. In doing so we must decide whether the plaintiffs and those acting as their agents or representatives exercised reasonable care, that care exercised by persons similarly situated under similar circumstances. It is important to observe that the main actors on the plaintiffs' side of this aspect were all involved for quite some time before the written contract of October 30, 1985 and particularly Kiesl and Burke. Theusch had access to the plans and specifications later than did Kiesl and Burke but did not come to New Haven to the site until August 1985, some months after Kiesl and Burke had been there. Evidence about the depth and quality of the inspections and verification of the site by plaintiffs and their admitted agents, which is relevant here, has already been referred to. Their accessibility not only to Kapetan's 2328 estimate which plainly revealed he anticipated substantial work on the masonry (both window openings and sills), which they had months before the October 30, 1985 Contract, did not raise, as it should have, their level of inquiry on this issue. After all, this was an existing building, not new construction, which suggested a higher level of inquiry ought to have been made by the plaintiffs. Even Boro, the plaintiffs' expert, despite his stated position that the Contract documents, particularly the plans and specifications were controlling, conceded that, as to any existing plans on an existing building his own project manager probably would have inquired if there were any and asked to look at any that did exist. This is particularly true, he noted, in CT Page 4855 rehabilitating an existing building. If Boro knew that Kapetan had made a bid estimate, he would have wanted to look at it as he (Boro) would like to see everything that was available. Boro did not know if any part of the building was exposed so that toothing could be seen.
Exhibit XX was the change order which was prepared and signed by Theusch and directed to Frank Sequino, who was then the inspecting architect of the New York architectural firm of Tudda, Scherer and Zborowski (TPZ), Theusch attached to it certain "photographs which show the toothed brick enclosure being revealed when the [aluminum] siding was being removed" in his May 20, 1986 letter to Sequino. In that letter Theusch informed Sequino as follows: "These photographs also show interior view of the jambs and building elevations showing the total scope of work added by this condition. Please note the photograph dated March 4, 1986 which showed enclosed window material being butted in to the existing jambs. These were the only windows on the project exposed and were taken to indicate the typical conditions throughout." The referenced photos of March 4, 1986 which were taken to indicate the typical condition throughout are of two adjoining bricked-up window openings. There were, however, other photographs of bricked-up windows (introduced into evidence as exhibits by the defendants) immediately adjoining the windows in the referenced March 4, 1986 photographs which were of windows that were exposed for some years before 1985 and had not been covered by any of the aluminum cladding — and these clearly depicted the presence of toothing-in. This information, if Theusch knew it, was not passed along to TPZ. It is thus true that those who passed on this change order did not have the whole picture. Yet Theusch's back-up material submitted to Sequino for the approval of the change order in the total amount of $435,353.00 (for window openings and sills) does state that the added additional work was "totally unknown to us" because of the aluminum siding on the exterior and the plaster on the interior of the window opening. It is apparent that this is not quite so. Sequino, who approved this change order as the inspecting architect (as well as a number of other relevant change orders), was associated at the time with the New York architectural firm of TPZ, did not testify at the trial and no inference of any sort can be drawn from that as there was no evidence that he was available. See [Secondino v. New Haven Gas Co.], 147 Conn. 672 (1960). It is hard to square Theusch's "assumption" that the March 4, 1986 photograph was deemed by him to be the typical condition throughout when immediately adjoining were windows that clearly demonstrated toothing. Moreover, both sets of the windows were exposed to CT Page 4856 viewing well before, as well as after, the appearance of Burke, Kiesl or Theusch at the project site. Furthermore, the broad rights of access to the building given Burke and his agents and ultimately to Center Court adds to the conclusion that the plaintiffs should have further investigated this matter. To assume that the March 4, 1986 photos showed "the typical conditions throughout" as Theusch stated, was not reasonable. For the plaintiffs to simply say that the plans and specifications did not alert them here to this is not acceptable under the circumstances. The cladding had been installed in sheets or panels and, given the circumstances, it seems reasonable that the plaintiffs could, and should have, done some sampling removal of some panels to assist in determining if there were other toothed-in window openings. Also involved in this claim (and other change orders as well) is the circumstance that when KM and Center Court signed their construction Contract on September 4, 1985, KM did not even have firm subcontractor bids for "substantial portions of the work on the project" including the bid on demolition which covered the window openings and sills among others. There is no credible evidence that any demolition subcontractor made even a cursory survey in that area before KM signed its Contract with Center Court on September 4, 1985. It is difficult to credit Kiesl's testimony that Kapetan's 2328 information (almost one year old) was not substantially used by him in his examination of the building preparatory to his estimate given to Burke to do the project in August 1985. Theusch candidly stated that KM had not finally put in its estimate for the project until [after] it signed its Contract with Center Court and that was signed on September 4, 1985. Concerning Kiesl's preparation of the estimate, Theusch, when asked if what KM "did was, simply adopt a prior Form 2328 that had been prepared by Kapetan", Theusch answered "I believe that's what was done for HUD purposes." Parenthetically, Theusch testified that KM is still owed money by Center Court under their September 4, 1985 Contract with KM and whether it will be repaid or not depends at least in part on the outcome of this lawsuit. The court concludes that the defendants have sustained their burden of proving that the plaintiffs were guilty of contributory negligence that was a proximate cause of harm to the plaintiffs.
Proceeding, we now take up the liability issue as to that portion of the change order in Exhibit XX that involves the sills and referred to as "sill replacement" in that change order. The basic dollar amount claimed there is $88,317.00 plus certain adjustments. According to Theusch the missing or damaged sills was another matter that was hidden and unforeseen. The plaintiffs CT Page 4857 argue that there is not any reference in the plans or specifications "to the fact that practically every window sill in the building would have to be replaced in the process of rehabilitation." Actually, Theusch, in his change order request asked approval for the rebuilding of 343 window openings while asking for replacement of sills that were either damaged or missing at 245 window locations. Parenthetically, at one point in his testimony Theusch estimated that there were "About four hundred ten" windows on the total project. The plaintiffs contend that the only reference to the replacement of sills "is a generic note in the specifications, providing a direction to replace whatever missing, chipped, broken or spalled sills might exist" and their expert, Boro said that "this off-hand reference is insufficient to bring to the contractor's attention this substantial work issue" and so, this brought about "an unanticipated expense."
On the other hand, the defendants have pleaded contributory negligence and the "as is" provision. Here again they point to the quality of the inspection by the inspecting architect (Sequino) from the TPZ firm who worked for and were the agents of the owner and who were to protect his interest. They also make reference to certain evidence of Ronald Feltenstein of TPZ firm who took over after Sequino had left TPZ. At the trial they adduced evidence that the Contract documents called out the missing or damaged sill issue.
When the aluminum cladding was installed in 1955, some stone sills were broken off, chipped away, knocked off or sustained damage from spalling. This came about prior to the installation of the cladding in the preparation for receiving the sub-framing which is attached to the building exterior in the creation of a flush plane on which the cladding was installed. In order to bring about this plane being flush with the exterior brick of the building this damage to the then existing sills probably came about. The rehabilitation undertaken required restoration of sills to their full profile. Theusch anticipated replacement would only be needed for a "minimal number" of sills as there was, he claimed, nothing indicated on the plans "that there was any reason that any amount of any significance would require replacement, were damaged whatsoever." When asked what a "minimum number" of sills meant to him here, Theusch said "Fifteen, twenty. Somewhere in that vicinity" and he said that he got this number "Based on past experience, buildings of that type, put in the minimal allowance." There was on Exhibit WW, a part of the defendants' plans, a note that point to the sills portrayal that specifically says "Restore CT Page 4858 projections as required to meet wall configuration prior to aluminum skin installations." Theusch did see this note when bidding on the project and it was his assumption that only a minor number of sills were involved even though the note also stated "Typical of all elevations." It is apparent from the evidence that the Kapetan 2328 available to Theusch, Kiesl and Burke demonstrated that Kapetan anticipated sill replacements. Again although Maitland knew before October 30, 1988 of damages to sills he did not know how many sills were so involved. In any event, there was no duty on the defendants' part to have the plan and specifications disclose the number of locations at which such condition prevailed. Even Boro's testimony fairly indicated that the presence of the cladding in turn indicated that framing members had to be attached to the building exterior to hold the cladding flush and, accordingly, sills would be damaged. Significantly, the specifications in the "Unit Masonry" section of Exhibit G has a division captioned "Cast Stone Window Sills" (in large type on pages 4A-8 and 4A-9) which provides:
CAST STONE WINDOW SILLS
 Provide cast stone window sills same profile, material and design as adjacent sound, true-to-profile existing sills.
 b. Provide shop drawings showing size, profile and finish of sills for Architect's approval.
 c. New cast stone sills shall be provided to replace sills found with the following defects:
(1) Missing sills.
 (2) Sills not to full provide and size of sound full profile sills.
(3) Cracked, shipped or spalled sills."
This "generic note", to use the plaintiffs' parlance, is one of a large number of specifications drawn and commissioned specifically for this project. Actually, inquiry was made as to whether this particular specification was drawn for this specific project, and it was. This specification, a part of the Contract documents, definitely communicated what was to be done on the project CT Page 4859 concerning cast stone window sills including when and under what circumstances sills were to be provided.
The plaintiffs, on the sill issue portion of Exhibit XX, have been proven guilty of contributory negligence which was a proximate cause of their injury in the amount of 80% and that the defendants are guilty of such contributory negligence in the amount of 20%. Therefore, because the negligence of the plaintiffs was greater than the negligence of the defendants on the sill issue, the plaintiffs have not proven liability of the defendants on that portion of the change order in Exhibit XX which seeks damages for the sills. See General Statutes 152-572h. In terms of dollars there is therefore to be deducted from the $435,353.00 the sum of $88,317.77. We thus deduct from the $435,353.00 this "sill replacement" amount of $88,317.00, which yields the figure of $347,036.00.
As already indicated we have determined that the plaintiffs have proven liability in the toothed window opening aspect of Exhibit XX and here we start with the figure of $347,036.00. Our conclusion here on the comparative negligence aspect is that the plaintiffs are guilty of 33.33% of contributory negligence that was a proximate cause of their harm or injury here while the defendants are guilty of 66.66% contributory negligence which was a proximate cause of the plaintiffs' harm or injury. Because the negligence of the plaintiffs is not greater than that of the defendants, the plaintiffs are entitled to recover on the toothing portion of the change order in Exhibit XX.
Before, however, we can conclude on the dollar amount of their recovery we must consider certain matters. At the trial there was conflicting evidence on the manner and cost of the repair of the window openings including those that were toothed in. Insofar as the total cost claimed per window of $700.20 to repair each of 343 window openings goes, the court cannot find that that has been proven to be reasonable. It is apparent that the only representative of the inspecting architects, the TPZ firm, who testified and that was Feltenstein in his deposition, could not offer any reasonable explanation. We take into consideration that one Sequino, and not Feltenstein, was the inspecting architect on Exhibit XX. The plaintiffs suggested that the change order process in general involving as it did, Theusch, Sequino or Feltenstein, Burke and HUD assured tight quality control not only over the need for it but also the amount sought. The court does not agree. All this makes for problems in arriving at the amount of damages on CT Page 4860 this issue upon which we began with the figure of $347,036.00 as the maximum amount available. We believe that there exist on this issue two grounds upon which to determine that $347,036.00 is not the proper amount which the plaintiffs are entitled to recover here. One is that of mitigation of damages and the other is that of the reasonableness of that amount.
Mere difficulty in the assessment of damages is, of course, not a sufficient reason for refusing them where the right to them has been established. [Ball v. Pardy Construction Co.], 108 Conn. 549,551 (1928); see [Grant v. West Haven Gardens], 181 Conn. 379,388 (1980). In assessing damages, a trier is concerned with reasonable probabilities, not possibilities. [Davis v. P.Gambardella Son Cheese Corporation], 147 Conn. 365, 373 (1960). The evidence at trial proved that the manner of removal of brick from brick-filled windows was unreasonable and that the costs attributed thereto was also unreasonable. The defendants claimed such unreasonableness at the trial.
In [Preston v. Keith], 217 Conn. 12, 16 (1991), our Supreme Court said in quoting from [Morro v. Brockett], 109 Conn. 87, 93-94
(1929):
 "The burden is on the plaintiff to establish that the injuries for which he seeks damages were the proximate result of the negligence of the defendant, but when a prima facie case had been made out, as in this instance, it becomes incumbent upon the defendant if he seeks to exonerate himself from responsibility for a portion of the consequences to show that some of these had their proximate cause in the failure of the plaintiff to act in good faith in an attempt to promote recovery and avoid aggravation of the initial injury."
[Morro] established that the theoretical formulation for a plaintiff's duty to mitigate damages was that a "defendant's negligence is not the proximate, or, legal, cause of any damage that would have been avoided had the plaintiff taken reasonable steps" to minimize his damages. In such a case the court will measure his damages as though he had acted reasonably. [Williametzv. Goldfeld], 171 Conn. 622, 627 (1976). The logical corollary of this is, of course, that a plaintiff is entitled to recover the CT Page 4861 cost of any reasonable efforts to mitigate the damages caused by a defendant. [West Haven Sound Development Corporation v. West Haven],201 Conn. 305, 322 (1986). In a negligence case although the plaintiff bears the burden of proving damages, the defendant bears the burden of proof on the issue of mitigation. [Preston v. Keith], supra, 21-22; [Kilduff v. Adams], 219 Conn. 314 (1991).
Even after the toothing condition was discovered the credible evidence discloses that the means of the demolition of affected window openings, i.e. by sledge hammer or air hammer from the interior of the building, was unreasonably expensive and impractical. Moreover, this means of demolition in these circumstances was, largely due to the cost factor, not only impractical but rarely heard of in the business, especially considering the object to be accomplished. To persist in this method, after Theusch discovered the toothing condition, proximately and unreasonably aggravated the damages caused by the defendants' negligence. The defendants have sustained their burden of proof on mitigation.
Turning to the matter of the reasonableness of expenses allegedly incurred and/or paid on account of the window openings aspect of Exhibit XX, it has been said that "Proof of the expenses paid or incurred affords some evidence of the value of the services, and if unreasonableness in amount does not appear from other evidence or through application of the trier's general knowledge of the subject mater, its reasonableness will be presumed." [Carangelo v. Nutmeg Farm Inc.], 115 Conn. 457, 462
(1932); see [Fuessenich v. D'Nardo], 195 Conn. 144, 156 (1985) (damages [re] paving and curbing contract). In this case unreasonableness is claimed as to the $700.20 per window charge claimed in Exhibit XX (this $700.20 does not include "Sill Replacement"). This unreasonableness is so even allowing for what was said to be the escalating costs and labor and material in the 1980s. There was credible evidence of dollar amounts of costs, adduced by the defendants, for the window opening work albeit somewhat earlier in time than that done in this case. However, even allowing for escalating costs on which there was credible evidence of a rate per year during the 1980s the $700.20 is clearly unreasonable. This court finds that the plaintiffs have not proven that $700.20 per window is a reasonable cost under the circumstances.
Working with the figure of $347,036.00 from which we now deduct $115,678.00 which represents the 33.3% of negligence of the CT Page 4862 plaintiffs' contributory negligence which was a proximate cause of their harm and damages on this issue, we arrive at the figure of $231,358.00. We deduct from $231,358.00 the amount of $60,025.00, which latter figure we deem a fair approximation for the plaintiffs' failure to mitigate their damages and a deduction to bring their per window request of $700.20 into a reasonable context, i.e. $525.00. This then becomes the figure of $171,333.00 which we conclude is the amount that the plaintiffs are to recover from the defendants on Exhibit XX.
[Asbestos]
We now turn to the matter of asbestos removal for which the plaintiffs have an approved change order, Exhibit qq, in the amount of $72,526.00 which they claim as part of their damages.
The plaintiffs claim that "KM discovered the first problem with the [defendants'] plans and specifications almost immediately upon commencing construction" when, in January 1986, a couple of days after starting construction, the mechanical contractor advised James Theusch, during a walkthrough of the building, that he had located asbestos "on one of the middle floors surrounding some piping." They continue, and state that "subsequently, asbestos was found in [that] basement at the boilers and on piping located throughout the building." As a result of the discovery of asbestos, of which they say there was not any indication in the defendants' plans or specifications of the risk of any asbestos being located in the project, the plaintiffs claim that "virtually the whole project ground to a halt" (although construction was able to continue in some areas) while the "dangerous substance" was removed. The removal of asbestos is a difficult process which the plaintiffs say required special equipment and "extensive laboratory testing to certify a successful conclusion."
The defendants admit that the presence of asbestos was not indicated in their plans and specifications and argue that they did not know that there was any in the project building. The defendants maintain that the applicable standard of care did not require that the presence of asbestos be shown or called out in their drawings or specifications. They argue that if there was any in the building, it should have been discovered when the plaintiffs' contractor investigated the building or when he solicited the subcontractor bids. Also they contend that because it is admittedly the demolition subcontractor who is responsible [inter alia] for the removal of such things as boilers and piping in CT Page 4863 the building, then that subcontractor could not have estimated the work on which he was bidding without discovering the asbestos. In resisting any liability on this change order, the defendants also point to Theusch's admitted lack of experience with asbestos.
Our analysis begins with the admission that the defendants' plans and specifications do not indicate the presence of any asbestos in the project building. Theusch, however, said the asbestos was visible to the naked eye when it was pointed out to him. Asbestos was found in piping on floors in the building, on some "equipment" on a couple of intermediate floors, and around boilers and piping around the boilers. As noted, this fell within the scope of the demolition subcontractor's undertaking.
There was conflicting evidence on whether the defendants, as architects, violated the standard of care by not indicating on their plans and specifications the presence of asbestos in the Center Court project building at the time of their plans and specifications in 1983. Boro, the plaintiffs' expert, answered a long hypothetical question in this regard concerning what plans or specifications should or should not do about relation "to the disclosure of the existence and/or risk of existence of asbestos in the building." He also gave other testimony on the matter of asbestos.
There is no requirement that a hypothetical question contains all of the pertinent facts in evidence but "the essential considerations include whether the question presents the facts in such a manner that they bear a true and fair relationship to each other and the whole evidence in the case . . . not so worded as to be likely to mislead or confuse the [trier of fact], and is not so lacking in the essential facts as to be without value in the decision of the case. [Healy v. White], 173 Conn. 438, 447 (1977)." [Trzcinski v. Richey], 190 Conn. 285, 298 (1983). The facts assumed in the hypothetical question must be sufficient to justify a definite and intelligent opinion. [Spoto v. Hayward Mfg. Co.],2 Conn. App. 663, 670 (1984). The trier of fact is not obligated to accept the ultimate opinion of any expert witness, see [Van Dehi v.Parson Bros. Inc.], 146 Conn. 282, 286 (1959), and there was more than one expert who spoke to the asbestos issue.
In any event, Boro's opinion was that the defendants did not meet the standard of care in 1983 saying that "the architect should have notified the owner that he either saw asbestos there or suspected asbestos and should have inquired, if he was not CT Page 4864 competent himself, to have the asbestos surveyed and an abatement program made at that time." Further, he opined that based on the age of the building it would have been "reasonable" for the architect to have expected that asbestos might be present." Later, on cross examination, the defendant Maitland was asked if in 1983, based on the age of the building, if he was aware the building probably had asbestos in it. He answered that he was not aware that "it probably had asbestos in it."
The credible evidence on this issue does not show that the plaintiffs have proven that the defendants violated the standard of care on the asbestos issue as alleged. Maitland, as already noted, said that he was not aware that there was "probably" asbestos in this building. Peter Abel, a practicing architect, testified as an expert for the defendants. It was his opinion that it was "absolutely not" Maitland, Strauss and Behr's responsibility to investigate the "possible presence" of asbestos in the building at the time their plans were prepared in 1983. The standard of care of the architect in 1983 did not extend to requiring the architect to inform a client or a contractor concerning the presence of asbestos. There was, said Abel, in 1983 a federal statute known as the Asbestos Hazardous Emergency Response Act ("AHERA") that addressed the danger of asbestos in school buildings and school projects. There was no credible evidence showing that at that time there was legislation regulating asbestos in commercial high-rise buildings such as the Center Court building. At that time the general practice was that the general contractor would learn of asbestos from his own investigation or the field investigation of his subcontractors, and particularly of the field investigation of the subcontractor to whose specialty asbestos involvement would specifically relate — in this case it would be the demolition subcontractor.
North Star Demolition Ltd. ("North Star") of Milwaukee, Wisconsin was Center Court's first demolition subcontractor. When Kiesl, Theusch and Chapizio came to Connecticut in August 1985 and examined the building and started to solicit bids from subcontractors, no one from North Star came at that time. No firm estimate or contract had been made with North Star, or any demolition contractor, as of September 4, 1985 when KM and Center Court signed their contract. The first time North Star ever came to the project site was "sometime in the fall of 1985" which, according to Theusch, was after September 4, 1985, about "approximately the first half of October in `85." Theusch was on the site after September 4, 1985 and Kiesl again came to the site CT Page 4865 in October 1985. Parenthetically, Kiesl's deposition does not refer to asbestos at all, including such reference to it on the occasion of his April 1985 meeting at the site between himself, Burke, Goldkamp and the defendant Behr. North Star did not even sign a firm contract with KM as the demolition contractor until January 21, 1986. It is clear that the plaintiffs, including Burke's representatives Kiesl and Theusch, failed to explore this significant aspect of the demolition work, i.e. asbestos, until quite late in the process.
Moreover, Burke as well as Kiesl and Theusch, had the plans and specifications long before the October 30, 1985 Contract. Certainly Burke and Kiesl, at the very least, had them as far back as May 1985. The demolition drawing of the defendant (Ex. UU) has certain notes on it directed to the general contractor concerning the scope of his work. As noted, Kiesl had this long before KM even signed their September 4, 1985 Contract. Among the directives on Exhibit UU was one "to remove existing boilers . . . piping . . . which are not part of the final work." It would be particularly around the boilers where asbestos would be and should have been picked up on an inspection of the project well before even September 4, 1985. At his pretrial deposition Boro, the plaintiff's expert, said that asbestos was visible on the boilers. The defendants did not violate the applicable standard of care as to asbestos.
It is concluded that the plaintiffs have not sustained their burden of proving the liability of the defendants on their claim on the asbestos change order for $72,560.00. They have not proven any negligence, i.e. zero negligence, on the part of the defendants. They are, therefore, not entitled to recover anything on the asbestos change order, i.e. Exhibit qq.
[Other Window Claims]
There are other change orders concerning windows which the plaintiffs argue came to their attention as construction progressed and after the aluminum cladding had been removed. Generally speaking as to these, they argue that these involved actual situations that were at variance with what was shown on the defendants' plans and specifications. The plaintiffs contend that given the circumstance that the defendants at the time of their preparation of the plans and specifications had available to them certain architectural drawings dated 1926 and 1916, that their failure to utilize fully those earlier drawings, particularly as to the location and size of the windows shown thereon, resulted in CT Page 4866 causing additional work and expenses and certain change orders now claimed. These change orders are set out in Exhibits AAA, CCC, EEE, GGG and ZZ. The defendants' briefing on this aspect argues that the plans were not intended to show the product that the contractor was to construct but rather to show a design concept, not the work that the contractor "must perform to achieve each construction detail on the plans." As to these change orders, it is quite different from others, as here the claims go to what the plans and specifications [did] show with reference to such things as the location and alignment of certain windows, the location of certain windows, and that the presence of certain windows was at variance to the actual physical fact on the building itself.
Exhibit AAA (Misaligned Windows on West Elevation)
Exhibit AAA is a change order in which the plaintiffs seek damages in the amount of $1,510.00. This concerns the misalignment of windows that were on the 2d 3rd and 4th floors on the west wall of the building which were not aligned (and the contractor had to do so) with windows on floors above. This misalignment was not disclosed by the defendants' plans and specifications and was not apparent until the cladding was removed.
This court concludes that the plaintiffs have sustained their burden of proof on this change order, the necessity for which was proximately caused entirely by the negligence of the defendants and that, therefore, the plaintiffs were not guilty of any, i.e. zero, negligence. The plaintiffs are entitled to recover, as part of their damages, $1,510.00 which is the entire amount of the change order in Exhibit AAA.
 Exhibit CCC (Incorrect Height of Windows on Third Floor of East Elevation)
Exhibit CCC is a change order in which the plaintiffs seek damages in the amount of $3,385.00. It concerns the extra expense generated by removing the difference in height of windows on the east wall. The problem was that these windows as presented by the defendants' plans and specifications were approximately eight feet in height and the actual situation on the building, disclosed after the cladding was removed, was that these windows were actually about four feet two and a half inches high. The actual condition encountered was that which was shown on the 1926 drawings which the plaintiffs had at the time they prepared their own plans and specifications. There was no way for the contractor to know that CT Page 4867 these windows were not of the height shown on the defendants' plans. This discrepancy required the contractor KM to create window openings to correspond with the height showing the defendants' plans.
This court concludes that the plaintiffs have sustained their burden of proof on this change order, the necessity for which was proximately caused entirely by the negligence of the defendants and that, therefore, the plaintiffs were not guilty of any, i.e. zero, negligence. The plaintiffs are entitled to recover, as part of their damages, $3,385.00 which is the entire amount of their change order in Exhibit CCC.
 Exhibit EEE (Location of Windows on Third and Fourth Floor on South Elevation)
Exhibit EEE is a change order in which the plaintiffs seek damages in the amount of $19,042.00. It concerns the extra expense generated by the need to provide proper window openings which agreed in alignment and quantity with the locations and sizes shown on the defendants' plans and specifications. When the cladding had been removed, it became evident that a number of windows on the third and fourth floor on the south wall were not in the same location as they were shown to be on the defendants' plans and specifications. Again the defendants had the 1926 drawings. There is not one location where any of the window openings on the 1926 elevations agreed with the locations shown on the defendants' plans and specifications. The contractor KM tried unsuccessfully to obtain a waiver from the Connecticut Historical Commission permitting it to deal with this matter in accordance with the 1926 drawings. The waiver was not obtained with the Historical Commission taking the position that it was the defendants' plans and specifications that had been approved by the Park Service of the United States Department of Interior and that the defendants' plans and specifications were to be followed. The expenses incurred, as set out in Exhibit EEE, followed.
Here, too, this court concludes that the plaintiffs have sustained their burden of proof on this change order, the necessity for which was proximately caused entirely by the negligence of the defendants and that, therefore, the plaintiffs were not guilty of any, i.e. zero, negligence. The plaintiffs are entitled to recover as part of their damages, $29,042.00 which is the entire amount of the change order in Exhibit EEE. CT Page 4868
 Exhibit GGG (Height Problems with Windows on East Elevation)
Exhibit GGG is a change order in which the plaintiffs seek damages in the amount of $3,013.00. It involves the extra expenses generated by the need in reworking window openings for sixteen windows on the east wall of windows to be installed there. These windows were all of a different height than that shown on the defendants' plans and specifications. The heights indicated on the 1926 drawings actually depicted the window heights as they in fact existed on the east wall and such a depiction on the defendants' plans and specifications would have obviated this particular problem.
This court concludes that the plaintiffs have sustained their burden of proof on this change order, the necessity for which was proximately caused entirely by the negligence of the defendants and that, therefore, the plaintiffs were not guilty of any, i.e. zero, negligence. The plaintiffs are entitled to recover as part of their damages, $3,013.00 which is the entire amount in Exhibit GGG.
 Exhibit ZZ (Windows Indicated on Defendants' Plans Where, In Fact, Doors Existed)
Exhibit ZZ is a change order in which the plaintiffs seek damages in the amount of $5,162.00. This claim concerns the extra expenses generated by expenses caused to correct the problem encountered, after the cladding was removed, which was caused by the fact that what the defendants' plans showed as windows were, in fact, fire escape doors. This was on the west wall and occurred at one location on each floor from floors two through twelve, for a total of eleven locations. Again the defendants had prior drawings in preparing their plans and appropriate use of those earlier drawings would have indicated that fire escape doors and not windows existed at those locations.
This court concludes that the plaintiffs have sustained their burden of proof on this change order, the necessity for which was proximately caused entirely by the defendants' negligence and that, therefore, the plaintiffs are not guilty of any negligence. The plaintiffs are entitled to recover as part of their damages $5,162.00 which is the entire amount of Exhibit ZZ.
 [Subsurface Conditions]] a) Exhibit QQQQ
CT Page 4869
In the change order which is Exhibit QQQQ the plaintiffs seek damages from the defendants in the amount of $17,914.00. Here it is claimed that certain subsurface conditions "not disclosed on the plans" as well as that "limited boring" tests conducted by the defendants generated these unanticipated expenses. Drawing upon their view of the evidence, the plaintiffs claim that the defendants' reading of the Westcott and Mapes 1972 drawings does not bear any relationship "to what they actually show". On the other hand, the defendants claim that they properly relied on the 1972 Westcott and Mapes drawings which, they maintain, indicated that all such subsurface foundations or subsurface conditions complained of had been removed and they undertook a reasonable number of test borings in the area involved in their investigation here, and that, therefore, they were justified in assuming that such subsurface foundations were "non-existent". Further, while the defendants state that they do not argue that the contractor's (KM's) entitlement to a change order from someone else for this additional work, they do deny that that extra work was not as a result of any negligence on their part. The court agrees with the defendants.
During construction the contractor encountered subsurface conditions such as large concrete slabs and large concrete matt foundations in the area of the footings and foundations. There was no indication of this on the defendants' plans or specifications. The defendants' plans did not do so because in preparing the plans and specifications they relied on certain drawings of "Westcott 
Mapes, Inc., Architects and Engineers" of New Haven, hereinafter 1972 drawings, which plans were made in 1972 and issued in 1976 and were the most current plans of drawings of this area, i.e.," Basement-First Floor, Plans and Details." The defendants themselves also took test borings of this area. The 1972 drawings had been given to the defendants by SNET as representing the condition of the building and "as indication of the existing conditions." These 1972 drawings were significant to the design work of the defendants as the defendants provided for a brand new three-story addition to the project which was in part atop the subsurface area where the contractor encountered the subsurface concrete slabs and matting complained of in this change order as well as a certain column problem (which is the subject of the next change order discussed below, i.e. Exhibit OOOO).
In relying upon the 1972 drawings by Westcott and Mapes, which were given to the defendants by SNET "as a record of the work done CT Page 4870 in that area of the site" of specific relativity to the defendants in preparing their plans and specifications which are the subject of this suit was a note on the 1972 drawing which states ["GEN NOTE] Remove all existing foundations shown dotted." The dotted lines which are on this drawing "indicate foundations, foundation walls, foundations under columns, foundations under miscellaneous walls that were in line with this. . . ." This note was clear as to what it referred to. In the preparation of their plans with respect to this area, the defendants assumed, and properly so, that the foundations had all been removed and that there would be no need for additional removal of foundations in that area. Boro, the plaintiff's expert disagreed with that reading of the 1972 Westcott and Mapes as he did with the adequacy of the number of test borings made by the defendants in that area. The test borings were commissioned by the defendants as a means of confirming the validity of their assumption that the removal of existing foundations directed by the note on the 1972 drawing had been followed. There is no credible evidence that demonstrates otherwise.
Moreover, the court does not consider that the defendants' position on this subsurface condition issue is, as the plaintiffs appear to claim, somehow fatally inconsistent with the position they have taken generally that they have no obligation to disclose certain conditions. Here, the defendants were given specific information in clear language on the most recent drawing (prior to their involvement in this project) made by a firm of architects and engineers in a general note stating "Remove all existing foundations shown dotted." Further, the 1972 drawing came from SNET, who had owned this property for many years, and it was given as representative of existing conditions. The assumption of the defendants, vis-a-vis the 1972 drawing discussed above and confirmed by their test borings, was reasonable under all the circumstances. There is, of course, no fraud, misrepresentation or the like as to this subsurface condition. There was [no] negligence on the part of the defendants, proven by the plaintiffs, insofar as any claims made by the plaintiffs to permit this court to find that the defendants respond in damages as to Exhibit QQQQ. In concluding our discussion of this change order in Exhibit QQQQ we do point out that the plaintiffs, in their comprehensive briefing, do not discuss at all Section 12.2.1 of the General Conditions here.
(b) Strap footing (Exhibit OOOO)
CT Page 4871
In the change order which is Exhibit OOOO the plaintiffs seek damages from the defendants in the amount of $3,397.00. It appears that, according to the plaintiffs, the problem requiring this change order was "that an existing column in the building, which did not show on S-1 (a structural drawing also known as Exhibit MMMM) interfered with the corner of a column to be constructed in connection with that project." This problem was encountered in the area of C-2 (on Exhibit MMMM) and was down in the existing basement foundation at a part of the footing below the existing column. A portion of the "interfering" footing had to be removed and some additional demolition done in this area to remedy the interference. This remedy was accomplished by means of a strap footing which the contractor constructed. This strap footing solution was devised by the structural consultant originally retained by the defendants to assist them in preparing structural drawings of which Exhibit MMMM was one. This consultant provided a revision to the structural drawing which brought about the strap footing remedy.
Again, we have, as the defendants argue and this court agrees, what is essentially a subsurface condition that again could not be encountered or discovered by anyone until the area in question was excavated. For that reason the inference that the plaintiffs suggests be drawn by the statement that this "problem" was not shown on the drawing in S-1 (also Exhibit MMMM) is, therefore, not a reasonable one and certainly not where there is an absence of fraud, misrepresentation and the like. As already noted, it was in the basement foundation. Moreover, another of the defendants' drawings, i.e. A-1 (a structural drawing also known as Exhibit NNNN), [did] show the original footing in this C-2 column problem. While it appears that it was only three feet four inches, based on the 1916 drawings from SNET in evidence and, when actually excavated turned out to be nine feet square, that again was a circumstance that could not be encountered or discovered until the area in question was actually investigated.
The plaintiffs have not proven that there was [any] negligence on the part of the defendants as to any damages claimed under Exhibit OOOO, and, accordingly, it is denied. Once again, we point out that as to this change order in Exhibit OOOO, the plaintiffs do not, in their comprehensive briefing, discuss at all Section 12.2.1 of the General Conditions.
[Pipe Chases (No Change Order)]
The plaintiffs next claim as damages the sum of $28,699.00 as CT Page 4872 expenses incurred when the contractor began work on the building because of the discovery of "8 hidden pipe chases" which, they maintain, "have not been disclosed in the construction drawings [made by the defendants]." Significantly, there was no change order requested for this claimed expense. A pipe chase is, as applicable here, a protrusion from a wall or column or pilaster that encloses pipes that run vertically up and down in the building. In this building the pipe chases involved ran vertically the entire height of the building. A pipe chase which protruded out from the wall or column or pilaster was about one foot by two feet in size and, as noted, pipes were inside it.
The plaintiffs argue that earlier plans, dated 1916 and 1926, in the possession of the defendants disclosed the pipe chases involved but this information was never transferred to the plans prepared by the defendants. Further, they contend that the 1916 and 1926 plans were not "presented" to Theusch until "after construction commenced and the bidding for the removal of the mechanical elements, including pipes, were completed." Parenthetically, as already found, there is no credible evidence that Burke, Kiesl, Theusch or KM even had a bid on the demolition work (which encompassed the removal of mechanical elements including pipe chases) before September 4, 1985 — the date of the contract between KM and Center Court. Moreover, there is no such evidence that even North Star Demolition Co. of Wisconsin (the first demolition contractor that KM did have a contract with) was ever on its project site before September 4, 1985.
On the other hand, the defendants deny any legal responsibility here. In doing so, they contend that their demolition plan clearly calls for the removal of the pipe chases, that Theusch himself testified that there are always pipe chases in this type of building, they also claim that a reasonably competent demolition contractor would have located the pipe chases immediately, that the locations of the pipe chases were obvious on comparing the field dimensions with the demolition dimensions shown on their demolition drawing and that the plaintiffs hired a contractor who failed to give the demolition contractor access to the building before agreeing to sign a contract with the plaintiffs. This court agrees that the plaintiffs have not proven that the defendants are legally liable to them for any portion of the amount, i.e. $28,699.00, claimed.
To begin with, as indicated earlier in this opinion, the general notes on the defendants' demolition drawing are directed to CT Page 4873 the contractor in doing the demolition work which encompasses the removal of pipe chases to be removed. Admittedly, as Theusch conceded and Maitland so stated, not all the pipe chases in this building were to be removed during construction in order to accomplish the final work. General Note #1 on the defendants' demolition drawing states "this drawing is intended to show a general scope of work and it shall specifically be the contractor's responsibility to do any and all demolition work necessary to accomplish the finish work called for in the rest of the contract documents." General Note #6 on the same exhibit recites: "Remove existing boilers, pumps, piping, etc. which are not part of the final work." Such general notes, pointing up the contractor's responsibility, alerted him to the pipe chase matter in the demolition work to be done. Moreover, Theusch and Kiesl as well as Burke had this demolition drawing (Exhibit UU), along with the other plans and specifications, well before KM even signed a contract with Center Court on September 4, 1985.
The defendants' demolition drawing D-1 (also know as Exhibit UU) is a general demolition drawing and it has to be referenced with the other drawings in the set because of the clear statement on A-1 in General Note #1 that the contractor shall do all the demolition required to accomplish the design intent of the remainder of the drawings. Therefore, as to those pipe chases which were to remain and not be removed during construction, they would be shown as so remaining and this reading would be arrived at by coordinating the drawings. A pipe chase intended to be removed would not be shown on the defendants' drawings, but only those that were intended to be retained would be so shown. This, which is evident from the defendants' drawings is underscored by General Notes #1 and #14, which not only say that it is a "general" note but also in Note #14 which makes it the contractor's responsibility to "remove all . . . piping, etc. not part of the final work." The pipe chase matter has been sufficiently called out on the drawings so as not to violate the applicable standard of care. The argument that this "problem" was not evident until Theusch was "presented" with the 1916 and 1926 plans implies some sort of concession by the defendants that they did not disclose or reveal this condition on their drawings. This presentment took place shortly before or about the time the plaintiff's second demolition contractor, SCS Corporation from Wisconsin, first got into the project building in late March 1986 for the purpose of continuing the demolition work started by North Star after the latter had gone bankrupt and left the job. In any event, Boro, the plaintiff's expert, acknowledged that the contractor should have expected pipe chases in an older CT Page 4874 building like this one as it is a common condition. Maitland knew that there were pipe chases in the building. In a rehabilitation project it is a common practice to have to contend with the removal of pipe chases. Pipe chases are generally readily visible to a reasonably competent demolition contractor upon inspection of the site; he may not know how many pipes they enclose but the existence of the pipe chases is readily visible.
Interestingly, no change order for this pipe chase expense was ever submitted to HUD. The reason for not doing so is not quite clear but it is clear that it was not done so after a "discussion" held in Milwaukee between KM Corporation (Theusch's employer) and "Burke Associates" and at that time "it was decided not to pursue that cost through HUD with a change order." Moreover, there is no credible evidence that the inspecting architect at that time, apparently Frank Sequino of TPZ in New York, ever approved of all or any part of this claim for $28,699.00 or, for that matter, that they ever brought it to his attention or that of any inspecting architect.
[Additional Overhead — Bill Balthasar]
We now turn to that item of damages claimed by the plaintiffs which they call "Additional Overhead" which is alleged to be in the amount of $55,000.00 and for which there is no change order request nor was one requested. It is claimed that this amount is owing due to the necessity of providing additional personnel in the person of Bill Balthasar, to "supervise" the project "due to the inordinate amount of time required of Mr. Theusch, the project manager, to process the change orders enumerated above [in the brief at page 69]." It appears that these expenses for Balthasar are also claimed to have been "required because [according to Theusch] with so many missing details and so many, so much information not shown [on the plans], subcontractors continually needed guidance, direction, had many questions which were asked for which the answers were required before they could proceed." Theusch maintained that with subcontractors working in various areas, it definitely was a requirement to have someone to be able to respond to that type of question as promptly as possible which would not have been required had the plans been of the complete nature incorporating the items that were being discussed as he testified.
Balthasar, who worked for KM, was said to have been on the Center Court project from approximately the first part of June 1986 into January 1987. As a result it is claimed KM incurred expenses CT Page 4875 for Balthasar in the amount of $55,000.00 and KM, in turn, billed Center Court in that amount. Theusch did not know how Balthasar was paid wages of approximately $24,000.00 which amount was exclusive of such things as Social Security and workmen's compensation, which came to approximately $7,000.00 more. His living expenses for this period were claimed to be approximately $24,000.00. There is no back-up information for any of these claimed expenses in evidence nor is there any breakdown of this sum other than just indicated. Balthasar did not testify and there is no evidence that he was "available." See [Secondino v. New HavenGas Co.], 147 Conn. 672 (1960).
Damages are an essential element for a plaintiff to prove before they are entitled to recover them where liability is shown and they must be proved with reasonable certainty. [Falco v. JamesPeter Associates], 165 Conn. 442, 445 (1973). Mere difficulty in assessing damages is not a sufficient reason for refusing them where the right to them has been established. [Ball v. T. J. PardyConstruction Co.], 108 Conn. 540, 551 (1928). In considering the issue of damages it is recognized that the circumstances that damages may be difficult to assess is, in itself, insufficient reason for refusing them once the right to damages has been established. [Griffin v. Nationwide Moving Storage Co.], 187 Conn. 405,420 (1982). Despite this, "the court must have evidence by which it can calculate the damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount." [Bronson Townsend Co. v. Battistoni], 167 Conn. 321,326-327 (1974); [Griffin v. Nationwide Moving Storage Co.], supra, 420. Again while this does not require mathematical exactitude, it does mean "that the evidence, with such certainty as the nature of the case may permit, lay a foundation which will enable the trier to make a fair and reasonable estimate." [Ball v.T. J. Party Construction Co.], supra. If entitlement to a recovery has been proven, and difficulty in the amount that may be awarded is encountered, the court must take into consideration whether the best evidence available has been produced that is at least sufficient to afford a basis for a reasonable estimate of loss.
We begin by noting that the court has already found certain actionable negligence on the part of the defendants in this case arising out of certain change orders in evidence. There are some twenty-five change orders on this project for which the plaintiffs are claiming damages from the defendants. However, there were fifty-nine change orders on this project and so the plaintiffs are not in this action seeking damages for some thirty-four orders but CT Page 4876 are doing so for less than one-half of the total change orders on this entire job. The evidence does not disclose on how many of all the fifty-nine change orders that Balthasar was involved in either byway of consulting with or directing subcontractors who worked on the project. The same applies to the pipe chase and janitor room issues. Further, this is specifically so with any of the twenty-five change orders under which claim is being made. Balthasar, according to Theusch, dealt with other change orders in addition to ones involved in this litigation, and was involved with "other issues" on this job. There is no evidence demonstrating Balthasar's involvement in anyone of the twenty-nine change orders in this case that affords a basis for any monetary award in connection with any part of the $55,000.00 claimed on his account upon which the court can make any fair or reasonable estimate as to its being damages in fact caused by the defendants in an amount that could fairly be the basis of any monetary award. The plaintiffs have just not sustained their burden of proof here and to enter a monetary award would be to do so truly based on speculation. We conclude that the plaintiffs have not proven as they must that these expenses of Balthasar were caused by the negligence of the defendants and this applies to any one of the twenty-five change orders in this case as well as the pipe chases and janitor room issues. Parenthetically, we point out that John L. Barnhart, an accountant from Milwaukee, who is senior vice president of finance of Burke Properties, testified for the plaintiffs. He said that, as such, he became familiar with the books and records of Burke Properties as they related to the Center Court Associates Limited Partnership. He testified at some length concerning certain change orders, Center Court's open indebtedness to KM and the like. Barnhart, however, during his testimony was not inquired of nor did he speak of the Balthasar claim which is still unpaid.
This $55,000.00 claim involving Balthasar is denied in full; the plaintiffs have not sustained their burden of proof of proving liability of the defendants on it as above set out.
[Code Violations]
We next turn to the plaintiff's claim of code violations. While an architect is not a guarantor that his plans and specifications are perfect, he has the duty of exercising reasonable care in making plans and drawings which are in conformance with applicable statutes, codes and ordinances. Both Boro and Maitland agreed that there may, during the construction CT Page 4877 process, be instances when there may be good faith differences between an architect who drew the plans and specifications and the building official of the applicability and/or the interpretation of code provisions. They agree that ambiguity in code provisions is not unheard of and differing interpretations on code issues do occur. In our discussion of code issues we will attempt to use the format that the plaintiffs have used in their briefing.
[a. Stair Rails in the Stair Towers]
This claim involves the change order in evidence as Exhibit III in which the plaintiffs claim $10,199.60. It concerned the matter of certain stair rails on the stair towers, which towers ran the entire interior height of the project building. When the defendants were preparing their plans they realized that there were various violations here of the State Building Code and state provisions concerning handicapped persons. In 1983 Landmark, which owned the project building, contacted the appropriate state officials and requested that it be given a variance (or "modification" to use the term of the state authority) of those matters in violation so as to permit it to proceed using the existing stair railings. That permission was properly obtained with the granting of Landmark's request. The defendants, in their evidence on this claim of the plaintiffs, produced Leo Belval, who was the State Building Inspector at that time. This claim for the moneys set out in Exhibit III is without merit. No negligence by the defendants has been proven by the plaintiffs on this alleged code violation and it is denied.
[b. Elevator Problems]
The plaintiffs claim that various code compliance problems arose with reference to the elevator room and the elevator which form the basis for the damages they seek in two change orders, i.e. Exhibit UUU and Exhibit VVV.
[1. Elevator Room (Exhibit UUU)]
We first turn to Exhibit UUU which seeks $14,029.00 for expenses involved in the "relocation of electrical panels and equipment in the elevator machine room as per objections of the State of Connecticut Elevator Inspector." The plaintiffs argue that the contract documents indicate that certain electrical panels and piping were located in the elevator room which was located at the top of the two elevators to be reused in the building. To meet CT Page 4878 the objections of the elevator inspector they maintain that they had to build a new equipment room and relocate the particular electrical panels and the like to that new room because it was a violation of the elevator code to have equipment other than elevator equipment in the room indicated in the contract documents. They therefore ask that they be awarded the $14,029.00 it cost to relocate the affected electrical panels and equipment and for the construction of a new electrical equipment room adjacent to the elevator penthouse.
The defendants do not dispute what the plaintiffs claim as the location on the contract documents of the electrical panels and equipment that had to be relocated. They maintain, however, there was no necessity to do so and that, according to their witness Cramer, it was permissible under the code to have that material located where indicated by them. They also appear to suggest and that their specifications addressed this.
The court does not agree with the defendants. The expenses evidenced by the back-up in Exhibit UUU was made necessary to remedy elevator code violation shown by the plaintiffs. Moreover, any suggestion or claim that the defendants' specifications in any way addressed the plaintiffs' claim has not been proven. The court finds the defendants are negligent as to Exhibit UUU and that the plaintiffs are not guilty as to any negligence in that regard. Accordingly, the court awards the plaintiffs as damages, under Exhibit UUU, the amount of $14,029.00.
[2. Elevator Hoistways, Machine Room, Etc. (Exhibit VVV)]
In Exhibit VVV, in which the plaintiffs claim $26,783.00, they maintain that that is warranted because of expenses involved concerning such things as the elevator machine room for the two existing elevators, the elevator hoistway for each of the existing elevators and the elevator machine room for new hydraulic elevator in order to bring hoistways and machine rooms into compliance with the elevator code. None of the work on Exhibit VVV, the plaintiffs argue, was "indicated on the plans or specifications." They indicate that the work was required by certain attached (to Exhibit VVV) reports of the elevator inspectors.
The defendants have resisted this claim on the ground, inter alia, that their specifications adequately addressed this was work to be done by the contractor. In doing so they pointed to Section 14B of the specifications which we note is entitled "Modernization CT Page 4879 of Existing Elevators." This is a comprehensive specification clearly calling out the work to be done under bringing the existing elevators up to code. Particularly the defendants call attention to two portions of this specification. One is § 14B-1a which describes the "Scope" of this specification. It recites:
 "Elevators #1 and #2 shall be rehabilitated to proper running condition with all necessary repairs and replacements to existing equipment that will be retained."
The other is § 14B-3d which recites:
"Building Codes:
 Both elevators are to be brought to the current standards of the Connecticut State Building Code and the Connecticut Sate [State] Fire Safety Code including those provisions relating to fireman's service and access by the handicapped, including all provisions of ANSI 17.1, Section 211."
Parenthetically, we note that Theusch in requesting of Feltenstein, the then inspecting architect for this change order, said in a letter to Feltenstein "Work is required at both hoistways where the elevator is being [modernized] and also at the machine room." (underlining added). During his testimony Theusch said that the reference to work done in the "machine room" was other and different from expenses involved in the elevator machine room claimed in the change order in Exhibit UUU. The plaintiffs have not sustained their burden of proof on Exhibit VVV. They have not proven [any] negligence by the defendants. Therefore, the court awards no damages at all on account of the plaintiffs' claim under Exhibit VVV.
[Duct Work Extension (Exhibit XXX)]
Exhibit XXX concerns damages for the construction of providing two hour fire rated enclosures around ductwork from the top of the elevator shaft to the building roof. This work was necessary because of code requirements. The plaintiffs are awarded $4797.87 under their claim in Exhibit XXX. This sum is awarded here on two independent grounds. First, the plaintiffs proved it. Second, at oral argument after the trial defendants' counsel admitted that CT Page 4880 they were liable for it.
[Problems With Loft Areas (Exhibit MMM)]
Exhibit MMM is the change order, in which the plaintiffs seek $9,886.00 for the expenses incurred to provide certain railings near loft areas between the 12th and 13th floor and between the 3rd and 5th floors. This expense, they claim, was required by the building officials of the City of New Haven in order to comply with the applicable building code requirement and the defendants' plans and specifications did not indicate that such railings were required. The back-up material attached to this change order indicates that the railings so required were at 34 locations "in front of windows at 34 window openings." That material also has attached to it a copy of the building code section invoked by the building code officials in requiring this.
This issue was developed at the trial. As stated above, the plaintiffs adduced evidence that the plans and specifications did show them to be required and the failure to do so, given their being required by the building code officials, demonstrates their negligence in this regard.
The defendants, on the other hand, adduced evidence that this matter was not one that was overlooked by them in preparing their plans and specifications but that they in fact, and it is so found, considered and examined the code and the section involved. After doing so, they made a judgment that the work now claimed to be required which resulted in Exhibit MMM was not required under the code. Hence, that was not indicated on the plans and specifications. The defendants, in resisting the claim made under Exhibit MMM, refer to evidence even from Boro, the plaintiffs' expert as well as other experts, that differences of opinion as to code application arise quite often on jobs. They also argue that their decision here was a reasonable one and that they should not be charged with negligence simply because their interpretation of the code here was one later disagreed with by the building official.
This court agrees with the defendants as to Exhibit MMM and with their arguments in resisting liability for it. The plaintiffs have not sustained their burden of proof of proving the defendants negligent. The court also finds that no negligence at all, i.e. zero negligence, has been proven against the defendants. There was no violation of the standard of care by the defendants as to CT Page 4881 Exhibit MMM. The plaintiffs' claim thereunder is denied in full.
[Kitchen Problems (Exhibit AAAA)]
Exhibit AAAA is a change order in which the plaintiffs claim $6,079.00 for expenses incurred in code compliance for two problems that arose in certain kitchen areas. They claim these necessitated changes in the defendants' plans, which plans give no indication that these two matters were code required. The defendants here again claim that these matters were not code required and claim no negligence at all on their part has been proven.
The first of the two alleged code-deficient problems was one, according to Theusch, that related to dishwashers. There, any time that a dishwasher is located at a point from which one cannot see the "electrical panel" on that unit "an additional disconnect or separate disconnect" which "is nothing other than a wall switch, typical light switch, be provided adjacent to the dishwasher" is required. The second problem was said to be the code requirement that whenever a countertop exceeds twelve inches in width, it was required "to provide . . . an outlet or receptacle against the wall for that length of the countertop."
Again this was a matter that the defendants had examined and considered in preparing the plans and specifications. Again they maintain that the code official was mistaken in requiring the additional work referred to in Exhibit AAAA. Moreover, the defendants view, on the credible evidence, of what the applicable code provisions require demonstrates that their claim that the code does not require these items is reasonable. The plaintiffs adduced no credible evidence, either testimonial or documentary, to discharge their burden of proving any negligence by the defendants here. Actually, the defendants introduced evidence of the applicable code provisions (the plaintiffs produced no such evidence) and adduced a reasonable explanation of their decision not to include these matters in the plans. The court agrees with the defendants. No violation of the standard of care has been proven by the plaintiffs. The plaintiffs' claim under Exhibit AAAA is denied in full.
[Smoke Detectors (Exhibit CCCC)]
Exhibit CCCC is a change order under which the plaintiffs claim $1,864.00 for the provision and installation of additional smoke detectors at the lower level of duplex or two-floor CT Page 4882 apartments on the twelfth and thirteenth floors. The plans indicated the need for only one smoke detector in each of these duplex apartments. The fire marshal, invoking the fire safety code which required a smoke detector at the lower level as well as the upper level of a duplex apartment required the installation of an additional smoke detector (at the lower level) in each affected duplex apartment. The plans or specifications should have shown this but did not. The plaintiffs have sustained their burden of proof as to Exhibit CCCC and are entitled to recover as damages the entire amount of $1,864.00.
["Layout Problems"]
 a. [Stairways in duplex units between 12th and 13th floors (Exhibit OOO)]
Exhibit OOO is a change order in the amount of $6,617.00, in which the plaintiffs seek damages for the provision and installation of materials necessary to complete and finish stairway within the duplex units between the 12th and 13th floors. According to the plaintiffs the stairs indicated on Exhibit NNN of the plans as "typical" where attempted to be constructed as so indicated were, in reality, not typical, and thus the ensuing expenses claimed in Exhibit OOO. The problem involved the defendants' claimed failure to do "field measurements". Moreover, Theusch testified that additional information was therefore needed to "construct these stairs in a code complying condition" and that this information was obtained from the defendant Strauss after encountering this problem whom Theusch said maintained that this was a problem the defendants might have encountered themselves.
The defendants, on the other hand, as Maitland testified contended that a consideration of all of Exhibit NNN (and not just that part emphasized by Theusch) and another drawing would have obviated the claimed problem. Maitland maintained that the stairs, marked as "typical" in Exhibit NNN, could be properly built by that rendering. Actually, as Maitland said the plans showed, and we agree, a complete layout of each and every stairway shown on the drawings, including those on the 12th and 13th floor. Exhibit NNN's "typical" is typical for the apartments circled in red thereon and that exhibit also has details on at least thirty other apartments in Exhibit NNN. Of particular concern to the court on this claim was Theusch's testimony that the additional information, which clearly implied the expenses claimed in Exhibit OOO, was needed to "construct the stairs in a code complying condition." CT Page 4883 That any code required this was not at all shown. The change order in Exhibit OOO has been examined and there is simply no indication at all of any code official ordering any of this work nor even any reference to any code that requires this.
The plaintiffs have not sustained their burden of proof on Exhibit OOO of proving liability on the part of the defendants and that claim is denied in full.
 b. [Column problem re code compliance of stairs in Units A, B and C on 3rd and 5th floors (Exhibit PPP)]
Exhibit PPP is a change order, in the amount of $9,021.00 seeking damages for expenses for additional work allegedly required to remove a portion of the column enclosure at five faces of columns on the 3rd and 5th floors in order to construct code complying stairs at those locations.
Generally speaking, this work was necessary so that a portion of the column enclosure at these locations had to be removed in order to obtain the code required distances concerning risers and treads of the stairs to be built here. Winder steps involved here had to be properly accommodated. The additional distances horizontally needed to do this was obtained by paring down materials that enclosed the structural columns involved which was done without affecting the structural integrity of these columns. The back-up material on Exhibit PPP, as well as Theusch's testimony in this instance, indicate code complying stairs, required this work. The defendants have not even seriously claimed that the work was not code-required.
The plaintiffs have sustained their burden of proof of liability on Exhibit PPP. They have proven that the defendants, as between the plaintiffs and defendants, are entirely negligent here. Exhibit PPP is allowed in full in the amount of $9,021.00.
 c. [Allowance of code complying access to apartments classified as Unit 13 (Exhibit OOO)]
Exhibit QQQ is a change order in the amount of $11,200.00 by which the plaintiffs seek the expenses incurred in cutting back existing column covering in all apartments classified as Unit 13 so as to constitute compliance with the minimum code required distance CT Page 4884 for access to such apartments. The plans did not show the three foot minimum required by the code. In order to reach the minimum required the structural column enclosures had to have the enclosure pared back to attain the minimum needed. This had to be done to such columns on floors three through eleven. This distance disclosed by the plans were not only not code compliant but also would present a problem in moving furniture in and out of the apartments involved.
Despite what we have said concerning the responsibility for reconciling and investigating field conditions in the main, here we have a code problem to which the defendants have not persuasively responded in our opinion. Moreover, although it does not appear that the structural integrity of these columns was compromised, we conclude that the plans here should have disclosed dimensions that complied with the code.
The plaintiffs have sustained their burden of proof of liability on Exhibit QQQ. The defendants are found entirely negligent. The plaintiffs are awarded the entire amount claimed in Exhibit QQQ, i.e. $11,200.00.
["Parapet Problems" (Roof)]
Exhibit SSS is a change order seeking $5,344.00 for expenses attendant upon the extension of the parapet on the three-story addition to meet the requirements of the roofing manufacturer "Carlisle".
The plaintiffs claim that "the plans provided for a roof membrane of two particular designs Trocal S.M.A. and, as an alternative Carlisle, W.R. Grace" as well as pointing out that the specifications required that "installation shall be in strict accord with the manufacturer's printed directions." They stated that "KM elected to use the Carlisle membrane option" but that "when it came time to install the roof, the slope required by the manufacturer for the runoff of water resulted in the roof being too high in the front to be accommodated by the parapet designed by the defendants." Testimony of Theusch is referred to by the plaintiffs to support this claim.
The defendants deny any liability on this claim and the court agrees with the defendants. Section 7B(7)(a) of the specifications in Exhibit G entitled "Roofing Membrane" provides: CT Page 4885
 "Trocal S.M.A. Roofing Membrane System as manufactured by Dynamit Nobel of Americal. Products of equal function, design components and functions as manufactured by Carlisle, W. R. Grace are approved."
According to Maitland the roofing membrane specified was the Trocal S.M.A. Use of that membrane would have worked consistently with the defendants' plans. KM did install a Carlisle system. Although Theusch had never heard of Dynamit Nobel of Americal and did not know if he ever investigated the use of the Trocal S.M.A. roofing membrane, he nevertheless believed that "it would not have worked" with the defendants' plans and specifications. Boro as well as Maitland acknowledged that Carlisle manufactured not one, but a number of roofing membrane systems. There were Carlisle systems available that could have been used and worked consistently with the defendants' plans and specifications. The Trocal S.M.A. system would fall in the same category.
The plaintiffs have not sustained their burden of proof on Exhibit SSS. The defendants were not guilty of any negligence. The plaintiffs are denied any damages under Exhibit SSS.
[Electrical Switchgear (Busduct — Exhibit ZZZ)]
Exhibit ZZZ is a change order seeking $14,998.00 for expenses incurred in providing a new switchgear and connections to the existing transformer. The switchgear is the main piece of electrical equipment from which all power is distributed in the building. The power is supplied initially by the utility company from the street into transformers in an enclosed vault housing the switchgear. The busduct is a rectangular section of designed electrical equipment that will move the power from the transformers to the switchgear. The busduct, as shown on the defendants' plans, did not satisfy the utility company's requirements for height and space limitations inside the existing transformer vault. Therefore, the expenses claimed here were incurred to replace the transformation compartment originally specified for the switchgear and its busduct connection and feeders to the transformers.
In making this claim the plaintiffs maintain these expenses were necessary because the defendants' plans and specifications did not communicate the problem that occurred here requiring this additional work. They do not seriously question that the defendants, through their electrical consultant not only contacted CT Page 4886 the utility company and early on made attempts to gain access to this vault under the sidewalk, which access was controlled by the utility company and was padlocked. There was only one entrance to this sidewalk vault. The electrical consultant and the utility company never got together on gaining access to the vault before this portion of the plans were designed by the electrical consultant for the defendants. The effort to gain access to the vault showed that the consultant realized further information was needed. Failing access, the plaintiffs argue that in designing this part of the electrical system where the consultant looked into the vault and essentially "guessed" as to the height of the vault in which the busduct would have to go generated this problem covered by Exhibit ZZZ and that demonstrates the defendants' liability here. This problem did not become apparent until after KM started construction and access was gained to the vault.
The defendants, on the other hand refer to their attempting to gain access to the vault but that they could never get together on it. They concede that it is the utility company's right and practice not to permit access to the vault until after construction begins. They argue that their electrical consultant designed a busduct "based upon a reasonable assumption about available headroom" and that although they sent a request for approval of the plans in 1983 to the utility company that the utility company did not raise any concern about the busduct design until after access was gained to the vault. They maintain that their electrical consultant "made reasonable assumptions in his design" and that that was "reasonably incorporated" in the final plans. They contend that there, accordingly, is no negligence on their part.
The defendants' plans did indicate the method of feeding power into the transformer vault through a busduct system but they gave indication that height or distance requirements could not be met by the plans as designed. This space conflict came about by an assumption made by the defendants' electrical consultant. Lacking access to the transformer vault, this consultant took information available and made an assumption from that. There was, the consultant said, a "clear height of seven feet six inches between the finished floor in this area and the overhead and there was a beam at the wall that came down to seven feet." The consultant assumed that and said "we could observe through a crack in the wall" that "the overhead in the wall was essentially the same. So based on that, we assumed that the overhead was the same." Actually, the clear height was five feet six inches as opposed to seven feet six inches. There were no lights on in the vault when CT Page 4887 the observations were made; the light that existed came through a grill on the sidewalk as the consultant, in the basement, looked into the vault "through a chink in the wall." It then became apparent that when they were getting ready to install it as designed that the space conflict prevented that. Therefore, to meet the utility company requirements, another design had to be done resulting in the expenses set out in Exhibit ZZZ. The court cannot agree that the consultant made reasonable assumptions in his design and that they were reasonably incorporated in the plans. Lacking access to needed information, it was the opinion of the plaintiffs' expert Boro on this matter that no design should be made until that information could be confirmed. The plaintiffs have sustained the burden of proof on the change order in Exhibit ZZZ. The defendants are found to be negligent and are liable in full for the $14,498.00 claimed in Exhibit ZZZ.
[Radiators (Exhibit DDDD)]
Exhibit DDDD is a change order for expenses in the amount of $7,213.00 submitted by the plaintiffs for the removal of existing steam radiators and replacement with new radiators "compatible to the new hot water system."
In support of this claim the plaintiffs point out that the defendants' plans indicated that the contractor should reuse the existing radiators in the stairwells but those radiators, they continue, were designed for the old steam heating system whereas the plans called for the installation of a new hot water heating system. Continuing, they refer to Theusch's testimony that the existing radiators were not "compatible" with the new hot water heating systems and, even if they were, it would not have been able to get the proper amount of heat from them "if an attempt was made to gerryrig a system." The defendants disagree and argue the evidence showing compatibility, fitness for reuse and cost saving and that the plaintiffs have not proven entitlement to the claimed expenses. The court agrees with the defendants.
Boro, the plaintiff's expert, indicated that he would defer to the opinion of a mechanical engineer on the matter of whether the existing radiators were compatible with a hot water system. The defendants produced a mechanical engineer Cramer who had designed the new hot water system. During the design stage he and the defendants collectively decided that the existing radiators were such that they could be reused in the new system. They were, in his view, absolutely compatible. Some retrofitting would be CT Page 4888 necessary but, given the compatibility, it would be the economical way to go to leave the existing radiators there. Moreover, heat loss did not mitigate against reusing them as that could be satisfied, especially with these radiators in the stairwells, in unoccupied space there is not the need or comfort level as in occupied space.
The plaintiffs have not sustained their burden of proof as to Exhibit ZZZ and the expenses claimed therein are denied in full.
[Additional Heating and Plumbing Problems (Exhibit EEEE)]
Exhibit EEEE is a change order setting out expenses claimed in the amount of $7,170.00 which figure is composed of five separate items. At the trial, however, the plaintiffs claimed the expenses of only three of these five items with the three totaling $5,167.00.
No extended discussion of these items is necessary because at oral argument after trial the defendants' conceded liability here. Accordingly, the plaintiffs are awarded as damages that portion of Exhibit EEEE which totals $5,167.00 plus 8.5 per cent thereof for a total award on account of Exhibit EEEE of $5,606.20.
[Change Order Marked As Exhibit HHHH]
Exhibit HHHH is a change order covering five separate items of expense and which total $10,293.00. The plaintiffs, however, at the trial, stated that they were claiming the expenses therein set out as to only two of the five items which two totaled $3,175.00. The two items claimed involve the provision of a railing and handrailing "as required by the City of New Haven Building Department at the exterior platform and stair adjacent to door "Go 8" and the provision of a sump pump, sump pit and drain line adjacent to the fire pump room.
We turn first to the railing and handrailing claim in the amount of $1,128.00. The evidence on this item is most confusing and not persuasive for the plaintiffs. The back-up information attached to this change order submitted to HUD refers to a railing to a code-required railing and handrail at the exterior platform and stair at door "Go 8" That door as well as the door "Go 5" appear on that portion of the defendants' plans in evidence as Exhibit FFFF. Theusch said that was a mistake and that the back-up material should have referred to a door "Go 5". Not only is door CT Page 4889 "Go 8" quite some distance away from door "Go 5" on Exhibit FFFF but there is no evidence to show that HUD was ever made aware that what was really meant was door "Go 5". Moreover, this casts a serious question on whether the claimed code requirement mandated such a railing and handrailing near the door location in fact specified in the material attached to this change order. Further, Theusch did say that the railing as installed did not permit this dock to be used as a loading dock.
The hypothetical question placed to Boro on the plaintiffs' direct examination concerning the violation or not of the standard of care concerning the failure of the defendants' plans and specifications to indicate the need for the code complying railing and handrailing, referred to the location at "Go 8" as circled by Theusch in Exhibit FFFF and not "Go 5."
The plaintiffs have not sustained their burden of proof on the railing claim and that is denied in full.
In examining the sump pit, sump pump and drain pipe aspect of this claim for $1,947.00, we note that the evidence on this was also not persuasive. As pointed out there, in Exhibit HHHH, of five items of expense only two of which are claimed here. In his March 2, 1987 letter to the inspecting architect Feltenstein in support of all five items, Theusch says these five items "are required for code compliance, operational and appearance reasons." That letter does state that two of the five are for compliance reasons, one for the New Haven Building Department and another for the New Haven Fire Marshall. Neither of these are for the sump pump, sump pit or drain pipe. The plans and specifications did not indicate a sump pump, sump pit or drain pipe next to the fire pump room.
There was a hypothetical question placed to Boro concerning this which among the assumptions asked to be made were that if this building was built according to the defendants' plans and specifications that portions of it would have failed to comply with the building code of the State of Connecticut if they did not provide for a sump pit, sump pump and drain pipe next to the fire pump room. Boro answered in the affirmative. There was no credible evidential basis upon which to determine that the state building code did require this, as assumed. The plaintiffs have not sustained their burden of proof on this $1,947.00 of their claim. CT Page 4890
The claim of the plaintiffs made under Exhibit HHHH is denied in full.
 [Doors and Areas Adjacent to Janitor Rooms First and Second Floors (No Change Order)]
Here the plaintiffs claim expenses of $1,243.00 for expenses claimed incurred to provide physical access to certain electrical equipment that operated as "disconnects" where the defendants' plans and specification required such "disconnects," but they did not provide for the access. There is no evidence that this claim was ever submitted to HUD. Significantly, there is simply no documentation by any back-up materials, or by way of a billing or cancelled check or the like for this or any part of it. Theusch said this item was billed to the project. Furthermore, the only evidence of the figure was Theusch's answer to the question by plaintiff's counsel "And was the cost of that $1,243?" to which he answered "That sounds familiar, yes."
The plaintiff has not sustained its burden of proof as to the $1,243.00 claim and it is denied in full.
"CONTRACT COUNTS"
 A.
We go on to the second and third counts of the amended substituted complaint which are contract counts. Each of these counts incorporate verbatim the first thirteen numbered paragraphs of allegations in the first count discussed at length above.
The only new allegations that the second count adds to the first thirteen allegations of the first count is the following: "As a result of Maitland's, Strauss', and Behr's failure to deliver complete architectural and engineering drawings for construction of the Project pursuant to the [1985] Contract, Maitland, Strauss and Behr breached the [1985] Contract and the plaintiffs have suffered damages, including consequential damages for delays on the construction of the Project." (underlining added).
The only new allegation that the third count adds to the first thirteen allegations of the first count is the following: "As a result of MSB failure to deliver the complete services for construction of the Project pursuant to the [1980] Contract, MSB breached the [1980] Contract and the plaintiffs have suffered damages CT Page 4891 including consequential damages." (underlining added).
As already noted, the Court has already found for the plaintiffs on the first count and awarded damages thereunder as against Richard A. Maitland, Peter L. Strauss, Richard H. Behr and Maitland/Strauss/Behr Architects P.C. (known as "MSB"). In the second count the defendants are Maitland, Strauss and Behr individually whereas in the third count the defendant is MSB which is Maitland/Strauss/Behr/Architects P.C. Various special defenses, i.e. the third, the fourth, the fifth, the sixth, the seventh, the eighth, the tenth and the eleventh have been interposed to all counts including the second and third counts.
In our discussion of the first count we referred to the plaintiffs' claims against all defendants in this case, particularly in paragraph thirteen of the first count which is specifically directed to all defendants in this case. We pointed out there the route that the plaintiffs used to get to the 1980 Contract was by virtue of their October 30, 1985 Contract with the individual defendants whereby the plaintiffs purchased inter alia all the stock of Landmark which was wholly owned by the three individual defendants. The plaintiffs had no binding contractual relationship with the individual defendants until the consummation of the 1985 (October 30, 1985) Contract. To put it another way, the plaintiffs' rights insofar as the 1980 Contract derives from their October 30, 1985 Contract with the individual defendants. Here plaintiffs, as they were entitled to did sue in professional malpractice in the first count and they have also alleged breach of contract in the second and third counts. But their cause of action still arises out of the October 30, 1985 agreement. The term "cause of action" has been said to mean "that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff and which entitles the plaintiff to relief." [Veits v.Hartford], 134 Conn. 428, 434, 58 A.2d 389 (1948). "Even though a single group of facts may give rise to rights for several different kinds of relief, it is still a single cause of action. [BridgeportHydraulic Co. v. Pearson], [139 Conn. 186, 198, 91 A.2d 778 (1952)]". [Wade Dairy Inc. v. Fairfield], 181 Conn. 556, 560 (1980). Our appellate courts have said that "It is proper to amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same, but where an entirely new and different factual situation is presented, a new and different cause of action is alleged." [Gallo v. G. Fox Co.], 148 Conn. 327, 330 (1961); [Burgess v.Vanguard Insurance Co.], 192 Conn. 124, 126 (1984). "That the CT Page 4892 remedies sought are somewhat different does not alter the fact that the course of action is the same." [Bridgeport Hydraulic Co. v.Pearson], 139 Conn. 186, 198 (1980).
In this case the plaintiffs have but one cause of action upon which they could and did determine to seek recovery on different theories, here in tort, contract and fraud.
The second and third counts allege breach of contract. In our disposition of these counts we do not propose to set out the evidence going to our disposition. It seems quite fair to say that all the evidence already set out in this opinion at length fully encompasses that. We conclude on the law and on the evidence that the plaintiffs have proven that, as to the second count, the individual defendants sued therein, i.e. Behr, Maitland and Strauss, the signatories on the October 30, 1985 Contract, have breached that contract. That determination, however, does not end the discussion here as we now must decide whether the defendants have proven by way of special defense matters that will bar or lessen any recovery of damages by the plaintiffs.
In disposing of the first count we agreed with and accepted the plaintiffs' claim that comparative negligence applied and we did apply it there. Comparative negligence, however, cannot apply to the breach of contract theories alleged in the second and third counts because the actions alleged in each of those counts are not "based on negligence" under the comparative negligence statute. See General Statutes § 52-572h. Moreover, under that statute contributory negligence is no bar to a recovery of damages in an action based on negligence. Contributory negligence, and that is one of special defenses to both the second and third counts, is, however, not a defense to a breach of contract. [Carter v. HawaiiTransportation Co.], 201 F. Sup. 301, 303 (1961); [Rotman v.Hirsch], 199 N.W.2d 53, 56 (1972); [Broce-Odell Concrete v. Mel JarvisConstruction], 634 P.2d 1142, 1145 (1981); [Trinity UniversalInsurance Co. v. Fuller], 524 S.W.2d 335, 337 (1975); 27A C.J.S. Contracts § 525(1); 57A Am.Jur.2d Negligence § 913.
Going on, we have the "as is" special defense which originates in the language of Section 8b. of the October 30, 1985 Contract, which contract language recites, "Sellers [the individual defendants in the second counts make no representations as to the physical condition of the Project and Buyer [Center Court Associates Limited Partnership] shall acquire the same on behalf of Landmark as is. . . ." Before discussing this defense further we note CT Page 4893 here that we have earlier rejected the fourth count in which the plaintiffs alleged fraud and misrepresentation as to the defendants. In addition, we have already accepted, as to the first count, the plaintiffs' claim of the applicability there of the doctrine of comparative negligence and there we treated the bar of the "as is" defense as not being absolute but rather as mitigated by or intermixed with the special defense of contributory negligence which latter came into consideration because of our use of the comparative negligence doctrine. Moreover, in the first count, in following comparative negligence, we recognized that the plaintiffs had reserved the right under Section 4 of the October 30, 1985 Contract to preserve the right to proceed in negligence "for any negligence in the preparation of the plans and specifications. . . ." This right to proceed in negligence was, according to Burke, a trade-off or negotiated matter in return for the inclusion by the defendants of the "as is" provision. Thus, the plaintiffs' argument as to the first count was accepted and we have already decided that count and the plaintiffs have already proceeded in negligence as the 1985 Contract permitted under our construction of it.
As to the second count, we must now determine whether the defendants can interpose the "as is" defense to those change orders (and the pipe chase claim) so as to be an absolute bar to which the "as is" defense applies. We decide that it can and will not repeat, the law permitting it to be an absolute bar on which [Holly HillHoldings v. Lowman], 226 Conn. 748, appears to be the most recent statement. In doing so, we also decide that, to do so, does not at all contravene the October 30, 1985 Contract as the plaintiffs have already, under their approach to the first count, proceeded in negligence and had that theory decided. That right to proceed in negligence under Section 4 of the Contract cannot and should not avail them in their contract counts as alleged and to which contributory negligence is not a defense.
It is, therefore, determined that the defendants have proven that they are entitled to prevail on their "as is" special defense, which defense is found to be an absolute bar to the plaintiffs recovering any damages as to the change orders (and the pipe chase item) to which this "as is" defense applies. The plain language of the "as is" claim in Section 8 covers "the physical condition of the project." For the record, the absolute bar of the "as is" defense applies to those change orders in Exhibits XX, qq, AAA, CCC, EEE, GGG, ZZ, QQQQ, OOOO and the pipe chase claim for which there was no change order. CT Page 4894
We turn to consider on the breach of contact issue in the second count the remaining changes and those claims (two) for which there are no change orders. There we decide that the plaintiffs have proven a breach of contract as to some but not all of these remaining items and that the defendants have not proven any of their special defenses as to those items. The items upon which we conclude that the plaintiffs have proven a breach of contract by the defendants and for which they are entitled to recover damages are the change orders in Exhibit UUU ($14,029.00), Exhibit XXX ($4,797.00), Exhibit PPP ($9,021.00), Exhibit QQQ ($11,200.00), Exhibit ZZZ ($14,498.00), Exhibit CCCC ($1,864.00, and the plumbing and heating claim ($5,606.20) for which there is no change order. These items total $61,015.20. It is in this amount that the plaintiffs are awarded damages on the second count. As to the remaining change orders as well as the Balthasar claim, the plaintiffs have not sustained their burden of proof as to any of them being a breach of contract, and, as to those it is therefore not even necessary to reach any of the special defenses.
Judgment may enter on the second count for the plaintiffs in the amount of $61,015.20.
It is to be specifically understood and it is this Court's intention in awarding the plaintiffs the money in damages against all defendants in the first count and in awarding the plaintiffs the money damages against the three individual defendants in the second count that this is not intended nor to be construed as an award by this Court to the plaintiffs of the total of the money damages award in the first and second counts. This Court's intent and position is expressly set out for the reasons that although a plaintiff is entitled to allege "separate theories of liability in the alternative, he is not entitled to recover twice for the same elements of damage." [Wilson v. Kapetan Inc.], 25 Conn. App. 525,535 (1991); [Jonah v. Silver], 1 Conn. App. 550, 561 (1984. To permit the plaintiffs to recover the $61,015.20 indicated on the second count in addition to the money damages already awarded on the first count would contravene the rule that an injured party is entitled to a full recovery only once for the harm suffered. See [Peck v.Jacquemin], 196 Conn. 53, 70 n. 19; [Day v. Connecticut Co.],89 Conn. 74 (1915); [Gionfriddo v. Gartenhaus Cafe], 211 Conn. 67,71 (1989). Other courts have also noted that a plaintiff "is entitled to only one compensatory damage award where liability is found on any or all of the theories involved." [Greenwood Ranches, Inc. v. Skie,Construction Co.], 629 F.2d 518, 521 (1982) and cases there cited; CT Page 4895 see also [Thompson v. City of Portland], 620 F. Sup. 482, 989 (1985).
Turning to the third count, there the plaintiffs have incorporated paragraphs one through thirteen of the first count and have added paragraph fourteen. That latter paragraph alleges: "14. As a result of MSB's failure to deliver the Complete Services for the construction of the Project pursuant to the 1980 Contract, MSB breached the 1980 Contract and the plaintiffs have suffered damages including consequential damages." The third count, according to the plaintiffs, apparently seeks damages as the result of the alleged breach of the 1980 Contract quite apart from the October 30, 1985 Contract. The problem for this court here is that it does not believe that that is possible under the pleadings in the third count and specifically paragraph thirteen which the third count incorporates from the first count. Paragraph thirteen of the first count as incorporated into the third count alleges: "13. The services, plans and specifications which the defendants provided to the plaintiffs pursuant to the 1980 Contract [and] the 1985 Contract were inadequate and incomplete in the following respects: . . . [six separate subparagraphs follow which allege particular claims] (underlining added).
Reading the third count as a whole, and particularly paragraphs thirteen and fourteen, it is apparent that as alleged, the plaintiffs are seeking damages against the defendants MSB for a breach of the 1980 Contract alone on the ground that services, plans and specifications which MSB "provided to the plaintiffs pursuant to the 1980 Contract [and] the 1985 Contract were inadequate and incomplete in the following respects. . . ." (underlining added) This they cannot do on these pleadings.
"What is in issue is determined by the pleadings. . . ." [Tedescov. Tedesco], 187 Conn. 715, 720 (1982); [Rosick v. EquipmentMaintenance Service Inc.], 33 Conn. App. 25, 31 (1993). A plaintiff may only rely on what he has alleged. [Kelley v. Bonney],221 Conn. 549, 590 (1992); [Mathews v. F. M. C. Corporation],190 Conn. 700, 705 1983). Only those issues raised in the plaintiffs' complaint can be tried before the court. See [Farrell v. St.Vincent's Hospital], 203 Conn. 554, 558 (1987). "It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint (citations omitted)." [Mathews v.F.M.C. Corporation], supra, 705.
We assume that the 1980 Contract between MSB and Landmark with its right and duties passed to the plaintiffs by virtue of the CT Page 4896 October 30, 1985 Contract. But in the third count the plaintiffs maintain by their pleadings that although they are suing on the 1980 Contract alone, they nevertheless allege, by importing paragraph thirteen of the first count [not] that the services, plans and specifications provided pursuant to the 1980 Contract were inadequate and incomplete in the respects alleged in paragraph thirteen in subparagraphs (a) through (f) [but] that the inadequacy and incompleteness goes to the services, plans and specifications provided the plaintiffs pursuant to the 1980 [and] the later October 30, 1985 Contract. This allegation of the 1985 Contract is not surplusage. The alleged violation of the 1980 Contract in paragraph fourteen of the second count cannot, given the allegation in paragraph thirteen to both contracts, serve from the pleading perspective, as any basis for a judgement for the plaintiffs on the 1980 Contract alone. Judgment on the third count is accordingly entered for the defendants MSB.
A word about the matter of attorneys' fees and interest is in order. The plaintiffs' brief contends that one of the elements of fraudulent misrepresentation is the award of attorneys' fees. There will, of course, be no consideration of an award of attorneys' fees as to that because the issue of fraud and the entire fourth count has been decided above adversely to the plaintiffs.
In addition, the plaintiffs point out that General Statutes § 37-3a provides for the award of interest at the rate of 10% per year as damages for the retention of money owed. Towards the end of their brief they argue that "the breach of contract claim against the individual sellers, Messrs. Maitland, Strauss and Behr, justifies the award of interest." The plaintiffs argue that their position that the drawings provided were sufficient to permit the construction of the building is "untenable". Moreover, they contend that: "For the reasons set forth above, it is clear that, in order to avoid the serious financial loss that would have resulted had the sale with John Burke not materialized, defendants, as a matter of conscious choice, elected not to advise Burke that the plans were inadequate, as they were designed with the intention that the defendants themselves would do the development."
The award of prejudgment interest under § 37-3a is an equitable determination that lies within the trial court's discretion. [Nor'easter Group Ins. v. Colossale Concrete Inc.], CT Page 4897207 Conn. 468, 482 (1988); [Newington v. General SanitationServices Co.], 196 Conn. 81, 90 (1985). An allowance of prejudgment interest under § 37-3a turns on whether the detention of the money is or is not wrongful under the circumstances. [Associated Catalog Merchandisers Inc. v.Chagnon], 210 Conn. 734, 748 (1989); [Cecio Bros., Inc. v.Feldman], 161 Conn. 265, 275 (1971); [Alderman v. RPM of NewHaven, Inc.], 20 Conn. App. 566, 569 (1990). [Cecio] states that "The determination of whether or not interest is to be recognized as a proper element of damage, is one to be made in view of the demands of justice rather than through the application of any arbitrary rule." [Cecio Bros, Inc. v.Feldman, supra] 275, in quoting [Bernhard v. Rochester GermanIns. Co.], 79 Conn. 388, 398 (1906).
It is not "clear", as the plaintiffs argue, that the defendants, in order to avoid the serious loss that would have resulted had the sale to John Burke "not materialized" did, as a matter of conscious choice, elect not to advise Burke that the plans were inadequate as were designed with the intention that the defendants themselves would do the development." We have already discussed at length to detail how the sale came about. We sorted out the credible from the incredible. We recounted the background including, but certainly not limited to, how Burke came upon the scene, his conduct and his expertise, how thoroughly he and his representatives acted or failed to act in critical areas, and the quality and level of inquiry into the project itself by Burke and his agents. We have discussed what duty rested upon the parties. We specifically rejected and do so again this imputation of "a conscious choice" by the defendant not to advise Burke of the claimed inadequacy of the plans. This is not so. Of course, the defendants had intended as developers to go ahead and use the plans. The plaintiffs are strangely silent about the credible evidence that shop drawings are customarily forthcoming once construction as well as the nature of design drawings. The "conscious choice" language smacks of fraud which we have already rejected.
The plaintiffs claim prejudgment interest against the individual defendants, Maitland, Strauss and Behr for breach of the 1985 contract which we decided in the second count. In our view the "demands of justice" under the circumstances cause this court, in exercising its discretion, to deny the plaintiffs' claim for prejudgment interest in this case. CT Page 4898
Judgment may enter on the plaintiffs' amended substituted complaint in accordance with the foregoing opinion.
Arthur H. Healey State Trial Referee